# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| MATTHEW SMITH and AKILA RADHAKRISHNAN, | Civil Case No.: 1:25-cv-00158-NT |
| Plaintiffs, | INJUNCTIVE RELIEF SOUGHT |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; U.S. DEPARTMENT OF JUSTICE; PAMELA BONDI, in her official capacity as Attorney General; OFFICE OF FOREIGN ASSETS CONTROL; and LISA M. PALLUCONI, in her official capacity as Acting Director of the Office of Foreign Assets Control, | |
| Defendants. | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 3

    I.    The International Criminal Court ............................................................................... 3

    II.   President Trump's Executive Order and IEEPA .................................................... 6

    III.  The Order's Chilling Effect on Plaintiffs' Speech ............................................. 7

ARGUMENT ................................................................................................................... 11

    I.    Legal Standard ........................................................................................................ 11

    II.   Plaintiffs Are Likely to Succeed on the Merits. .................................................... 12

          A.  The Order Violates the First Amendment. ............................................. 12

          B.  The Order's Speech Restrictions Are *Ultra Vires*. ................................. 15

    III.  Absent a Preliminary Injunction, the Order's Speech Ban Will Continue to Cause Irreparable Harm. .................................................................................................... 17

    IV.  The Balance of Equities and the Public Interest Favor Injunctive Relief. ......................... 18

CONCLUSION ................................................................................................................. 19

# TABLE OF AUTHORITIES

## Cases

*Ams. for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021)................................................................................15

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,*
  564 U.S. 721 (2011) ............................................................................. 13

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) ............................................................................. 16

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004) ............................................................................. 11

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
  591 U.S. 610 (2020) ............................................................................. 13

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) ........................................................................ 13, 14

*Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.,*
  721 F.Supp.3d 31 (D. Me. 2024)........................................................... 11

*Chamber of Com. v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) .............................................................. 16

*Chevron, U.S.A., Inc. v. NRDC,*
  467 U.S. 837 (1984) ............................................................................. 16

*Comcast of Me./N.H., Inc. v. Mills,*
  435 F.Supp.3d 228 (D. Me. 2019).......................................................... 18

Comcast of Me./N.H., Inc. v. Mills,
  988 F.3d 607 (1st Cir. 2021) ................................................................. 18

*Elrod v. Burns,*
  427 U.S. 347 (1976)............................................................................... 17

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024)............................................................................... 16

*Maceira v. Pagan,*
  649 F.2d 8 (1st Cir. 1981) ..................................................................... 18

*McCullen v. Coakley,*
  573 U.S. 464 (2014)............................................................................... 15

*Melendres v. Arpaio,*
  695 F.3d 990 (9th Cir. 2012) ................................................................. 18

*Open Soc'y Just. Initiative v. Trump,*
  20-cv-8121 (S.D.N.Y. Nov. 9, 2020) ..................................................... 17

*Open Soc'y Just. Initiative v. Trump,*
    510 F.Supp.3d 198 (S.D.N.Y. 2021) ..................................................... passim

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205,*
    391 U.S. 563 (1968)........................................................................ 18

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015)........................................................................ 13

*Reno v. ACLU,*
    521 U.S. 844 (1997)........................................................................ 15

*Rideout v. Gardner,*
    838 F.3d 65 (1st Cir. 2016) ............................................................. 14

*Rodriguez v. Robbins,*
    715 F.3d 1127 (9th Cir. 2013) ......................................................... 19

*Rosaura Bldg. Corp. v. Mun. of Mayagüez,*
    778 F.3d 55 (1st Cir. 2015) ............................................................. 18

*Sable Commc'ns of Cal., Inc. v. FCC,*
    492 U.S. 115 (1989)........................................................................ 15

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
    699 F.3d 1 (1st Cir. 2012) ............................................... 11, 17, 18

*Thompson v. W. States Med. Ctr.,*
    535 U.S. 357 (2002)........................................................................ 15

*TikTok Inc. v. Trump,*
    490 F. Supp. 3d 73 (D.D.C. 2020) .................................................. 19

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994)........................................................................ 14

*United States v. Amirnazmi,*
    645 F.3d 564 (3d Cir. 2011) ........................................................... 16

*United States v. Griffith,*
    515 F.Supp.3d 106 (S.D.N.Y. 2021) ............................................... 16

*United States v. Playboy Ent. Grp., Inc.,*
    529 U.S. 803 (2000)......................................................... 11, 13, 15

*Winter v. NRDC,*
    555 U.S. 7 (2008)........................................................................... 11

**Statutes**

22 U.S.C. § 7433(a) ............................................................................ 3, 5, 14

50 U.S.C. § 1701 .................................................................................... 2

50 U.S.C. § 1702(b)(3) ................................................................. 2, 15, 16, 17

50 U.S.C. § 1705(b) ..................................................................................................7

50 U.S.C. § 1705(c) ..................................................................................................7

**Other Authorities**

Carnegie Mellon Univ., *Informational Material*, Ontology of Pers. Info......................16

Charlie Savage, *Biden Orders U.S. to Share Evidence of Russian War Crimes With Hague Court*, N.Y. Times (Jul. 26, 2023) ...................................................5

Daily Press Briefing, Sean McCormack, Spokesman, U.S. Dep't of State (Feb. 27, 2007) ................................................................................................................4

Exec. Order No. 13928, "Blocking Property of Certain Persons Associated with the International Criminal Court," 85 Fed. Reg. 36139 (June 15, 2020)........................7

Executive Order 14203, "Imposing Sanctions on the International Criminal Court," 90 Fed. Reg. 9369 (Feb. 6, 2025) .................................................1, 2, 6, 12

*Frequently Asked Questions: Hong Kong-Related Sanctions*, U.S. Dep't of the Treasury (Sept. 25, 2020)..............................................................................12

Press Statement, Antony J. Blinken, Sec'y of State, U.S. Dep't of State, Taliban Bans Women from Receiving Medical Training (Dec. 11, 2024) ...................................5

Remarks, Beth Van Schaack, Amb.-at-Large for Glob. Crim. Just., Statement of the United States at the 22nd Session of the Assembly of States Parties of the International Criminal Court (Dec. 8, 2023)....................................................5

Remarks, Michael R. Pompeo, Sec'y of State, U.S. Dep't of State, Secretary Michael R. Pompeo at Afghanistan Signing Ceremony (Feb. 29, 2020)..............................5

Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90 .................3, 4

*Statement of ICC Prosecutor Karim A.A. Khan KC: Applications for Arrest Warrants in the Situation in the State of Palestine*, ICC (May 20, 2024) ..............................6

*Statement of The Prosecutor of the International Criminal Court, Karim A. A. Khan QC, Following the Application for an Expedited Order Under Article 18(2) Seeking Authorisation to Resume Investigations in the Situation in Afghanistan*, ICC. (Sept. 27, 2021) .................................................................................................5

*The States Parties to the Rome Statute*, ICC, https://perma.cc/ADW6-CB8K...............................3

**Rules**

ICC R. P. & Evid. 11 ..................................................................................................4

**Regulations**

31 C.F.R. § 539.201 ..................................................................................................7

iv

31 C.F.R. § 560 ........................................................................................................ 7

31 C.F.R. §510.201 .................................................................................................. 7

**International Cases**

*Prosecutor v. Al Mahdi*,
    ICC-01/12-01/15-171, Judgment and Sentence (Sept. 27, 2016) ................................. 4

*Prosecutor v. Lubanga Dyilo*,
    ICC-01/04-01/06-2842, Judgment (Apr. 5, 2012) .................................................. 4

*Prosecutor v. Ongwen*,
    ICC-02/04-01/15-1762, Trial Judgment (Feb. 4, 2021) ........................................... 4

Plaintiffs Matthew Smith and Akila Radhakrishnan, pursuant to Federal Rule of Civil Procedure 65, respectfully move for a preliminary injunction prohibiting Defendants from imposing civil or criminal penalties on them, under section 3 of Executive Order 14203 and the International Emergency Economic Powers Act, based on their provision of speech-based services to the International Criminal Court's Office of the Prosecutor.

## INTRODUCTION

Plaintiffs are U.S. citizens who have dedicated their lives to pursuing accountability for human rights violations. They do this by, among other things, gathering and analyzing evidence of atrocities, interviewing victims, authoring reports, and providing expert policy analysis. Assisting the International Criminal Court, particularly its Office of the Prosecutor, is a core part of their work.[1] For example, Mr. Smith has provided the OTP with evidence of the genocide, torture, and forced deportation of Myanmar's Rohingya people, and has helped the OTP analyze and develop new sources of evidence regarding related atrocity crimes in Myanmar and Bangladesh. Ms. Radhakrishnan has advised the OTP on investigating sexual and gender-based violence committed against Afghan women under the Taliban, has helped the OTP develop policies on sexual and gender-based violence, and has advocated with the OTP to investigate genocides by ISIS against the Yazidi people in Iraq and Syria, and by Myanmar's junta against the Rohingya people in that country.

Plaintiffs' work with the OTP is speech protected by the First Amendment, but Executive Order 14203, "Imposing Sanctions on the International Criminal Court" (the "Order"), has brought it to a halt. The Order, purporting to exercise authority Congress granted to the President in the

---

[1] Plaintiffs refer to the International Criminal Court as the "ICC" and the Office of the Prosecutor as the "OTP."

International Emergency Economic Powers Act ("IEEPA"), imposes economic sanctions on the ICC's chief prosecutor (the "Prosecutor"). It also prohibits Americans from providing "services" for the benefit of the Prosecutor, who runs, and is ultimately responsible for, the OTP. Order § 3(a).

The Order imposes a content-based ban on speech—in particular, speech that benefits the Prosecutor, including by helping him investigate and prosecute atrocities. Content-based bans on speech are presumptively unconstitutional, and this one is unlawful twice over. It violates the First Amendment because it does not come close to satisfying strict scrutiny. It also exceeds the executive's authority under IEEPA. 50 U.S.C. § 1701 et seq. In IEEPA, Congress authorized the executive to impose economic sanctions in response to certain national emergencies. But this authorization came with an important limit: Congress expressly prohibited the executive from using IEEPA to regulate "information or informational materials." *Id.* § 1702(b)(3). That is exactly what the Order does, rendering it *ultra vires*.

Each day the Order's unconstitutional and *ultra vires* ban on speech remains in effect, it chills protected expression. A preliminary injunction is necessary to stop that ongoing and irreparable harm. In granting one, the Court would not break new ground. Five years ago, the first Trump administration issued a similar executive order imposing sanctions targeting two top OTP officials. That order, like this one, faced prompt legal challenges, and a federal court preliminarily enjoined its enforcement, holding that it likely violated the First Amendment rights of plaintiffs who provided the OTP with services akin to those Plaintiffs here provide. *See Open Soc'y Just. Initiative v. Trump*, 510 F.Supp.3d 198, 209–13 (S.D.N.Y. 2021). Likewise, the Court should preliminarily enjoin Defendants from implementing or enforcing this Order's speech restriction.

## BACKGROUND

### I.    The International Criminal Court

For decades, the United States has played a central role in the movement for international criminal justice. It was a driving force behind the effort to hold Nazi-era war criminals to account through the Nuremberg Trials, and during the latter half of the 20th century, it supported the creation of international criminal tribunals to address unspeakable horrors committed in Cambodia, the former Yugoslavia, Rwanda, Sierra Leone, and other conflict zones.

The ICC is the culmination of that global movement. A permanent court based in The Hague, the ICC was created in 1998 by at treaty known as the "Rome Statute." *See* Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90. Today, 125 countries—"States Parties"—have ratified or acceded to the Rome Statue, including 30 of the 32 members of NATO.[2] The United States has not ratified the Rome Statute, and at times, it has sharply criticized the ICC. Nevertheless, both Republican and Democratic administrations have also supported critical aspects of the ICC's work, as has Congress. *See, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. K, tit. VII, 136 Stat. 4459, 5092 (2022) (codified in relevant part at 22 U.S.C. § 7433(a)) (authorizing U.S. government cooperation with ICC respecting investigation of Russian atrocity crimes committed in invasion of Ukraine).

The Rome Statute gives the ICC jurisdiction over genocide, war crimes, and crimes against humanity—collectively, "atrocity crimes." Rome Stat. art. 5. This authority is limited by foundational respect for national sovereignty: under the Rome Statute, the ICC's jurisdiction is "complementary to national criminal jurisdictions," *id*. art. 1, and exists only where national legal systems prove unable or unwilling to provide meaningful redress for atrocity crimes, *id.* art 17(1).

---

[2] *See The States Parties to the Rome Statute*, ICC, https://perma.cc/ADW6-CB8K.

Matters before the ICC follow robust procedures spelled out in the Rome Statute. The Prosecutor—leading the OTP—plays a critical role in these procedures. *See* Compl. ¶¶ 28–41. Among other things, the Prosecutor is responsible for conducting preliminary examinations and formal investigations of atrocity crimes, and for prosecuting those allegedly responsible. The Prosecutor has full authority over OTP investigations and prosecutions, as well as certain "inherent powers"—including determining whether to seek authorization to conduct a formal investigation and "analys[ing] the seriousness" of "information on crimes within the jurisdiction of the" ICC. Rome Stat. art. 15; *see id.* art. 42(2), 53, 54(1)(a)–(b); ICC R. P. & Evid. 11.[3]

Over time, often with the United States' support, the OTP has successfully prosecuted atrocity crimes in various conflict zones. *See* Compl. ¶ 42 n. 5–19. These include, for instance, the conviction of a Congolese warlord for enlisting and conscripting children,[4] an Al-Qaeda–aligned militant for intentionally directing attacks against religious shrines and historic buildings,[5] and a former Lord's Resistance Army commander for forced marriage, torture, rape, and sexual slavery perpetrated against civilians in Uganda.[6] The OTP's critical work continues today. Its current probes and prosecutions—all supported in one form or another by the United States—include investigations to which Plaintiffs have contributed, as well as investigations into the genocide in Darfur;[7] arbitrary detentions, torture, rape and sexual violence, and persecution perpetrated by the

---

[3] Official Records of the Assembly of States Parties to the Rome Statute of the International Criminal Court, First session, New York ICC-ASP/1/3 and Corr.1, part II.A (Sept. 3–10, 2002). Available at https://perma.cc/T3JT-C8J2.

[4] *See Prosecutor v. Lubanga Dyilo*, ICC-01/04-01/06-2842, Judgment (Apr. 5, 2012).

[5] *See Prosecutor v. Al Mahdi*, ICC-01/12-01/15-171, Judgment and Sentence (Sept. 27, 2016).

[6] *See Prosecutor v. Ongwen*, ICC-02/04-01/15-1762, Trial Judgment (Feb. 4, 2021)

[7] *See, e.g.*, Daily Press Briefing, Sean McCormack, Spokesman, U.S. Dep't of State (Feb. 27, 2007), https://perma.cc/SEZ5-GNJY.

Maduro regime in Venezuela;[8] and war crimes and forced deportations committed in Ukraine and Georgia during Russia's invasions of those countries.[9]

The OTP has also opened investigations into alleged crimes related to the situations in Afghanistan and Palestine. The Afghanistan proceedings—first announced 18 years ago—initially encompassed crimes allegedly committed by Taliban forces, Afghan security forces, and U.S. military and Central Intelligence Agency personnel. But more than three years ago, the Prosecutor announced that he had "deprioritse[d]" all aspects of the investigation involving U.S. personnel, nullifying any realistic prospect of the investigation leading to U.S. personnel's prosecution.[10] The current Afghanistan investigation, which targets the Taliban, aligns with longstanding foreign policy positions adopted across U.S. administrations.[11] That investigation is ongoing. As for the

---

[8] *See, e.g.*, Remarks, Beth Van Schaack, Amb.-at-Large for Glob. Crim. Just., Statement of the United States at the 22nd Session of the Assembly of States Parties of the International Criminal Court (Dec. 8, 2023), https://perma.cc/Z9W5-ULYQ (The United States is "providing practical assistance to the OTP across a range of its investigations. We are helping the [ICC] track fugitives across several situations, including through offering rewards for their arrest. With others, we are providing input and commentary on the OTP's policy papers. We are convening meetings with experts from the U.S. government, the private sector, the Court, and other accountability mechanisms to identify practical solutions to some of the most difficult challenges facing international justice actors, including with respect to witness protection, insider witnesses, and cybersecurity.").

[9] *See, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. K, tit. VII, 136 Stat. 4459, 5092 (2022) (codified in relevant part at 22 U.S.C. § 7433(a)); Charlie Savage, *Biden Orders U.S. to Share Evidence of Russian War Crimes With Hague Court*, N.Y. Times (Jul. 26, 2023), https://www.nytimes.com/2023/07/26/us/politics/biden-russia-war-crimes-hague.html.

[10] *Statement of The Prosecutor of the International Criminal Court, Karim A. A. Khan QC, Following the Application for an Expedited Order Under Article 18(2) Seeking Authorisation to Resume Investigations in the Situation in Afghanistan*, ICC. (Sept. 27, 2021), https://www.icc-cpi.int/news/statement-prosecutor-international-criminal-court-karim-khan-qc-following-application.

[11] *See, e.g.*, Press Statement, Antony J. Blinken, Sec'y of State, U.S. Dep't of State, Taliban Bans Women from Receiving Medical Training (Dec. 11, 2024), https://perma.cc/S93F-2U7Z; Remarks, Michael R. Pompeo, Sec'y of State, U.S. Dep't of State, Secretary Michael R. Pompeo at Afghanistan Signing Ceremony (Feb. 29, 2020), https://perma.cc/3U28-7VN4.

Palestine investigation, the OTP has sought five arrest warrants: three against Hamas leaders and two against Israeli officials.[12]

## II.    President Trump's Executive Order and IEEPA

President Trump issued the Order on February 6, 2025. The Order asserts that "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States."[13] 90 Fed. Reg. 9369 at 9370. Such an emergency now exists, says the Order, because the ICC has "asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel," and issued "arrest warrants targeting" the Israeli Prime Minister and a Former Minister of Defense. *Id.* at 9369.

In response to this purported emergency, the Order invokes certain authorities that Congress granted to the executive in IEEPA, blocking "[a]ll property and interests in property" under U.S. jurisdiction belonging to the Prosecutor, *id.* § 1(a)(i), or to others whom the Secretary of State, in consultation with other officials, may designate, *id.* §§ 1(a)(ii)(A), (B). Especially important here, the Order prohibits "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked" under the Order. *Id.* § 3(a). Likewise, it prohibits "the receipt of any contribution or

---

[12] *See Statement of ICC Prosecutor Karim A.A. Khan KC: Applications for Arrest Warrants in the Situation in the State of Palestine*, ICC (May 20, 2024), https://www.icc-cpi.int/news/statement-icc-prosecutor-karim-aa-khan-kc-applications-arrest-warrants-situation-state.

[13] The Order's definition of "protected person" includes "any United States Person, unless the United States provides formal consent to ICC jurisdiction over that person or becomes a state party to the Rome Statute" or "any foreign person that is a citizen or lawful resident of an ally of the United States that has not consented to ICC jurisdiction over that person or is not a state party to the Rome Statute." Order § 8(d).

provision of funds, goods, or services from" any person whose property and interests in property are blocked. *Id.* § 3(b).

Presidents have historically used IEEPA authority to address the proliferation of weapons of mass destruction or the acts of foreign adversaries, like Iran and North Korea. *See, e.g.*, 31 C.F.R. § 539.201 (nuclear proliferation); 31 C.F.R. § 560 (Iran); 31 C.F.R. §510.201 (North Korea). Only once before has a president attempted to wield IEEPA to sanction people pursuing justice at an international court or body: in 2020, during his first term, President Trump issued an executive order imposing similar sanctions for similar reasons. *See* Exec. Order No. 13928, "Blocking Property of Certain Persons Associated with the International Criminal Court," 85 Fed. Reg. 36139 (June 15, 2020). That order promptly faced legal challenges, and the U.S. District Court for the Southern District of New York enjoined it, holding that it likely violated the First Amendment. *Open Soc'y*, 510 F.Supp.3d at 209–13.

The consequences of violating IEEPA sanctions can be severe. A person who violates IEEPA sanctions may be subject to a civil penalty equaling the greater of $377,700 or twice the value of the transaction giving rise to the violation. 50 U.S.C. § 1705(b); 90 Fed. Reg. 3687, 3688 (Jan. 15, 2025). A person who willfully violates IEEPA sanctions, attempts or conspires to do so, or aids and abets a violation faces criminal fines of up to $1,000,000 and up to twenty years in prison. 50 U.S.C. § 1705(c).

## III.    The Order's Chilling Effect on Plaintiffs' Speech

Plaintiffs Matthew Smith and Akila Radhakrishnan are human rights advocates who have been forced to halt their speech to the OTP because the Order imposes a substantial risk that their speech would expose them to harsh civil and/or criminal penalties under IEEPA.

Plaintiff Smith is the co-founder and Chief Executive Officer of Fortify Rights, an award-winning nongovernmental organization. He has long assisted the OTP's investigation of atrocity

crimes largely committed by Myanmar's military against the Rohingya population. Decl. of Matthew Smith ¶¶ 4–5. For example, he has provided the OTP with Fortify Rights publications detailing evidence of atrocity crimes in Myanmar and Bangladesh (including, *inter alia*, evidence of massacres of and the systematic denial of nationality and citizenship to the Rohingya), as well as direct evidence of such crimes (including official Myanmar government documents from the time of the Rohingya genocide) and the identities of potential witnesses. *Id.* ¶¶ 4–9. He has also communicated with OTP officials to discuss and advise on the Prosecutor's investigation, including the staff leading the Bangladesh/Myanmar investigation, international cooperation advisers, a Special Advisor to the Prosecutor, and a Country Expert. *Id.* ¶ 5.

The Order has forced Plaintiff Smith to stop providing evidence and information to the OTP. For example, before the Order issued, Plaintiff Smith planned to provide the OTP with newly discovered details of ongoing mass atrocity crimes committed by non-state actors in Myanmar. *Id.* ¶ 10. He planned to provide the OTP with information—known only to Fortify Rights—identifying members of the Myanmar military junta who may be criminally liable for their role in deadly airstrikes against civilian targets. *Id.* He planned to provide the OTP with information that would help it expand its jurisdiction to investigate ongoing atrocities in Myanmar, including information shared with him personally by the President of Timor-Leste. *Id.* And he planned to organize a delegation from Myanmar to The Hague, which, according to an OTP representative, would have been helpful in explaining why the OTP's jurisdiction should expand to encompass more crimes being committed in Myanmar. *Id.* ¶ 11. Because of the Order, he is unable to carry out any of these plans.

Moreover, on March 18, 2025, Plaintiff Smith and Fortify Rights published a report on widespread, heinous violence committed against Rohingya refugees in Bangladesh by Rohingya-

led militant groups. *Id.* ¶ 12. That same day, Bangladeshi authorities arrested the leader of an armed group featured in the report. *Id.* If not for the Order, Plaintiff Smith would immediately have communicated with OTP staff about liaising with local authorities in Dhaka, Bangladesh to help ensure that OTP could take custody of the arrested militant leader. *Id.* But because of the Order, he did not.

Plaintiff Akila Radhakrishnan is a leading proponent of gender justice and women's rights, as well as an expert in international human rights and criminal law. Decl. of Akila Radhakrishnan ¶ 2. She has worked with the OTP and ICC both as an external advocate and as an expert consultant since around 2014, when she served as Legal Director for the Global Justice Center. *Id.* ¶ 4. She currently serves as a Legal Advisor for the End Gender Apartheid Campaign, which focuses on sexual and gender-based rights violations and crimes in Iran and Afghanistan. *Id.* ¶ 2. Plaintiff Radhakrishnan's work with the OTP and ICC focuses on matters involving sexual and gender-based violence; it includes preparing and filing Article 15 submissions with the OTP, advising victim communities on possible legal recourse before the ICC, arguing as an amicus in connection with ICC prosecutions, facilitating discussions between OTP personnel and victim communities, advising the OTP on the investigation and prosecution of sexual and gender-based crimes, and consulting with the OTP on its internal policies. *Id.* ¶ 5.

For example, in 2017, Plaintiff Radhakrishnan prepared a filing to the OTP urging it to investigate ISIS's genocide against the Yazidi people, in support of a submission to the ICC from two Yazidi partner organizations. *Id.* ¶ 6. Plaintiff Radhakrishnan engaged in direct advocacy with the OTP on the filing and supported the Yazidi partners in their own advocacy. *Id.* More recently, in December 2024, Plaintiff Radhakrishnan accompanied a group of eight Afghan women to The Hague. *Id.* ¶ 8. There, they met with the OTP's Afghanistan situation team, as well as other relevant

OTP staff, with whom they discussed the status and scope of the Prosecutor's investigation into systematic Taliban violations of women's rights and gender-based crimes. *Id.* Their meeting also covered ways in which civil society could support the OTP through providing documentation, evidence, and legal expertise. *Id.*

Plaintiff Radhakrishnan has also provided expert advice to the OTP on its ongoing development of policies relating to gender justice, as well as its development of policies relating to gender persecution (2022), gender-based crimes (2023), and slavery crimes (2024). *Id.* ¶ 9. In doing so, she has regularly engaged with OTP staff at all levels, including the Deputy Prosecutor, staff focused on sexual and gender-based violence, and multiple Special Advisors to the Prosecutor. *Id.*

Moreover, since November 2019, Plaintiff Radhakrishnan has facilitated the OTP's engagement with Rohingya partner organizations and experts who seek to contribute to the Prosecutor's investigation of the situation in Bangladesh/Myanmar. *Id.* ¶ 7. For instance, in December 2022, Plaintiff Radhakrishnan organized and spoke on a panel during the ICC's Assembly of States Parties with Prosecutor Karim Khan on justice options for Myanmar. *Id.* More recently, following the Prosecutor's statement that he was seeking an arrest warrant for a senior Myanmar junta general, Plaintiff Radhakrishnan moderated a discussion on justice for the Rohingya that included the OTP's International Cooperation Officer on the Bangladesh/Myanmar matter. *Id.*

Plaintiff Radhakrishnan also argued as amicus in the prosecution of a Ugandan war criminal, presenting to the Appeals Chamber on the crime of forced pregnancy. *Id.* ¶ 10.

The Executive Order and designation of the Prosecutor have forced Plaintiff Radhakrishnan to stop ongoing and planned work with the OTP because of the substantial risk that

her communications will cause her to be subjected to penalties under IEEPA. *Id.* ¶ 16. For example, immediately before the Order, Plaintiff Radhakrishnan was working with Afghan partners to provide the OTP with evidence of, and other information relating to, sexual and gender-based crimes perpetrated by the Taliban in Afghanistan. *Id.* ¶ 15. Because of the Executive Order, Plaintiff Radhakrishnan had to cease her work, can no longer assist the Afghan women with whom she had been partnering in submitting evidence to the OTP, and has also been forced to abandon plans to consult with the OTP on using the concept of gender apartheid to frame its potential cases on Afghanistan. *Id.*

## ARGUMENT

### I. Legal Standard

A preliminary injunction is warranted when the movant shows that it is likely to succeed on the merits, that it will suffer irreparable harm absent relief, that the balance of the equities favors relief, and that relief is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008). "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012); *see, e.g.*, *Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*, 721 F.Supp.3d 31, 55 (D. Me. 2024). Moreover, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000). Thus, even at the preliminary injunction stage, plaintiffs challenging a speech-restrictive law "must be deemed likely to prevail unless the Government" carries its burden under the applicable First Amendment standard. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

## II.    Plaintiffs Are Likely to Succeed on the Merits.

### A.  The Order Violates the First Amendment.

The Order has forced Plaintiffs to suppress their intended speech to the OTP. Plaintiffs wish to provide the OTP with evidence, information, expert analysis, and advocacy supporting the OTP's efforts to investigate and prosecute alleged atrocity crimes committed against the Rohingya and Afghan women and girls. But under the Order, U.S. persons may not provide "services . . . to, or for the benefit of," the Prosecutor. Order § 3(a). This prohibition has chilled Plaintiffs' speech because of the substantial risk that OFAC will construe their assistance to OTP staff as a service benefitting the Prosecutor. Indeed, one federal court has concluded that providing a service in support of the OTP's investigative and prosecutorial efforts is tantamount to providing a service to the Prosecutor himself.[14] *Open Soc'y*, 510 F.Supp.3d at 212 ("As a practical matter, the distinction . . . between supporting the Office of the Prosecutor and supporting [the Prosecutor] is illusory."); *id.* ("[I]t is unclear . . . how Plaintiffs could provide services to the Office of the Prosecutor or to others involved in ICC investigations without indirectly benefitting [the Prosecutor], given that [he] is the head of the Office of the Prosecutor and oversees the investigations Plaintiffs would support if able.").

The Order's speech restriction is content-based: it targets speech depending on whether it benefits the Prosecutor. Advising the OTP on investigating and prosecuting sexual and gender-based violence, or providing it with evidence of atrocity crimes in Myanmar, is restricted;

---

[14] OFAC has cautioned that other, similarly worded sanctions regimes may reach services that indirectly involve sanctioned persons—even if provided through unsanctioned persons. For example, when foreign government officials have been designated for sanctions, OFAC has taken the position that "U.S. persons should be cautious in dealings" with the relevant foreign government "to ensure that they are not engaged in transactions or dealings, directly *or indirectly*," with the designated individuals. *E.g.*, *Frequently Asked Questions: Hong Kong-Related Sanctions*, U.S. Dep't of the Treasury (Sept. 25, 2020), https://perma.cc/P2WE-6MY6 (emphasis added).

communicating with OTP staff about the weather or soccer is not. Put differently, under the Order, whether Plaintiffs or other U.S. persons may communicate with the Prosecutor's staff in the OTP depends on what they plan to say. *See Open Soc'y*, 510 F.Supp.3d at 210–11 (concluding that an earlier, materially indistinguishable executive order prohibited speech based on content); *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("Government regulation of speech is content based if [it] applies to particular speech because of the topic discussed or the idea or message expressed.").

Content-based restrictions like the one imposed by the Order are "presumptively unconstitutional." *Reed*, 576 U.S. at 163; *see also id.* (explaining that the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content"). The government must prove that such a restriction is "narrowly tailored to serve compelling state interests." *Id.* By design, this standard is exceptionally difficult to satisfy. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) ("It is rare that a regulation restricting speech because of its content will ever be permissible.") (internal quotation marks omitted). Indeed, the Supreme Court almost invariably strikes down speech restrictions subject to strict scrutiny. *See, e.g., Reed*, 576 U.S. at 171; *Playboy*, 529 U.S. at 807; *Ent. Merchs. Ass'n*, 564 U.S. at 799; *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 621 (2020); *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 753 (2011).

Strict scrutiny is fatal here. To start, the government cannot meet its burden of proving that the Order's speech restriction serves a compelling interest—*i.e.*, an interest "of the highest order." *Reed*, 576 U.S. at 172 (cleaned up); *see also Playboy*, 529 U.S. at 816–17 (explaining that when the government restricts speech, it bears the burden of identifying and proving the existence of a compelling interest). Even when a regulation of speech is subject to less-demanding intermediate scrutiny, the government must demonstrate that "the regulation will in fact alleviate" any relevant

harms "in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994). The Order's speech restriction does nothing of the sort. Whatever the U.S. government's policy interests may be with respect to particular ICC prosecutions, the government has no compelling interest in preventing Americans' speech to an international tribunal.

But even if the government could cross the compelling-interest threshold, it would be wholly unable to establish that the Order's speech restriction is narrowly tailored, because the restriction is "vastly overinclusive." *Ent. Merchs. Ass'n*, 564 U.S. at 804. The Order purports to address ICC actions "targeting America and [its] close ally Israel." Order at 9369. Yet it bars U.S. persons, including Plaintiffs, from providing speech-based services that assist the Prosecutor in any way at all—including with investigations and prosecutions the United States has *supported*. Because the restriction is so expansive, Plaintiffs have ceased providing the OTP with evidence, information, advice, and advocacy that would assist the OTP in investigating and prosecuting atrocity crimes wholly unrelated to the "national emergency" declared in the Order, including atrocity crimes committed (a) against the Rohingya by militants in Myanmar and Bangladesh and (b) against women and girls by the Taliban in Afghanistan. By the same token, the Order bans Americans from assisting the OTP with its investigation of atrocity crimes allegedly committed in Ukraine—even though Congress has passed a law expressly permitting the United States government to do just that. Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. K, tit. VII, 136 Stat. 4459, 5092 (2022) (codified in relevant part at 22 U.S.C. § 7433(a)). The Order's speech restriction is thus a "[b]road prophylactic prohibition[] that fail[s] to respond precisely to the substantive problem" the government has identified; it therefore "cannot withstand" *any* form of heightened First Amendment scrutiny—let alone strict scrutiny. *Rideout v. Gardner*, 838 F.3d 65, 72 (1st Cir. 2016) (cleaned up).

14

Notably, the Order's breadth "imposes an especially heavy burden on the Government to explain why a less restrictive provision would not be as effective." *Reno v. ACLU*, 521 U.S. 844, 879 (1997); *see also Playboy*, 529 U.S. at 816 (explaining that when "a plausible, less restrictive alternative" to "a content-based speech restriction" exists, the Government bears "the obligation to prove that the alternative will be ineffective"). Alternatives are readily conceivable. For instance, the Order could have explicitly exempted speech-based services from the prohibitions in Section 3(a). Yet there is no indication "that the Government even considered" alternative, less speech-restrictive means of addressing the "national emergency" declared in the Order. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). That is fatal. *See id.*; *McCullen v. Coakley*, 573 U.S. 464, 494 (2014); *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 130 (1989).

Finally, the Order's restriction on providing "services" to the Prosecutor is unlawful because it is overbroad. That is, even if it may be legitimately applied to some set of non-speech services, "a substantial number of its applications are unconstitutional," because it chills a vast and lopsided amount of protected expression—as its chilling effect on Plaintiffs and numerous others like them well illustrates. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 598 (2021).

### B.  The Order's Speech Restrictions Are *Ultra Vires*.

The Order's speech restrictions are also unlawful because they exceed the authority Congress granted to the executive in IEEPA. IEEPA plainly states that the President's authority to impose sanctions "does not include the authority to regulate or prohibit, directly or indirectly," the import or export of "information or informational materials," "regardless of format or medium of transmission." 50 U.S.C. § 1702(b)(3). The "best reading" of this provision is that it prohibits the executive from regulating Plaintiffs' speech to the OTP. *Loper Bright Enters. v. Raimondo*, 603

15

U.S. 369, 373 (2024).[15] The phrase "informational materials" ordinarily means "any type of content that is designed to provide information or educate the audience on a specific topic."[16] Consistent with this reading, when Congress added IEEPA's carveout for information and informational materials, it explicitly intended to ensure that any sanctions imposed under the statute would not restrict "information that is protected under the First Amendment." H.R. Rep. No. 103-482 at 239 (1994) (Conf. Rep.). Congress recognized that the transfer of information and informational materials provided a way for Americans to "encourag[e] democracy and human rights abroad," and for that reason, among others, Congress made clear that IEEPA's speech protections have a "broad scope." *Id.*

Plaintiffs have a cause of action to seek equitable relief enforcing 50 U.S.C. § 1702(b)(3). *See Open Soc'y*, 510 F.Supp.3d at 214 ("[T]he Court may review the challenged Executive Order and the Regulations for their compliance with the statute that purportedly authorizes their issuance."); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority. . . . [I]t is now well established that review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive" (cleaned up)); *cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015) ("[W]e have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law. . . . [T]hat has been true not only with respect

---

[15] Courts have sometimes deferred to OFAC's narrow interpretations of the informational materials limitation under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). *See, e.g.*, *United States v. Amirnazmi*, 645 F.3d 564, 586–88 (3d Cir. 2011); *United States v. Griffith*, 515 F.Supp.3d 106, 117 (S.D.N.Y. 2021). Because the Supreme Court has overruled *Chevron*, *see Loper Bright*, 603 U.S. at 412–13, such deference is no longer warranted.

[16] Carnegie Mellon Univ., *Informational Material*, Ontology of Pers. Info., https://perma.cc/TB62-VUSF.

to violations of federal law by state officials, but also with respect to violations of federal law by federal officials.").

Here, contrary to the statute's plain text and Congress's stated intent, OFAC takes a crabbed view of IEEPA's carveout for information and informational materials. According to OFAC, 50 U.S.C. § 1702(b)(3) protects only information or informational materials fully created and in existence at the time of the transaction with the sanctioned person. *See, e.g.*, 31 C.F.R. § 560.210(c)(2). When the first Trump Administration imposed sanctions targeting the OTP, OFAC insisted that training, technical assistance, and presentations to the OTP, as well as *amicus curiae* briefs supporting the OTP's efforts, were not exempt from the order's restrictions. *See* Defs.' Mem. of Law in Opp. to Pls.' Mot. for a Preliminary Injunction, *Open Soc'y Just. Initiative v. Trump*, 20-cv-8121 (S.D.N.Y. Nov. 9, 2020), ECF No. 51, at 23–24. There is no indication that OFAC has changed course, giving rise to a substantial risk—if not a certainty—that OFAC, in implementing the Order, will ban the international flow of information and informational materials "to, or for the benefit of" the Prosecutor. Order § 3(a). This ban directly impacts Plaintiffs' work. Each Plaintiff has previously transmitted and had concrete plans to continue transmitting information and informational materials, including legal filings and publications detailing evidence of atrocity crimes, to members of the Prosecutor's staff to support the Prosecutor's work. *See generally* Decl. of Matthew Smith; Decl. of Akila Radhakrishnan. By prohibiting Plaintiffs from providing the OTP with information and informational materials, the Order flouts IEEPA's plain text and undermines Congress's efforts to protect First Amendment rights. It is therefore *ultra vires*.

## III.  Absent a Preliminary Injunction, the Order's Speech Ban Will Continue to Cause Irreparable Harm.

"It is well established that the loss of First Amendment freedoms constitutes irreparable injury." *Fortuño*, 699 F.3d at 11 (cleaned up); *see also Elrod v. Burns*, 427 U.S. 347, 373–74 (1976)

(plurality opinion)). "Accordingly, irreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim." *Fortuño*, 699 F.3d at 11. Indeed, the irreparable harm requirement is satisfied when movants "have made out a plausible claim of a 'chilling effect' on the exercise of their rights of expression." *Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981). Plaintiffs have done so. Each Plaintiff had planned to continue providing speech-based services to the OTP, for the ultimate benefit of the Prosecutor, before President Trump issued the Order. But the Order has forced each Plaintiff to abandon those plans. *See* Decl. of Matthew Smith ¶¶ 10–13; Decl. of Akila Radhakrishnan ¶¶ 15–16. These are ongoing injuries, and the chill on Plaintiffs' exercise of their First Amendment rights will continue to harm them and other U.S. persons who wish to provide speech-based services benefitting the Prosecutor.

## IV.    The Balance of Equities and the Public Interest Favor Injunctive Relief.

"The public interest is served by protecting First Amendment rights from likely unconstitutional infringement." *Comcast of Me./N.H., Inc. v. Mills*, 435 F.Supp.3d 228, 250 (D. Me. 2019), *aff'd*, 988 F.3d 607 (1st Cir. 2021). Indeed, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned up). That is especially true of violations of the First Amendment, which "guarantees the 'public interest in having free and unhindered debate on matters of public importance.'" *Rosaura Bldg. Corp. v. Mun. of Mayagüez*, 778 F.3d 55, 66 (1st Cir. 2015) (quoting *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 573 (1968)).

As explained above, the Order unlawfully restricts the speech of U.S. persons, including Plaintiffs, who wish to assist the OTP with its examinations, investigations, or prosecutions. A preliminary injunction would prevent that violation of speech rights pending a full hearing on the merits. And such an order would pose no hardship for the government, which lacks any interest in enforcing unconstitutional or *ultra vires* prohibitions. *See, e.g.*, *Rodriguez v. Robbins*, 715 F.3d

1127, 1145 (9th Cir. 2013); *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) ("[T]he government cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.") (cleaned up). By contrast, the injury to Plaintiffs and others like them is acute and ongoing.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion for a preliminary injunction and enjoin Defendants from imposing civil or criminal penalties on them, under section 3 of the Order and IEEPA, based on their provision of speech-based services to the OTP.

April 25, 2025                                    Respectfully submitted,

<table>
<tr><td>/s/ Carol J. Garvan</td><td>/s/ Charles Hogle</td></tr>
<tr><td>Carol J. Garvan<br>AMERICAN CIVIL LIBERTIES UNION<br>OF MAINE FOUNDATION<br>PO Box 7860<br>Portland, Maine 04112<br>(207) 619-8687<br>cgarvan@aclumaine.org</td><td>Charles Hogle*<br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION<br>125 Broad Street, 18th Floor<br>New York, New York 10004<br>(212) 549-2660<br>charlie.hogle@aclu.org</td></tr>
<tr><td>/s/ Zachary Heiden</td><td>/s/ Ashley Gorski</td></tr>
<tr><td>Zachary Heiden<br>AMERICAN CIVIL LIBERTIES UNION<br>OF MAINE FOUNDATION<br>PO Box 7860<br>Portland, Maine 04112<br>(207) 619-6224<br>zheiden@aclumaine.org</td><td>Ashley Gorski*<br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION<br>125 Broad Street, 18th Floor<br>New York, New York 10004<br>(212) 549-2660<br>agorski@aclu.org</td></tr>
<tr><td>/s/ Anahita D. Sotoohi</td><td>/s/ Hina Shamsi</td></tr>
<tr><td>Anahita D. Sotoohi<br>AMERICAN CIVIL LIBERTIES UNION<br>OF MAINE FOUNDATION<br>PO Box 7860<br>Portland, Maine 04112<br>(207) 613-4350<br>asotoohi@aclumaine.org</td><td>Hina Shamsi*<br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION<br>125 Broad Street, 18th Floor<br>New York, New York 10004<br>(212) 549-2660<br>hshamsi@aclu.org</td></tr>
</table>

ATTORNEYS FOR PLAINTIFFS
*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on the date below, I electronically filed the foregoing document, Plaintiffs' Motion for Preliminary Injunction with Incorporated Memorandum of Law, via the Court's CM/ECF system, and emailed a copy of same to the following individuals:

Craig M. Wolff
Acting United States Attorney for the District of Maine
craig.wolff@usdoj.gov

Andrew K. Lizotte
Assistant United States Attorney for the District of Maine
Andrew.Lizotte@usdoj.gov

Dated: April 25, 2025                    */s/ Charles Hogle*

                    Charles Hogle
                    AMERICAN CIVIL LIBERTIES UNION
                    FOUNDATION
                    125 Broad Street, 18th Floor
                    New York, New York 10004
                    (212) 549-2660
                    charlie.hogle@aclu.org
                    Admitted *pro hac vice*