# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

MATTHEW SMITH and
AKILA RADHAKRISHNAN,

    *Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

    *Defendants*.

No.: 1:25-cv-00158-NT

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 2

I.    The International Emergency Economic Powers Act ........................................... 2

II.   Executive Order No. 14,203 ............................................................................... 4

III.  Plaintiffs' Lawsuit ............................................................................................. 7

ARGUMENT ............................................................................................................. 9

I.    Legal Standard .................................................................................................. 9

II.   Plaintiffs Cannot Show a Substantial Likelihood of Success on the Merits of Any of Their Claims. ................................................................................................................ 10

    A.   Plaintiffs Are Not Likely to Succeed on Their First Amendment Claim ................... 10

        1.   Strict Scrutiny Does Not Apply Because the EO is Content Neutral ................. 10

        2.   The EO Satisfies Both Intermediate Scrutiny and Strict Scrutiny ..................... 13

    B.   Plaintiffs Are Not Likely to Succeed on Their *Ultra Vires* Claim .............................. 17

III.  Plaintiffs Do Not Meet the Remaining Requirements to Establish Entitlement to Injunctive Relief ...................................................................................................... 19

CONCLUSION .......................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*Akebia Therapeutics, Inc. v. Azar*,
 976 F.3d 86 (1st Cir. 2020) ............................................................................... 9, 19

*Alexander v. Sandoval*,
 532 U.S. 275 (2001) ....................................................................................... 17, 18

*Ams. for Prosperity Found. v. Bonta*,
 594 U.S. 595 (2021) ....................................................................................... 16, 17

*Bank Markazi v. Peterson*,
 578 U.S. 212 (2016) .............................................................................................. 14

*Cannon v. Univ. of Chicago*,
 441 U.S. 677 (1979) .............................................................................................. 17

*Crosspoint Church v. Makin*,
 719 F. Supp. 3d 99 (D. Me. 2024) ........................................................................ 9

*Cutting v. City of Portland*,
 802 F.3d 79 (1st Cir. 2015) .................................................................................. 12

*Dames & Moore v. Regan*,
 453 U.S. 654 (1981) ................................................................................................ 2

*Does 1-6 v. Mills*,
 16 F.4th 20 (1st Cir. 2021) .................................................................................... 9

*Franklin v. Massachusetts*,
 505 U.S. 788 (1992) .............................................................................................. 18

*G.K. Ltd. Travel v. City of Lake Oswego*,
 436 F.3d 1064 (9th Cir. 2006) ............................................................................. 14

*Haig v. Agee*,
 453 U.S. 280 (1981) .............................................................................................. 14

*Holder v. Humanitarian Law Project*,
 561 U.S. 1 (2010) ....................................................................................... 13, 14, 15

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
 219 F. Supp. 2d 57 (D.D.C. 2002),
 *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ............................................................ 15, 19

*Kadi v. Geithner*,
    42 F. Supp. 3d 1 (D.D.C. 2012) ............................................................................... 13

*Kiobel v. Royal Dutch Petroleum Co.*,
    621 F.3d 111 (2d Cir. 2010),
    *aff'd*, 569 U.S. 108 (2013) ......................................................................................... 5

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001) ................................................................................................. 14

*Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Off. of Emergency Preparedness*,
    649 F.2d 71 (1st Cir. 1981),
    judgment entered, No. 1:23-CV-00146-JAW, 2024 WL 2830931 (D. Me. June 4, 2024) ........ 9

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ................................................................................................. 10

*McCullen v. Coakley*,
    571 F.3d 167 (1st Cir. 2009),
    *overruled on other grounds*, 573 U.S. 464 (2014) .................................................... 12

*McGuire v. Reilly*,
    260 F.3d 36 (1st Cir. 2001) ..................................................................................... 11

*Metromedia, Inc. v. City of San Diego*,
    453 U.S. 490 (1981) ................................................................................................. 14

*Milena Ship Mgmt. Co. v. Newcomb*,
    804 F. Supp. 846 (E.D. La. 1992) ............................................................................ 19

*Mississippi v. Johnson*,
    71 U.S. 475 (1866) ................................................................................................... 18

*Munaf v. Geren*,
    553 U.S. 674 (2008) ................................................................................................. 9

*Nieves-Marquez v. Puerto Rico*,
    353 F.3d 108 (1st Cir. 2003) ................................................................................... 9

*Nixon v. Fitzgerald*,
    457 U.S.  (1982) ..................................................................................................... 18

*Open Soc'y Just. Initiative v. Trump*,
    510 F. Supp. 3d 198 (S.D.N.Y. 2021) ................................................................. 18, 19

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015)...................................................................... 10, 12, 13

*Regan v. Wald,*
  468 U.S. 222 (1984)........................................................................ 2, 7, 14

*Rideout v. Gardner,*
  838 F.3d 65 (1st Cir. 2016)............................................................... 11

*Schickel v. Dilger,*
  925 F.3d 858 (6th Cir. 2019) ........................................................... 13

*Teague v. Reg'l Comm'r of Customs, Region II,*
  404 F.2d 441 (2d Cir. 1968).............................................................. 15

*TikTok Inc. v. Garland,*
  145 S. Ct. 57, 220 L. Ed. 2d 319 (2025) ......................................... 11

*Together Emps. v. Mass Gen. Brigham Inc.,*
  32 F.4th 82 (1st Cir. 2022)................................................................. 9

*United States v. Amirnazmi,*
  645 F.3d 564 (3d Cir. 2011)................................................................ 3

*United States v. South Carolina,*
  720 F.3d 518 (4th Cir. 2013) ........................................................... 19

*United States v. Stevens,*
  559 U.S. 460 (2010)............................................................................ 16

*Ward v. Rock Against Racism,*
  491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)...................... 11

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)................................................................. 9, 10, 19, 20

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury,*
  750 F. Supp. 2d 150 (D.D.C. 2010) ................................................ 14

## STATUTES

50 U.S.C. § 1701......................................................................................... 2

50 U.S.C. § 1701(a) .................................................................................... 2

50 U.S.C. § 1701(a)(1)(B) ................................................................................ 3

50 U.S.C. § 1702(b) .......................................................................... 3, 12, 17

50 U.S.C. § 1702(b)(3) ...................................................................... 3, 12, 18

50 U.S.C. § 1702(c) ........................................................................................ 18

50 U.S.C. § 1705(b) .......................................................................................... 4

50 U.S.C. § 1705(c) .......................................................................................... 4

50 U.S.C. § 4305(b)(1)(B) ............................................................................... 2

American Service-Members' Protection Act,
  Pub. L. No. 107-206,116 Stat. 820 (codified at 22 U.S.C. § 7421 et seq.)................................. 5

International Emergency Economic Powers Act,
  50 U.S.C. §§ 1701-1707 (1977)................................................................. 2

National Emergencies Act,
  Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601-1651) .. 3

Trading With the Enemy Act,
  40 Stat. 411 (1917) (codified as amended at 50 U.S.C. § 4301 et seq.) .................................... 2

**REGULATIONS AND EXECUTIVE ORDERS**

31 C.F.R. pt. 500 ............................................................................................... 7

31 C.F.R. pt. 501 ............................................................................................... 4

31 C.F.R. § 501.801 .......................................................................................... 7

85 Fed. Reg. 61,816 (Oct. 1, 2020)................................................................. 7

Exec. Order No. 13,219, 6 Fed. Reg. 34,777 (June 26, 2001) ...................... 3

Exec. Order No. 13,382, 70 Fed. Reg. 38,567 (June 28, 2005) .................... 3

Exec. Order No. 13,928, 85 Fed. Reg. 36,139 (June 11, 2020)................. 5, 7

Imposing Sanctions on the International Criminal Court,
  Executive Order No. 14,203, 90 Fed. Reg. 9,369 (Feb. 6, 2025) ...................................... *passim*

**OTHER AUTHORITIES**

Letter from OFAC Acting Director to Found. for Global Political Exchange, Nov. 8, 2024,
    https://perma.cc/MV2U-4QGK ............................................................................................. 11

OFAC, *Frequently Asked Question (FAQ) No. 1190*,
    https://ofac.treasury.gov/faqs/1190 ..................................................................... 12, 16, 17, 18

OFAC, *Specially Designated Nationals List*,
    https://sanctionslist.ofac.treas.gov/Home/SdnList (last visited April 29, 2025) ...................... 4

OFAC, *Specific Licenses and Interpretive Guidance*, U.S. Dep't. of Treasury,
    https://ofac.treasury.gov/ofac-license-application-page (last visited May 15, 2025) ................ 8

S. Rep. No. 95-466 at 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540 ........................................ 2

## INTRODUCTION

Executive Order 14,203, "Imposing Sanctions on the International Criminal Court" (the "EO" or the "Order"), which was issued on February 6, 2025, declares a national emergency with respect to the efforts of the International Criminal Court ("ICC") to investigate and prosecute "protected persons," as defined by the EO, not subject to the ICC's jurisdiction and provides authority to designate persons for sanctions in connection with those efforts. At present, the restrictions in this Order apply only to the sole designee under the EO—current Prosecutor of the ICC, Karim Khan—who has been listed in the Annex to this authority by the President. As a result of this listing, Plaintiffs, two individual U.S. citizens based on the United States, may not deal in the property or interests in property of the designated individual, including by providing goods, funds, or services to him or for his benefit or receiving the same from him. Plaintiffs filed this suit alleging that the EO is a content-based prohibition infringing on their First Amendment speech rights and is *ultra vires* because it regulates or prohibits conduct that is covered by an exemption to the statutory authority under which the President issued this EO.

Plaintiffs' motion for a preliminary injunction—a "drastic remedy"—should be denied because Plaintiffs cannot show they have a substantial likelihood of prevailing on any of these claims. First, Plaintiffs' as-applied First Amendment claim fails because the EO is a content-neutral restriction that advances important governmental interests unrelated to the suppression of free speech. And even if a more rigorous standard applies, which it does not, the EO is narrowly tailored to a compelling governmental national security and foreign policy interest. Second, Plaintiffs have no private right of action to bring an *ultra vires* challenge to the EO, but such a claim would fail in any event because the EO is fully consistent with the relevant statutory text.

# BACKGROUND

## I.    The International Emergency Economic Powers Act

For nearly its entire history, the United States has utilized economic sanctions as a tool of foreign policy and national security. Under current U.S. law, the International Emergency Economic Powers Act resides at the core of the United States' economic sanctions regime where the President's executive authority is expansive. The President not only exercises the expansive powers provided under IEEPA, but the President also determines the conditions under which those powers may be exercised. *See* 50 U.S.C. § 1701.

For much of the 20th century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917. *See* 40 Stat. 411 (codified as amended at 50 U.S.C. § 4301 et seq.). As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies. *See* 50 U.S.C. § 4305(b)(1)(B); *Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981). In 1977, Congress amended TWEA and enacted the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, to delineate "the President's authority to regulate international economic transactions during wars or national emergencies." *See* S. Rep. No. 95-466 at 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541. IEEPA limited TWEA's application to periods of declared wars and to certain existing TWEA programs, with IEEPA available during other times of declared national emergency. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). Under IEEPA, the President may declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States[.]" *See* 50 U.S.C. § 1701(a). Similar to TWEA, IEEPA authorized the President to:

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

*Id.* § 1702(a)(1)(B). In addition, the National Emergencies Act ("NEA"), Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601-1651), established procedures for regular congressional review over a President's national emergency declarations.

IEEPA includes several exemptions to the President's authority, including that the President may not

> regulate or prohibit, directly or indirectly . . . the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. 50 U.S.C. § 1702(b), (b)(3).

This exclusion, which Congress added to IEEPA in 1988 and expanded to include new forms of media in 1994, is part of what is commonly known as the "Berman Amendment." *United States v. Amirnazmi*, 645 F.3d 564, 584–86 (3d Cir. 2011).

Presidents have blocked persons under sanctions programs based on IEEPA in response to a variety of declared national emergencies. *See, e.g.*, Exec. Order No. 13,382, 70 Fed. Reg. 38,567 (June 28, 2005) (blocking the property and interests in property of persons who, among other things, are determined to have engaged in transactions that have materially contributed to the proliferation of weapons of mass destruction); Exec. Order No. 13,219, 66 Fed. Reg. 34,777 (June 26, 2001) (listing individual persons as blocked). In general, persons who are listed or designated under an IEEPA-based sanctions program are added to the list of "Specially Designated Nationals and Blocked Persons" (the "SDN List"), which is administered by the U.S.

3

Department of the Treasury's Office of Foreign Assets Control (OFAC).[1] Persons on the SDN List have their assets subject to U.S. jurisdiction "blocked" (i.e., frozen) and U.S. individuals and entities are generally prohibited from dealing in them. *See* 50 U.S.C. § 1705(b) (civil penalties), *id.* § 1705(c) (criminal penalties).[2]

## II.    Executive Order No. 14,203

On February 6, 2025, President Trump issued Executive Order No. 14,203, in which he determined that "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons… constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States" and declared a national emergency to address that threat." Exec. Order No. 14,203, pmbl. The EO states that the ICC has "engaged in illegitimate and baseless actions targeting America and our close ally Israel," and "without a legitimate basis[] asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel," and "issu[ed] baseless arrest warrants targeting" Israeli government officials." *Id.*

The EO is consistent with President Trump's long-maintained assessment that the ICC infringes upon the sovereignty of the United States and threatens to impede the critical national security and foreign policy work of the United States and its allies, thereby threatening the

---

[1] *See* OFAC, *Specially Designated Nationals List*, https://sanctionslist.ofac.treas.gov/Home/SdnList (last visited April 29, 2025).

[2] When determining whether to issue a civil penalty, OFAC follows a set process outlined in the agency's regulations. *See generally* 31 C.F.R. pt. 501, app. A, Economic Sanctions Enforcement Guidelines. OFAC begins by reviewing the "facts and circumstances surrounding an apparent violation," then applies a set of General Factors to determine whether to initiate a civil penalty proceeding and, where applicable, to determine the appropriate amount of a civil monetary penalty. *Id.* § 501, app. A(V). The General Factors OFAC considers include whether any apparent violation was willful or reckless, the subject person or entity's awareness of the conduct, involvement of senior management in the conduct, harm to the sanctions program objectives, and individual factors such as the commercial sophistication and size of the subject person or entity. *Id.* § 501, app. A(III). Depending on the facts and circumstances of particular cases, OFAC may determine after investigation, among other outcomes, that no response is warranted (because, for example, the conduct does not rise to a level warranting a response); that additional information is needed; that a cautionary letter should be issued; or that a violation occurred. *Id.* § 501, app. A(II).

United States' national security and foreign policy interests. *See id.*; *see also* Exec. Order No. 13,928, pmbl, 85 Fed. Reg. 36,139 (2020). The EO is also consistent with the United States' long history of objecting to the ICC's assertions of jurisdiction over U.S. personnel. The United States has never ratified the Rome Statute (the treaty establishing the ICC) and thus having never undertaken any obligations related to the ICC, nor has it agreed to subject its citizens to the ICC's jurisdiction. *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 119 n.16 (2d Cir. 2010) (describing U.S. decision to "un-sign" the Rome Statute (citation omitted)), *aff'd*, 569 U.S. 108 (2013). In 2002, the same year the ICC was established, Congress passed the American Service-Members' Protection Act ("ASPA"), Pub. L. No. 107-206, 116 Stat. 820 (codified at 22 U.S.C. § 7421 *et seq.*), which prohibits several forms of cooperation between the United States and the ICC.

Concerns about the risks to U.S. persons posed by the ICC became more pronounced in 2020 after the ICC Prosecutor requested authority to investigate alleged war crimes, including by U.S. personnel, committed during the war in Afghanistan. Such concerns about the national security risks to the United States and its allies posed by the ICC continued with the ICC's 2024 commencement of investigations into certain U.S. allies, such as Israel, which have not consented to the ICC's jurisdiction. Although Executive Order 14,203 is a direct response to the ICC Prosecutor's continued pursuit of an investigation and attempt to assert jurisdiction over the United States and its allies, the U.S. Government has long-standing concerns about the ICC, as noted above.

The President identified Karim Khan, the current ICC Prosecutor listed in the Annex to Executive Order 14,203, as subject to specified sanctions pursuant to the EO, and authorized the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General,

to designate additional foreign persons who meet certain criteria. Exec. Order No. 14,203 § 1.[3] Specifically, under Section 1 of the EO, the Secretary of State may designate foreign persons determined to have "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute" any protected person, as defined by the EO, without the consent of that person's country of nationality. Exec Order No. 14,203 § 1(a)(ii)(A). That section of the EO also authorizes the designation of foreign persons determined to have "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity in [§ 1(a)(ii)(A)]" or any person designated under the EO.[4] *Id.* § 1(a)(ii)(B).

The EO states that "[a]ll property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, of [blocked persons] may not be transferred, paid, exported, withdrawn, or otherwise dealt in[.]" *Id.* § 1(a). Section 3 of the EO specifies that this prohibition includes the making "of any contribution or provision of funds, goods, or services by, to, or for the benefit of any" person blocked pursuant to the EO, or the receipt of such funds, goods, or services from such person. *Id.* § 3(a), (b). Accordingly, absent an applicable exception or authorization, U.S. persons are prohibited from providing funds, goods, or services to, or for the benefit of, a designated or otherwise blocked person.

The EO authorizes the Secretary of the Treasury, in consultation with the Secretary of State, to "employ all powers granted to [the President] by IEEPA," to promulgate rules and regulations to carry out the purposes of the EO, and to re-delegate such functions within the

---

[3] A "foreign person" is defined to mean "not a United States person," i.e., someone who is not a United States citizen, permanent resident, alien, entity organized under the laws of the United States (including a foreign branch, subsidiary, or employee of such entity), or any person lawfully in the United States. Exec. Order No. 14,203 § 8(c), (h).

[4] The EO also authorizes the designation of foreign persons who are determined to be "owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property or interests in property are blocked pursuant to this order." Exec. Order No. 14,203 § 1(a)(ii)(C).

Department of the Treasury. EO 14,203 § 10. To date, the Department of the Treasury has not yet issued implementing regulations.[5]

### III.    Plaintiffs' Lawsuit

In this case, Plaintiffs are two U.S. citizens and human rights advocates who have allegedly interacted with the ICC in the past. They request a declaration that the EO is an unconstitutional violation of the First Amendment and *ultra vires* under IEEPA, seeking an order enjoining the Government from enforcing the EO and imposing any civil and criminal penalties authorized under IEEPA. Complaint ("Compl.") & Prayer for Relief, ECF. No. 1, ¶ 1.

According to Plaintiffs' motion papers, before the EO was issued, Plaintiff Matthew Smith "assisted the OTP's investigation of atrocity crimes largely committed by Myanmar's military against the Rohingya population" by providing the OTP with "publications detailing evidence of atrocity crimes in Myanmar and Bangladesh," "direct evidence of such crimes," and "the identities of potential witnesses" to those crimes. Pls.' Mot. for Prelim. Inj. & Inc. Mem. of Law ("Mot.") at 7-8, ECF No. 19. Plaintiff Smith has also "communicated with OTP officials to discuss and advise on the Prosecutor's investigation, including the staff leading the Bangladesh/Myanmar investigation, international cooperation advisers, a Special Advisor to the Prosecutor, and a Country Expert." *Id.* at 8. Plaintiff Smith states that the EO has forced him to stop directly providing evidence and information to the OTP. *Id.*

---

[5] OFAC has promulgated recordkeeping and procedural regulations applicable to all U.S. sanctions programs. 31 C.F.R. pt. 500; *see Regan*, 468 U.S. at 226 n.2. These regulations permit persons, including designated or blocked persons, to seek licenses from OFAC for authorization to engage in otherwise prohibited activities. 31 C.F.R. § 501.801.

As OFAC previously stated in connection with Executive Order 13,928, implementing regulations specific to Executive Order 14,203 "may include additional interpretive and definitional guidance, general licenses, and statements of licensing policy." 85 Fed. Reg. 61,816 (Oct. 1, 2020).

Plaintiff Akila Radhakrishnan's work with the OTP and the ICC has purportedly involved "preparing and filing Article 15 submissions with the OTP, advising victim communities on possible legal recourse before the ICC, arguing as an amicus in connection with ICC prosecutions, facilitating discussions between OTP personnel and victim communities, advising the OTP on the investigation and prosecution of sexual and gender-based crimes, and consulting with the OTP on its internal policies," with a focus on "sexual and gender-based rights violations and crimes in Iran and Afghanistan." *Id.* at 9. Her interactions with the OTP have allegedly included the filing of legal documents, advocating before the OTP and as amicus before the ICC, accompanying victims and witnesses to meetings with the OTP, and providing expert advice to staff at all levels of the OTP. *Id.* at 10. Plaintiff Radhakrishnan states that she stopped ongoing and planned work with the OTP because of the EO and the risk of penalties under IEEPA. *Id.* at 10-11.

To date, Plaintiffs have not submitted a request for interpretive guidance to OFAC with respect to the portion of the EO they allege would subject them to penalties. Nor have Plaintiffs submitted a request for a specific license from OFAC. *See* OFAC, *Specific Licenses and Interpretive Guidance*, U.S. Dep't. of Treasury, https://ofac.treasury.gov/ofac-license-application-page (last visited May 15, 2025).

In their complaint, Plaintiffs bring two claims. In Count One, Plaintiffs allege that the EO violates the First Amendment because it imposes a content-based restriction on constitutionally protected speech by subjecting them to the threat of civil and criminal penalties for their communications with the OTP. Compl. ¶ 82-84. In Count Two, Plaintiffs allege that the EO is *ultra vires* because it regulates or prohibits acts that are expressly excluded from the scope of the President's authority by statute. *Id.* ¶ 87-90.

8

On April 25, 2025, Plaintiffs filed the instant motion seeking a preliminary injunction. ECF No. 19.

## ARGUMENT

## I. Legal Standard

"A preliminary injunction is an extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). More plainly, "[a] judge should use the authority to grant such injunctive relief 'sparingly.'" *Crosspoint Church v. Makin*, 719 F. Supp. 3d 99, 112 (D. Me. 2024), (citing *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Off. of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981)), judgment entered, No. 1:23-CV-00146-JAW, 2024 WL 2830931 (D. Me. June 4, 2024).

A plaintiff seeking a preliminary injunction must show "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Of those factors, the first two are the most important. *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022). The third and fourth factors "merge when the government is the opposing party." *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (quotation and alternation omitted). The first factor is the most important and is a necessary condition such that "[i]f the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020) (citation omitted). And further, to obtain a preliminary injunction in this Circuit, Plaintiffs must demonstrate both a "*substantial* likelihood of success on the merits" and a "*significant* risk of irreparable harm." *Nieves-Marquez*

*v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003) (emphasis added) (citations omitted). Finally, the movant bears the burden of demonstrating by "a clear showing" that the remedy is necessary and that the prerequisites for issuance of the relief are satisfied. *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

## II.    Plaintiffs Cannot Show a Substantial Likelihood of Success on the Merits of Any of Their Claims.

Plaintiffs have not demonstrated a substantial likelihood of success on their First Amendment claim (Count I) because the EO is a content-neutral restriction that advances important governmental interests unrelated to the suppression of free speech. And even if a more rigorous standard applies, which it does not, the EO is narrowly tailored to a compelling governmental national security and foreign policy interest. Further, Plaintiffs have not demonstrated a likelihood of success on their *ultra vires* claim (Count II) because the issuance of the EO clearly falls within the President's statutory authority under IEEPA.

### A.  Plaintiffs Are Not Likely to Succeed on Their First Amendment Claim

#### 1.   Strict Scrutiny Does Not Apply Because the EO is Content Neutral

A speech restriction is content-based if it "on its face draws distinctions based on the message a speaker conveys . . . , cannot be justified without reference to the content of the regulated speech, or . . . [was] adopted by the government because of disagreement with the message the speech conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) (cleaned up). None of these circumstances are present here.

Plaintiffs argue that the EO's speech restriction is content-based because it "targets speech depending on whether it benefits the Prosecutor." Mot. at 12. This is not the case. The EO prohibits Plaintiffs from dealing in the property or interests in property of the ICC Prosecutor,

Karim Khan, including by providing "funds, goods, or services" to him or for his benefit. EO 14,203 §§ 1(a), 3(a). On their face, these restrictions do not implicate speech, and are content-neutral as they draw no distinction based on the message or content of the funds, goods, or services provided. *See Rideout v. Gardner*, 838 F.3d 65, 71 (1st Cir. 2016) ("The government's purpose [in adopting a regulation of speech] is the controlling consideration. A regulation that serves purposes unrelated to the context of expression is deemed neutral . . . ") (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)); *McGuire v. Reilly*, 260 F.3d 36, 43 (1st Cir. 2001) ("Thus, a law designed to serve purposes unrelated to the content of protected speech is deemed content-neutral even if, incidentally, it has an adverse effect on certain messages while leaving others untouched."). Further, the EO contains a content-neutral justification for the challenged restriction: "to oppose any ICC actions against the United States, Israel, or any other ally of the United States that has not consented to ICC jurisdiction." Exec. Order No. 14,203, pmbl. *Cf. TikTok Inc. v. Garland*, 145 S. Ct. 57, 68, 220 L. Ed. 2d 319 (2025) (finding that "preventing China from collecting vast amounts of data from 170 million U.S. TikTok users" was "decidedly content agnostic."). Here, the EO aims to counter the ICC's ability to prosecute U.S. citizens and citizens of foreign allies that have not consented to the ICC's jurisdiction by restricting funds, goods, and services to the Prosecutor; a restriction that is devoid of any reference to speech or a specific message.

Further, the Government has expressly and publicly stated that U.S. persons do not violate OFAC sanctions for engaging in "activities subject to U.S. constitutional protection, such as protected speech," nor is any authorization from the Government needed to engage in those activities. OFAC, *Frequently Asked Question (FAQ) No. 1190*, https://ofac.treasury.gov/faqs/1190; *see also* Letter from OFAC Acting Director to Found. for

Global Political Exchange at 2, Nov. 8, 2024, https://perma.cc/MV2U-4QGK (noting OFAC's determination that "including sanctioned persons as speakers" at conference and "actions ordinarily incident to facilitating their participation as speakers" under described circumstances "is not a service prohibited by U.S. sanctions and thus no authorization is necessary"). That interpretation is consistent with, and reinforces, the Berman Amendment to IEEPA, which prohibits the Government from using that statute to "regulate or prohibit, directly or indirectly" the exchange of "any information or informational materials." 50 U.S.C. § 1702(b), (b)(3); *see* OFAC FAQ No. 1190 (noting that "additional limitations and authorizations are in place to ensure that U.S. sanctions do not restrict the exchange of information or informational materials, or personal communication"). And to ensure clarity, OFAC explicitly invites any person concerned about the effect of sanctions to contact the agency for guidance. OFAC FAQ No. 1190.

Even to the extent the EO affects speech, it was adopted to address the Government's national security concerns, not because of a disagreement with a certain message, and it is justified without any reference to the content of incidentally regulated speech. *See Reed*, 576 U.S. at 163-64. The restriction in the EO is content neutral, and entitled to intermediate scrutiny, because "the test for content neutrality . . . simply requires that the evidence support a conclusion that the regulation is in service to a legitimate governmental interest unrelated to expressive content." *McCullen v. Coakley*, 571 F.3d 167, 177 (1st Cir. 2009), *overruled on other grounds*, *McCullen v. Coakley*, 573 U.S. 464 (2014); *Cutting v. City of Portland*, 802 F.3d 79 (1st Cir. 2015). As described further below, the purpose of the EO is to U.S. national security and foreign policy by deterring persons from assisting the ICC in pursuing personnel of the United States and its allies in investigations, arrests, detentions, and prosecutions. The prohibition on transactions

with Khan, a standard consequence of the imposition of sanctions, is aimed at addressing the Government's national security concerns with the ICC's targeting of "protected persons." Plaintiffs are free to speak openly, or publish widely, in opposition to this foreign policy, as confirmed by OFAC's affirmation in FAQ No. 1190 that U.S. persons do not violate OFAC sanctions for engaging in constitutionally protected speech. *See Schickel v. Dilger*, 925 F.3d 858, 876 (6th Cir. 2019) ("Kentucky's gift ban provision, however, serves an anticorruption purpose unrelated to the content of expression and is justified without any reference to the content of the gifts regulated."); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 34 (D.D.C. 2012) (applying intermediate scrutiny and noting that "the designation of Kadi as a [specially designated global terrorist] and the blocking of his assets merely restricts his ability to make financial transfers to other SDGTs, not his ability to express his views generally.").

## 2. The EO Satisfies Both Intermediate Scrutiny and Strict Scrutiny

Because the EO is content-neutral and only incidentally burdens expression, intermediate scrutiny applies. A regulation survives intermediate scrutiny so long as it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 26-27 (2010) (citation omitted). However, even if the Court were to conclude that the more demanding strict scrutiny standard applies instead, the EO also satisfies that standard. Under strict scrutiny, a regulation survives if it "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (citation omitted).

The EO serves a governmental interest that is both "important" and "compelling"— protecting the personnel of the United States and its allies from investigation, arrest, detention, and prosecution by the ICC without the consent of the United States or its allies. These are

"sensitive and weighty interests of national security and foreign affairs" that constitute critically important governmental interests for purposes of a First Amendment analysis. *Humanitarian Law Project*, 561 U.S. at 33-34; *see Bank Markazi v. Peterson*, 578 U.S. 212, 217 (2016) (IEEPA blocking regime allows President to "best further[ ] the United States' foreign-relations and national-security interests" (citation omitted)); *Haig v. Agee*, 453 U.S. 280, 307 (1981) ("no governmental interest is more compelling than the security of the Nation").[6] Notably, in their motion papers, Plaintiffs offer no basis to doubt the importance of the national security and foreign policy concerns discussed in the EO. *See* Mot. at 13-14. Nor could they. *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 157-58 (D.D.C. 2010) (declining "to adjudicate such matters of strategy and tactics relating to the conduct of foreign policy, which 'are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" (quoting *Regan*, 468 U.S. at 242)).

The EO also satisfies the applicable tailoring standards under either level of scrutiny. Plaintiffs argue the EO's restriction on speech is "vastly overinclusive" because it "bars U.S. persons, including Plaintiffs, from providing speech-based services that assist the Prosecutor in any way at all[.]" Mot. at 14 (citation omitted). But Plaintiffs misunderstand how U.S. sanctions authorities are designed to work. Sanctions authorities such as those in the EO allow the President to address a threat by, among other things, discouraging certain types of conduct and preventing transactions with specified persons, or in areas that may create leverage on those responsible for the activities of concern. *See Zarmach*, 750 F. Supp. 2d at 157-58. By sanctioning

---

[6] Even outside of the national security context, courts "generally defer" to the Government in "determining whether the government's ends are advanced by a regulation." *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1073 (9th Cir. 2006). Applying such deference, the Supreme Court has upheld speech restrictions when they are justified in numerous ways, such as with "studies and anecdotes[,]" and through "history, consensus, and 'simple common sense.' " *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (quotation omitted); *see also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508-09 (1981) (noting that even in the face of a "meager record," the Court "hesitate[d] to disagree with the accumulated, common-sense judgments of local lawmakers").

Khan, the Government is seeking to deter him from continuing to attempt to exercise jurisdiction over the personnel of the United States and its allies without consent. Thus, barring Plaintiffs from transacting with Khan, including by providing him with funds, goods, or services of any kind—including outside of his work at the ICC—is narrowly tailored to the government interest served by the EO. *See Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57 (D.D.C. 2002), (concluding that restrictions created by an Executive Order promulgated under IEEPA prohibiting the provision of funds to a blocked entity were "narrowly enough tailored" to serve the governments' national security and foreign policy interest), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003); *see also Teague v. Reg'l Comm'r of Customs, Region II*, 404 F.2d 441, 445 (2d Cir. 1968) ("The restriction of First Amendment freedoms is only incidental to the proper general purpose of the [TWEA] regulations: restricting the dollar flow to hostile nations.").

And indeed, determining the degree to which the sanctions program is necessary to further foreign policy and national security interests is a judgment "Congress and the Executive are uniquely positioned to make." *Humanitarian Law Project*, 561 U.S. at 35. In those areas, "the lack of competence on the part of the courts is marked, and respect for the Government's conclusions is appropriate." *Id*. at 34 (internal quotation marks and citation omitted). Where the political branches have concluded that particular restrictions are necessary to achieve foreign policy and national security goals, the First Amendment does not require courts to reject that "considered judgment." *Id*. at 36.

Plaintiffs also contend that the EO is overly broad because there were less restrictive alternatives available to the Government or readily conceivable. Mot. at 15. Plaintiffs argue that the EO "could have explicitly exempted speech-based services from the prohibitions in Section 3(a)." *Id.* This argument ignores the statutory framework and OFAC guidance previously

described herein. *See supra* p. 13. First, the text of the EO itself states that it "shall be implemented consistent with applicable law[.]" Exec. Order No. 14,203 § 12(b). This would include Section 1702(b) of IEEPA. Second, OFAC has issued public guidance acknowledging its responsibility to comply with the restrictions imposed by Section 1702(b) and confirming that the Government "does not sanction persons for their engagement in activities subject to U.S. constitutional protection, such as protected speech or religious practice or for their religious beliefs; nor do U.S. persons violate OFAC sanctions for engaging in such constitutionally protected activity." OFAC FAQ 1190. Plaintiffs have offered no basis on which this Court could assess whether the EO is, facially, more restrictive than necessary to achieve the Government's ends. However, the existence of a statutory exclusion for speech, the EO's express requirement that it be implemented consistent with applicable law, and OFAC FAQ 1190 all favor a determination that the Government has taken the least speech-restrictive approach in this case.

Finally, Plaintiffs argue that the EO's restriction on "services" provided to the Prosecutor is overbroad "because a substantial number of its applications are unconstitutional, because it chills a vast and lopsided amount of protected expression." Mot. at 15 (citation omitted). In support of this argument, Plaintiffs cite *Americans For Prosperity Foundation v. Bonta*, *id.*, where the Supreme Court explained that "a second type of facial challenge" in the First Amendment context may be raised "whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). The Supreme Court, in *Americans For Prosperity Foundation*, applied this test in the context of a government-compelled speech, wherein a government-imposed disclosure requirement was found to have "create[d] an

unnecessary risk of chilling" to the aggrieved parties' First Amendment freedom of association. *See id.* at 616 (citation omitted). That rationale does not apply in this case where the only prohibition is on transacting with or for the benefit of, or dealing in the property or property interests of, the designated individual. In *Americans For Prosperity Foundation*, the Government was found to have compelled more speech than necessary. *See id.* Here, the Government has only restricted the contribution or provision of funds, goods, or services by, to, or for the benefit of the ICC Prosecutor, which Plaintiffs argue chills the exercise of their free speech rights. The EO's restriction on speech is narrowly tailored; Plaintiffs have merely abstained from more speech than is clearly prohibited. As previously stated, constitutionally protected speech is broadly exempt from Section 3 of the EO's sweep. *See* 50 U.S.C. § 1702(b); Exec. Order 14,203 § 12(b); OFAC FAQ 1190. Any speech that may be bound up in, and prohibited by, this restriction is *de minimis* and incident to a legitimate, compelling governmental interest.

**B. Plaintiffs Are Not Likely to Succeed on Their *Ultra Vires* Claim**

Plaintiffs' argument that the EO is *ultra vires* and violates IEEPA also fails because Plaintiffs have no entitlement to assert such a claim, and because the EO is consistent with the statute.

First, IEEPA contains no private right of action. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). IEEPA does not contain the sort of "rights-creating language" that courts find "critical" to imputing to Congress an intent to create a private right of action. *Id.* at 288-91. Because IEEPA does not "explicitly confer[] [any] right directly on" individuals affected by an IEEPA Executive Order, *see Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979), but instead contains provisions that are at most "phrased as a directive" to

17

the Executive Branch, *see Sandoval*, 532 U.S. at 289 (citation omitted), no private right of action exists to enforce the statute's provisions.[7]

Similarly, Plaintiffs cannot obtain relief against the President for his actions in connection with the EO. Federal courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties[.]" *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866); *see Franklin v. Massachusetts*, 505 U.S. 788, 802-03, 806 (1992) (plurality op.). And separation of powers concerns mandate that an "express statement by Congress" is required before even a generally available cause of action may be extended specifically to challenge an action of the President. *See Franklin*, 505 U.S. at 801; *Nixon v. Fitzgerald*, 457 U.S. 73 1, 748 n.27 (1982).

Second, even if Plaintiffs could bring an *ultra vires* claim, it would fail. The Berman Amendment, 50 U.S.C. § 1702(b)(3), exempts from the President's authority under IEEPA the power to regulate or prohibit the importation from any country or exportation to any country of information or informational materials. Plaintiffs argue that the Government "takes a crabbed view of IEEPA's carveout for information and informational materials." Mot. at 17. But this argument fails to consider more recent and more relevant sources of authority. The EO expressly provides that it "shall be implemented consistent with applicable law," which includes IEEPA. Exec. Order No. 14,203 § 12(b). And OFAC has repeated the limitation of the Berman Amendment in its public guidance. OFAC FAQ No. 1190("additional limitations and authorizations are in place to ensure that U.S. sanctions do not restrict the exchange of information or informational materials, or personal communication"). IEEPA's language is clear,

---

[7] Plaintiffs cite *Open Society Justice Initiative v. Trump ("OSJI")* in support of their claim that a private right of action exists. The court in *OSJI* reasoned that Congress would not have begun § 1702(c) with the phrase "In any judicial review of a determination made under this subsection" if it had not contemplated a private right of action to review an exercise of authority under § 1702. 510 F. Supp. 3d at 214. But the court there disregarded the final phrase of § 1702(c): "This subsection does not confer or imply any right to judicial review."

and the EO clearly states that it will be implemented in accordance with its restrictions. It is therefore "no more than speculation that OFAC intends to violate [§ 1702(b)(3)] in its enforcement of the Executive Order." *Open Society Justice Initiative v. Trump*, 510 F. Supp. 3d 198, 215-16 (S.D.N.Y. 2021).

Plaintiffs' as-applied challenge thus fails because the EO cannot, by statute, prohibit the transmission of "information and informational materials."

## III.    Plaintiffs Do Not Meet the Remaining Requirements to Establish Entitlement to Injunctive Relief

Plaintiffs also have not made a "clear showing," *Winter*, 555 U.S. at 22, that they meet the remaining requirements for injunctive relief. Plaintiffs' argument that they have demonstrated irreparable harm depends entirely on their demonstrating a clear likelihood of success on the merits of their First Amendment claim which, for the reasons discussed above, they cannot do. *See Akebia Therapeutics, Inc.*, 976 F.3d at 92.

Additionally, the balance of the equities and the public interest favor the Government. At stake here are significant national security and foreign policy interests that weigh strongly against an injunction. *See Winter*, 555 U.S. at 24; *cf. United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013); *Holy Land*, 219 F. Supp. 2d at 84. The injunction Plaintiffs seek would frustrate and displace the President's determination of how best to address threats to national security. *Holy Land*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) (denying a preliminary injunction to unblock assets, despite showing of irreparable harm, because "[t]he public interest overarches all else because of the world backdrop against which OFAC's action was taken") (quoting *Milena Ship Mgmt. Co. v. Newcomb*, 804 F. Supp. 846, 854 (E.D. La. 1992)).

19

To counter the weight of the Government's and the public's interest in the President's ability to exercise his authority under IEEPA, Plaintiffs makes unsupported allegations that the United States has or plans to unlawfully restrict their speech, merely speculating that the Government will, at some indeterminable point in the future, impose civil penalties or criminal prosecution.  Compl. ¶ 82. Unsupported speculation, however, cannot outweigh the significant foreign policy and national security interests that the EO is meant to counter. *Winter*, 555 U.S. at 22 (vacating a preliminary injunction granted by the lower court on the basis of only a *possibility* of irreparable harm rather than the required showing of a *likelihood* of irreparable injury in the absence of relief).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Dated:  May 16, 2025                    Respectfully submitted,

                                        YAAKOV M. ROTH
                                        Acting Assistant Attorney General

                                        ALEXANDER HAAS
                                        Director, Federal Programs Branch

                                        STEPHEN M. ELLIOTT
                                        Assistant Director, Federal Programs Branch

                                        */s/ Ryan M. Underwood*
                                        RYAN M. UNDERWOOD
                                        Trial Attorney (D.C. Bar No. 1656505)
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street, NW
                                        Washington, DC 20005
                                        Tel: (202) 305-1952
                                        E-mail: ryan.m.underwood2@usdoj.gov

                                        *Counsel for Defendants*

20

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2025, I caused the foregoing to be electronically filed with Clerk of Court using the CM/ECF system, which sent such notice to any individuals and entities who have entered appearances in this case to date, pursuant to the Court's ECF system.

YAAKOV M. ROTH
Acting Assistant Attorney General

 /s/ RYAN M. UNDERWOOD
Ryan Underwood
Trial Attorney (D.C. Bar No. 1656505)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-1952
E-mail: ryan.m.underwood2@usdoj.gov