## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| MATTHEW SMITH and | ) | |
| AKILA RADHAKRISHNAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No. 1:25-cv-00158-NT |
| | ) | |
| DONALD J. TRUMP et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Matthew Smith and Akila Radhakrishnan are United States citizens and human rights advocates. A core part of their human rights work involves providing evidence, expertise, and advice to the International Criminal Court ("**ICC**") to support its investigation and prosecution of atrocity crimes committed around the world. Since February 6, 2025, the Plaintiffs have halted all work with the ICC in response to an executive order issued by the President of the United States, Donald J. Trump, that imposes sanctions on the ICC, prohibits certain interactions with designated ICC officials, and threatens civil and criminal penalties for any violations.

The Plaintiffs have filed a lawsuit against President Trump and several federal agencies and officials. The complaint seeks injunctive relief and a declaration that the executive order restricts protected speech in violation of the First Amendment of the U.S. Constitution and exceeds the executive branch's powers under the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–1710.

Before me is the Plaintiffs' motion for a preliminary injunction under Federal Rule of Civil Procedure 65 (ECF No. 19). The motion seeks an order preliminarily enjoining the Defendants from implementing or enforcing the executive order's restrictions against the Plaintiffs.

For the following reasons, the motion is **GRANTED**.

## BACKGROUND

### I.    The International Criminal Court

The ICC is a permanent international court created by a 1998 treaty and based in The Hague, The Netherlands. Compl. for Decl. and Inj. Relief ("**Compl.**") ¶ 2 (ECF No. 1). The ICC is authorized to investigate and prosecute atrocity crimes such as genocide, war crimes, and crimes against humanity that are inadequately addressed by national criminal justice systems. Compl. ¶¶ 25–26, 42. Countries that ratify or accede to the ICC's founding treaty consent to ICC jurisdiction over atrocity crimes committed in the ratifying country or by its nationals. Compl. ¶ 25. To date, 125 countries have ratified that treaty. Compl. ¶ 24. Though the United States has not, "both Democratic and Republican administrations have supported several prominent ICC investigations and prosecutions" since the ICC's creation. Compl. ¶¶ 24, 42.

The ICC operates through its internal Office of the Prosecutor ("**OTP**") led by a head prosecutor (the "**Prosecutor**"). Compl. ¶¶ 29–30. That role has been occupied by Karim Khan since 2021. Compl. ¶ 31. As Prosecutor, Khan oversees the preliminary examination, formal investigation, and prosecution of alleged crimes within the ICC's jurisdiction. Compl. ¶ 30. During each stage, the OTP may obtain

information and assistance from a range of state and non-state actors and individuals, including state parties and nonparties, special advisors with relevant legal expertise appointed by the Prosecutor, international and regional organizations, and victims and their representatives. Compl. ¶ 38. For example, during preliminary examinations, atrocity victims, their legal representatives, and civil society groups can file written submissions with the OTP about the situations under ICC review. Compl. ¶¶ 39–40.

## II.    The International Emergency Economic Powers Act

In issuing the executive order challenged here, President Trump cited his authority under the International Emergency Economic Powers Act ("**IEEPA**"), a federal statute that empowers the President to "deal with any unusual and extraordinary threat" to U.S. national security, foreign policy, or the economy by sanctioning designated foreign countries or nationals. 50 U.S.C. §§ 1701(a), 1702(a)(1); Compl. ¶ 67. The statute sets forth penalties for violating any restrictions that a President imposes under IEEPA, including civil fines up to $250,000, criminal fines up to $1,000,000, and imprisonment up to twenty years. 50 U.S.C. § 1705(b), (c). The President's authority under IEEPA is broad but not unlimited. As relevant to this lawsuit, IEEPA bars the President from regulating or prohibiting "the exportation . . . of any information or informational materials[.]" 50 U.S.C. § 1702(b)(3); Compl. ¶ 71.

## III.    Executive Order 14203

On February 6, 2025, invoking his authority under IEEPA, President Trump issued Executive Order 14203, "Imposing Sanctions on the International Criminal

Court" (the "**Executive Order**"). Compl. ¶ 4; 90 Fed. Reg. 9369 (Feb. 6, 2025) ("**EO**"). The Executive Order imposes sanctions on the ICC in response to the ICC's "illegitimate and baseless actions targeting America and [its] close ally Israel." EO at 9369. The Executive Order condemns the ICC's investigations of U.S. and Israeli personnel and its issuance of arrest warrants for Israel's current Prime Minister and former Minister of Defense. Compl. ¶ 73 (quoting EO at 9369). The Executive Order, emphasizing that neither the U.S. nor Israel is a party to the ICC's founding treaty, asserts that the ICC's conduct "threatens to infringe upon" U.S. sovereignty and "undermin[es]" the "critical national security and foreign policy work" of the United States, Israel, and other U.S. allies. EO at 9369.

As "consequences" for the ICC's "transgressions," the Executive Order announces that it will impose sanctions on designated ICC officials, including by freezing their assets and barring their entry into the United States. Compl. ¶ 75; EO at 9369. The Executive Order imposes sanctions specifically on Khan and authorizes the Secretary of State to sanction other foreign persons based on ICC-related activities. Compl. ¶ 5; EO at 9370. The Secretary of State has since exercised that authority by sanctioning four ICC judges. *See* Defs.' Notice ¶ 1 (ECF No. 27).

In addition to imposing sanctions, the Executive Order prohibits certain interactions with sanctioned persons. Specifically, Section 3(a) bars anyone— including U.S. citizens and residents—from "contribut[ing] or provi[ding] . . . funds,

goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked" under the Executive Order. Compl. ¶ 76; EO at 9370.[1]

## IV.   The Plaintiffs

Plaintiff Matthew Smith, a Maine resident, is a co-founder and the chief executive officer of a nonprofit and nongovernmental human rights organization. Compl. ¶¶ 11, 53. He has worked regularly with the ICC since 2019, with a focus on the OTP's investigation and prosecution of atrocity crimes against the ethnic minority Rohingya people in the People's Republic of Bangladesh and the Republic of the Union of Myanmar. Compl. ¶¶ 1, 43, 53–54. For example, Smith's nonprofit has given the OTP direct evidence of atrocity crimes against the Rohingya, including victim testimonies, video-recorded statements by Myanmar soldiers, and the identification of perpetrators who have confessed to their crimes. Compl. ¶¶ 54–56. Smith has also co-hosted public events with OTP personnel. Compl. ¶ 57.

Plaintiff Akila Radhakrishnan, a New York resident, is an international human rights lawyer and an expert on issues of gender justice, women's rights, and criminal law. Compl. ¶¶ 12, 59. Her work with the OTP began in around 2014 and focuses on matters involving sexual and gender-based violence, particularly in Afghanistan. Compl. ¶¶ 59–60. Her work has included filing written submissions

---

[1]    On July 1, 2025, the U.S. Department of Treasury's Office of Foreign Assets Control ("**OFAC**") issued regulations implementing Executive Order 14203 (the "**Executive Order**"). *See* Int'l Crim. Ct.-Related Sanctions Reguls., 31 C.F.R. Part 528, 90 Fed. Reg. 28012-01 (July 1, 2025). The regulations do not define any terms within or clarify the scope of Section 3(a) of the Executive Order, which is the primary provision at issue in this suit. The regulations state that "OFAC intends to supplement this part with a more comprehensive set of regulations, which may include additional interpretive guidance and definitions, general licenses, and other regulatory provisions." 31 C.F.R. § 528.101 n.1.

with the OTP regarding its ongoing preliminary examinations, advising victim communities on legal recourse from the ICC, arguing as an amicus in ICC prosecutions, facilitating discussions between the OTP and victim communities, advising the OTP on sexual and gender-based crimes, consulting with the OTP on its internal policies, meeting in person with OTP personnel, and participating in public events with the Prosecutor and other OTP officials. Compl. ¶ 60.

After the President issued the Executive Order, both Plaintiffs immediately halted their activities with the ICC for fear of incurring penalties under IEEPA. Compl. ¶¶ 58, 61. For example, Smith has refrained from providing the OTP with evidence of atrocities in Myanmar, some of which was directly requested by the head of the OTP's Myanmar investigation; has abandoned plans to organize a delegation from Myanmar to the OTP, which an OTP representative requested in 2024; and has refrained from communicating with OTP staff about assisting the OTP's prosecution of a militia leader recently arrested in Bangladesh. Compl. ¶ 58. Similarly, Radhakrishnan has ceased her ongoing work with Afghan partners to give the OTP evidence of and information about sexual and gender-based crimes perpetrated by the Taliban in Afghanistan, which was in progress until the Executive Order was issued. She has also abandoned existing plans to consult with the OTP about using the concept of "gender apartheid" in its potential Afghanistan cases. Compl. ¶ 61.

## V.    Procedural History

The Plaintiffs filed this lawsuit on April 11, 2025 against the following Defendants: Donald J. Trump, in his official capacity as U.S. President;[2] the U.S. Secretary of State, Marco Rubio; the U.S. Department of Treasury and the U.S. Secretary of the Treasury, Scott Bessent; the U.S. Department of Justice and the U.S. Attorney General, Pamela Bondi; and the Office of Foreign Assets Control ("**OFAC**") and OFAC's Acting Director, Lisa M. Palluconi (collectively, the "**Government**").

The Plaintiffs make two claims. First, they assert that Section 3(a) violates the First Amendment by prohibiting the "Plaintiffs and others like them from engaging in constitutionally protected speech under threat of civil and criminal penalties." Compl. ¶ 82. Second, they assert that the Executive Order is ultra vires because it exceeds the President's authority under IEEPA by regulating "the exportation . . . of any information or informational materials" in violation of 50 U.S.C. § 1702(b)(3). Compl. ¶¶ 87, 90.

The Plaintiffs moved for a preliminary injunction on April 25, 2025, arguing that they are likely to succeed on the merits of both claims, will suffer irreparable harm absent judicial intervention, and that the balance of equities and the public interest favor their requested relief. Pls.' Mot. for Prelim. Inj. ("**Mot.**") (ECF No. 19). The Government responded on May 16, 2025, and the Plaintiffs filed a reply on May

---

[2]    The Government argues that the Plaintiffs "cannot obtain relief against the President for his actions in connection with the EO." Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj. ("**Opp'n**") 25 (ECF No. 23). I do not address this argument because the Plaintiffs assert that they "do not seek injunctive relief against the President." Pls.' Reply in Supp. of Their Mot. for Prelim. Inj. 9 n.6 (ECF No. 26).

30, 2025. Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj. ("**Opp'n**") (ECF No. 23); Pls.' Reply in Supp. of Their Mot. for Prelim. Inj. (ECF No. 26).

## LEGAL STANDARD

In deciding a motion for a preliminary injunction, I consider four factors: "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing the injunction will burden the defendants less than denying an injunction would burden the plaintiffs[;] and (4) the effect, if any, on the public interest." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (citation omitted). "Though each factor is important, . . . 'the sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'" *Id.* at 10 (citation omitted). When the government is the opposing party, the third and fourth factors merge. *Does 1–6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## DISCUSSION

### I.    Likelihood of Success on the Merits

To establish a likely success on the merits of their claims, the Plaintiffs "must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood[.]'" *Fortuño*, 699 F.3d at 10 (citation omitted). I find the Plaintiffs meet that burden as to their First Amendment claim, which precludes any need to consider

the merits of their IEEPA ultra vires claim.[3] *Cf. Baines v. Dunlap*, 466 F. Supp. 3d 273, 285 (D. Me. 2020) (evaluating a preliminary injunction motion based on plaintiffs' likely success on the merits of "at least one of their claims").

### A.    First Amendment Framework

The Plaintiffs focus their First Amendment claim on Section 3(a), which prohibits any person from contributing or providing "services . . . for the benefit of" Khan or any other person sanctioned under the Executive Order. The Plaintiffs argue that this provision imposes a content-based restriction that does not survive strict scrutiny. Compl. ¶ 84; Mot. 18–21.

The First Amendment limits the government's ability to take actions " 'abridging the freedom of speech.' " *McCoy v. Town of Pittsfield, N.H.*, 59 F.4th 497, 505 (1st Cir. 2023) (quoting U.S. Const. amend. I). The Supreme Court has developed a framework for evaluating the government's justifications for restricting protected speech. Under that framework, a restriction's constitutionality turns in part on whether it is "content based or content neutral." *Signs for Jesus v. Town of Pembroke,*

---

[3]    In declining to reach the merits of the Plaintiffs' statutory claim under IEEPA, I am mindful that ordinarily, " 'federal courts are not to reach constitutional issues where alternative grounds for resolution are available.' " *Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 178 (1st Cir. 2021) (citation omitted). But here, I am concerned that the IEEPA claim is not ripe absent additional evidence that the Government intends to enforce the Executive Order in a manner that would amount to regulating "information or informational materials" in violation of IEEPA. *Cf. Open Soc'y Just. Initiative v. Trump*, 510 F. Supp. 3d 198, 216 (S.D.N.Y. 2021) (plaintiffs' IEEPA claim was not ripe where there was no more than "speculation that OFAC intend[ed] to violate" IEEPA's restriction on regulating "informational materials" in its enforcement of the executive order). Those concerns do not extend to the First Amendment claim because "[w]hen free speech is at issue,' . . . 'concerns over chilling effect call for a relaxation of ripeness requirements.' " *Project Veritas Action Fund v. Rollins,* 982 F.3d 813, 825 (1st Cir. 2020) (citation omitted).

*N.H.*, 977 F.3d 93, 101 (1st Cir. 2020) (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015)).

Content-based restrictions target speech based on " 'the topic discussed or the idea or message expressed.' " *McCoy*, 59 F.4th at 505 (quoting *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022)). Such restrictions are presumptively unconstitutional and trigger strict scrutiny, which requires the government to show that the restriction is "narrowly tailored" to achieve a "*compelling* interest." *Id.* at 506 (citations omitted and emphasis added). By contrast, content-neutral restrictions "do not apply to speech based on or because of the content of what has been said, but instead 'serve[ ] purposes unrelated to the content of expression.' " *Rideout v. Gardner*, 838 F.3d 65, 71 (1st Cir. 2016) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Content-neutral restrictions "require a lesser level of justification" and are therefore subject only to intermediate scrutiny, which demands that the law be " 'narrowly tailored to serve a *significant* governmental interest.' " *Id.* at 71–72 (citation omitted and emphasis added).

## B.    First Amendment Analysis

Here, I need not decide whether Section 3(a) restricts speech based on its content because I find it fails even intermediate scrutiny.[4] "Though content-neutral laws need not be the least restrictive or least intrusive means of serving the government's interests, the government still may not regulate expression in such a

---

[4]    *See, e.g.*, *Rideout v. Gardner*, 838 F.3d 65, 72 n.4 (1st Cir. 2016) ("As the statute fails even intermediate scrutiny, we need not resolve the question of whether [the challenged regulation] is a content-based regulation.").

manner that a substantial portion of the burden on speech does not serve to advance its goals." *Rideout*, 838 F.3d at 72 (citation and quotations omitted). A content-neutral restriction fails intermediate scrutiny if it functions as a "[b]road prophylactic prohibition[ ] that fail[s] to 'respond precisely to the substantive problem' " it intends to address or if "there is a substantial mismatch" between the restriction and the asserted government interest. *Id.* at 72; *cf. id.* at 74 (state law banning "ballot selfies" failed intermediate scrutiny because it "reache[d] and curtail[ed] the speech rights of all voters, not just those motivated to cast a particular vote for illegal reasons").

The Government says that the Executive Order advances an " 'important' and 'compelling' " government interest in "protecting the personnel of the United States and its allies from investigation, arrest, detention, and prosecution by the ICC without the consent of the United States or its allies." Opp'n 20.[5] Even assuming the importance of that government interest, the Executive Order appears to restrict substantially more speech than necessary to further that end.[6] The Executive Order broadly prohibits any speech-based services that benefit the Prosecutor, regardless of whether those beneficial services relate to an ICC investigation of the United States, Israel, or another U.S. ally. The Government does not explain how its stated interest

---

[5]    *See also* Opp'n 18 ("[T]he EO aims to counter the ICC's ability to prosecute U.S. citizens and citizens of foreign allies that have not consented to the ICC's jurisdiction by restricting funds, goods, and services to the Prosecutor[.]"); Opp'n 22 ("[T]he Government is seeking to deter [Khan] from continuing to attempt to exercise jurisdiction over the personnel of the United States and its allies without consent.").

[6]    I assume without deciding that the Government's stated interest is "important" because, even with that assumption, the Executive Order does not survive intermediate scrutiny given the lack of sufficient tailoring. *Cf. Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 13 (1st Cir. 2012) (per curiam) (content-based restriction would fail strict scrutiny "[e]ven if . . . justified by a compelling interest" given insufficient tailoring to achieve that end).

would be undermined—or even impacted—by the Plaintiffs' services to the OTP related to the ICC's ongoing work in Bangladesh, Myanmar, and Afghanistan. "The government's burden is not met when a State offers no evidence or anecdotes in support of its restriction." *Rideout*, 838 F.3d at 73 (citation modified and citation omitted). Nor does the Government offer any evidence suggesting that it has even "attempted to tailor its solution to the potential problem it perceives," *id.* at 74, such as by prohibiting services to the Prosecutor only if they relate to ICC investigations that threaten the United States or its allies. *Cf. Kadi v. Geithner*, 42 F. Supp. 3d 1, 34 (D.D.C. 2012) (executive order issued under IEEPA passed intermediate scrutiny because it narrowly restricted anyone designated as a "specially designated global terrorist" from transferring money to other designated terrorist groups, thus furthering the important state interest in "combating terrorism by undermining its financial base" (citation omitted)); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 82 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) (executive order issued under IEEPA passed intermediate scrutiny because it was "narrowly enough tailored to only further its interest in stopping the flow of American dollars to Hamas").

For similar reasons, a federal court in 2021 preliminarily enjoined a nearly identical executive order, issued during the first Trump administration, that condemned the ICC's investigation of U.S. personnel in Afghanistan. *See Open Soc'y Just. Initiative v. Trump*, 510 F. Supp. 3d 198, 217 (S.D.N.Y. 2021); *see also* Exec. Order No. 13928, Blocking Property of Certain Persons Associated with the

12

International Criminal Court, 85 Fed. Reg. 36139 (June 11, 2020). The district court found the plaintiffs likely to succeed on their First Amendment claim under either intermediate or strict scrutiny, reasoning that the executive order and its implementing regulations "burden[ed] substantially more speech than necessary." *Open Soc'y*, 510 F. Supp. 3d at 212 n.7 (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 26–27 (2010)).

Here too, the Executive Order appears to burden substantially more speech than necessary. Accordingly, the Plaintiffs have established likely success on the merits of their First Amendment challenge to Section 3(a) of the Executive Order.[7]

## II. Irreparable Harm

Having found the Plaintiffs likely to succeed on the merits of their First Amendment claim, I continue the preliminary injunction analysis by considering " 'whether and to what extent [they] will suffer irreparable harm in the absence of injunctive relief.' " *Becky's Broncos, LLC v. Town of Nantucket*, 138 F.4th 73, 77 (1st Cir. 2025) (citation omitted). "As the Supreme Court has explained, 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " *Fortuño*, 699 F.3d at 10–11 (citation omitted). Accordingly, "[t]here is no need for an extensive analysis" of this factor in the First Amendment context. *Id.* at 15. Because I find the Plaintiffs likely to succeed on their First

---

[7]    As an alternative First Amendment theory, the Plaintiffs argue that Section 3(a) of the Executive Order is unconstitutionally overbroad. Pls.' Mot. for Prelim. Inj. ("**Mot.**") 21 (ECF No. 19). Because I find the Plaintiffs likely to succeed on the merits of their First Amendment claim on the theory that Section 3(a) is insufficiently tailored, I do not address their overbreadth argument. *Cf. Fortuño*, 699 F.3d at 15 n.11 ("Because we conclude that the unions' First Amendment claims are likely to succeed on their merits, we do not address their contention that the statute as drafted is void for vagueness.").

Amendment claim, their "irreparable injury is presumed." *Id.* at 11. This factor favors granting the Plaintiffs' requested relief.

## III.    Balancing of Equities and the Public Interest

The final step in the preliminary injunction analysis is to consider "the balance of relative hardships, that is, the hardship to the nonmovant if enjoined as opposed to the hardship to the movant if no injunction issues," and "the effect, if any, that an injunction or the lack of one may have on the public interest." *Russomano v. Novo Nordisk Inc.*, 960 F.3d 48, 52 (1st Cir. 2020) (citation modified and citation omitted).

On the one hand, the Plaintiffs argue that enforcement of the Executive Order would result in " 'the loss of First Amendment freedoms,' " which would cause a hardship not just to them but also to the public interest, which is necessarily "served by protecting First Amendment rights from likely unconstitutional infringement." *Comcast of Me./N.H., Inc. v. Mills*, 435 F.Supp.3d 228, 250 (D. Me. 2019), *aff'd*, 988 F.3d 607 (1st Cir. 2021); *see* Mot. 24. On the other hand, the Government insists that an injunction would both impede the "significant national security and foreign policy interests" implicated by the Executive Order and "frustrate and displace the President's determination of how best to address threats to national security." Opp'n 26.

I find the Government's argument unpersuasive. First, the Government has at least implied that injunctive relief is unnecessary because it does not intend to enforce the Executive Order against the Plaintiffs at all. *See* Opp'n 18 ("[T]he Government has expressly and publicly stated that U.S. persons do not violate OFAC sanctions for engaging in 'activities subject to U.S. constitutional protection, such as

14

protected speech[.]' " (citation omitted)); Opp'n 25 ("The EO expressly provides that it 'shall be implemented consistent with applicable law,' which includes IEEPA."). It is hard to square that position with the Government's assertion that an injunction would impede national security and foreign policy interests.

Second, even putting that inconsistency aside, I find the Government's argument unpersuasive for the same reasons that I find Section 3(a) fails intermediate scrutiny. The Government does not explain how the Plaintiffs' continued services to the Prosecutor concerning atrocities in Bangladesh, Myanmar, or Afghanistan would impede national security and foreign policy interests concerning the United States and Israel. *Cf. Open Soc'y*, 510 F. Supp. 3d at 217 ("[T]he proffered national security justification for seeking to prevent and potentially punish Plaintiffs' speech is inadequate to overcome Plaintiffs' and the public's interest in the protection of First Amendment rights.").

Moreover, there is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 195 (D.D.C. 2021) (citation modified and citation omitted).

In sum, the third and fourth preliminary injunction factors—the balance of equities and the impact on the public interest—favor the Plaintiffs.

## CONCLUSION

For the reasons above, the Plaintiffs' motion for a preliminary injunction (ECF No. 19) is **GRANTED**. The Government is hereby enjoined from imposing civil or

criminal penalties on the Plaintiffs under Executive Order 14203 and the IEEPA based on the Plaintiffs' provision of speech-based services to the ICC.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 18th day of July, 2025.