# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| MATTHEW SMITH and AKILA RADHAKRISHNAN, <br><br>     Plaintiffs, <br><br>     v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; U.S. DEPARTMENT OF JUSTICE; PAMELA BONDI, in her official capacity as Attorney General; OFFICE OF FOREIGN ASSETS CONTROL; and LISA M. PALLUCONI, in her official capacity as Acting Director of the Office of Foreign Assets Control, <br><br>     Defendants. | Civil Case No.: 1:25-cv-00158-NT <br><br> INJUNCTIVE RELIEF SOUGHT |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.    Plaintiffs Matthew Smith and Akila Radhakrishnan (together, "Plaintiffs") are U.S. citizens and human rights advocates who have dedicated their lives to pursuing accountability for human rights violations. Assisting the International Criminal Court ("ICC")—in particular, the ICC's Office of the Prosecutor ("OTP")—is a core part of Plaintiffs' work. For example, Mr. Smith has provided the OTP with evidence of the genocide and forced deportation of Myanmar's Rohingya people and has assisted the OTP in analyzing and developing new sources of evidence regarding related atrocity crimes in Myanmar and Bangladesh. Ms. Radhakrishnan has advised the OTP on investigating sexual and gender-based violence committed against Afghan women under the Taliban regime, helped the OTP develop policies on sexual and gender violence, and advocated with the OTP to investigate genocides—by ISIS against the Yazidi people in Iraq and Syria, and by Myanmar's junta against the Rohingya people in that country. Plaintiffs' work with the OTP is speech protected by the First Amendment, but they have been forced to cease it for fear that Defendants will penalize them for violating the prohibitions set forth in Executive Order 14203, "Imposing Sanctions on the International Criminal Court." 90 Fed. Reg. 9369 (Feb. 6, 2025). Plaintiffs file this suit to challenge the Trump administration's imposition of sanctions that violate their First Amendment rights, and those of others like them, by prohibiting their constitutionally protected speech with the OTP under threat of civil or criminal penalties.

2.    The ICC is a permanent court based in The Hague, The Netherlands. The international community, including the United States, established the ICC in 1998 through a treaty known as the "Rome Statute." The ICC has enjoyed broad international support since its founding, and today, 125 countries have ratified or acceded to the Rome Statute. The establishment of the ICC reflects a shared international understanding that global peace, security, and well-being require an

international, independent court of last resort able to ensure accountability for these most serious crimes when national justice systems are unable or unwilling to do so.

3. Historically, both Democratic and Republican administrations have supported the ICC's critical work on a range of matters including the genocide against the Rohingya in Myanmar, crimes against humanity committed by the Maduro regime in Venezuela, the genocide in Darfur, and the Gaddafi regime's attacks on civilians in Libya. The United States has issued statements commending the ICC's work, supported referrals to the ICC by the United Nations Security Council, facilitated the transfer of alleged perpetrators to ICC custody, and even shared evidence with the ICC pursuant to a law Congress enacted over two years ago, with bipartisan support.

4. On February 6, 2025, President Trump issued Executive Order 14203 (the "Executive Order" or "Order"). The Order declares a national emergency with respect to "any effort by the ICC to investigate, arrest, detain, or prosecute" U.S. persons, or persons of U.S. allies that are not party to the Rome Statute. In support, the Order refers to certain ICC "actions targeting America and our close ally Israel."

5. In response to this declared emergency, the Order imposes restrictions that include sanctions under the authority of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.* Specifically, the Order imposes sanctions on Karim Khan, the ICC's Prosecutor and head of the OTP. On February 13, 2025, the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") added Mr. Khan to its List of Specially Designated Nationals and Blocked Persons ("SDN List").

6. The Order also authorizes the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to sanction other foreign persons who meet its ICC-related designation criteria.

    a.   On June 5, 2025, under section 1(a)(ii)(A) of the Order, the Secretary of State sanctioned four judges of the ICC. That same day, OFAC added all four sanctioned judges to the SDN list.

    b.   On July 9, 2025, under section 1(a)(ii)(A) of the Order, the Secretary of State sanctioned the United Nations Human Rights Council Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied since 1967. That same day, OFAC added the Special Rapporteur to the SDN list.[1]

7.   The Order prohibits all U.S. persons—on pain of significant civil and criminal penalties—from providing "services . . . to, or for the benefit of," the Prosecutor or other sanctioned persons. Exec. Order § 3(a). This prohibition sweeps in speech protected by the First Amendment. It does so based on the contents of that speech—namely, based on whether the speech is for the benefit of the Prosecutor or other sanctioned individuals. And it does so despite Congress's express limitation in IEEPA prohibiting the executive branch from regulating First Amendment–protected "information or informational materials." 50 U.S.C. § 1702(b)(3).

8.   On July 1, 2025, OFAC promulgated regulations (the "Regulations") implementing the Executive Order. 31 C.F.R. § 528.101 et seq. "All transactions prohibited pursuant to [the Order] are prohibited pursuant to" the Regulations. 31 C.F.R. § 528.201(a).

9.   Plaintiffs wish to continue the human rights work that the Order forced them to cease: seeking justice for victims of atrocities by working with the OTP to carry out its investigative and prosecutorial mandate. Prohibiting Plaintiffs and others like them from assisting the OTP is unconstitutional and unlawful. Plaintiffs accordingly seek (1) a declaration that the speech

---

[1] Collectively, Plaintiffs refer to the designations of persons under the Order as the "Designations."

restrictions imposed by the Executive Order violate the First Amendment and exceed the authority Congress granted to the executive under IEEPA, (2) an order enjoining Defendants from implementing or enforcing the speech restrictions imposed by the Executive Order and Regulations, and (3) an order setting aside under the Administrative Procedure Act ("APA") the speech restrictions imposed by the Regulations.

## JURISDICTION AND VENUE

10.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and IEEPA.

11.   This Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and injunctive relief pursuant to 5 U.S.C. § 702 and the Court's inherent equitable powers.

12.   Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because officers or employees of agencies of the United States acting in their official capacities and agencies of the United States are defendants and because Plaintiff Matthew Smith resides in this district. 28 U.S.C. § 1391(e)(1)(C).

## PARTIES

### Plaintiffs

13.   Plaintiff Matthew Smith is a co-founder and Chief Executive Officer of Fortify Rights, an organization dedicated to ensuring human rights for all. Plaintiff Smith resides in Maine and is a citizen of the United States.

14.   Plaintiff Akila Radhakrishnan is an international human rights lawyer and gender-justice expert. Since 2023, she has served as a legal advisor for the End Gender Apartheid campaign. Plaintiff Radhakrishnan resides in New York and is a citizen of the United States.

**Defendants**

15.   Defendant Donald J. Trump is the President of the United States. President Trump issued the Executive Order, invoking, *inter alia,* his authority under IEEPA. Plaintiffs sue President Trump in his official capacity.

16.   Defendant the Department of State is a United States agency headquartered in Washington, D.C.

17.   Defendant Marco A. Rubio is the United States Secretary of State. Plaintiffs sue Defendant Rubio in his official capacity. The Secretary of State is tasked under the Executive Order with determining whether "any foreign person" has "(A) . . . directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality; (B) . . . materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity in subsection (a)(ii)(A) of this section or any person whose property or interests in property are blocked pursuant to this order; or (C) [is] owned or controlled by, or . . . acted or purported to act for or on behalf of, directly or indirectly, any person whose property or interests in property are blocked pursuant to this order." Exec. Order § 1(a)(ii).

18.   Defendant the Department of the Treasury is a United States agency headquartered in Washington, D.C. The Department of the Treasury is charged with implementing the President's IEEPA authorities under the Executive Order.

19.   Defendant Scott Bessent is the United States Secretary of the Treasury. Plaintiffs sue Defendant Bessent in his official capacity.

20.   Defendant the Department of Justice ("DOJ") is a United States agency headquartered in Washington, D.C. DOJ is responsible for criminal enforcement of violations of IEEPA, including violations of the prohibitions in the Executive Order.

21.   Defendant Pamela Bondi is the United States Attorney General. Plaintiffs sue Defendant Bondi in her official capacity.

22.   Defendant OFAC is an office within the Department of the Treasury located in Washington, D.C. OFAC is responsible for civil enforcement of violations of IEEPA, including violations of the prohibitions in the Executive Order. On February 13, 2025, OFAC added the Prosecutor of the ICC, Mr. Karim Khan, to the SDN List.[2]

23.   Defendant Lisa M. Palluconi is the Acting Director of OFAC. Plaintiffs sue Defendant Palluconi in her official capacity.

**FACTUAL ALLEGATIONS**

**I. The International Criminal Court and the Office of the Prosecutor**

**A. The Genesis of the ICC**

24.   The 1998 Rome Statute, which created the ICC, was the culmination of a decades-long push by the international community—including the United States—for a transnational forum in which victims of the gravest crimes could seek justice. *See* Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90.

25.   The movement for international criminal justice emerged from the aftermath of the Holocaust, and the United States was a driving force behind the effort to hold Nazi-era war criminals to account through the Nuremberg Trials. Throughout the latter half of the 20th century,

---

[2] *See Issuance of Executive Order Imposing Sanctions on the International Criminal Court; International Criminal Court-Related Designation*, OFAC (Feb. 13, 2025), https://perma.cc/PYX8-N4PF.

as unspeakable horrors also unfolded in Cambodia, the former Yugoslavia, Rwanda, Sierra Leone, and other conflict zones, the United States supported the creation of international criminal tribunals to address atrocity crimes committed in those jurisdictions. When President Clinton signed the Rome Statute in 2000, he noted the United States's "long history of commitment to the principle of accountability, from our involvement in the Nuremberg tribunals that brought Nazi war criminals to justice, to our leadership in the effort to establish the International Criminal Tribunals for the former Yugoslavia and Rwanda." Statement on the Rome Treaty on the International Criminal Court, 37 Weekly Comp. Pres. Doc. 4, Dec. 31, 2000.

26.    Today, 125 countries—known as "States Parties"—have ratified or acceded to the Rome Statue. Of the 32 members of NATO, 30 are States Parties to the Rome Statute. The United States has signed the Rome Statute but has not ratified it.

**B. The Jurisdiction of the ICC**

27.    Under the Rome Statute, the ICC may exercise jurisdiction over investigations, prosecutions, and punishments of individuals accused of atrocity crimes. A State that ratifies or accedes to the Rome Statute consents to ICC jurisdiction over such crimes allegedly committed on or after July 1, 2002 in the State's territory or by its nationals. Such a State may refer crimes within the ICC's jurisdiction to the ICC.

28.    The ICC's mandate is limited by respect for national sovereignty. The ICC does not assert jurisdiction over crimes that are adequately addressed by national criminal justice systems. Under Article 1 of the Rome Statute, the ICC's jurisdiction is "complementary to national criminal jurisdictions." This principle of complementarity ensures that the ICC remains a court of last resort rather than replacing national justice systems.

29.    The ICC may exercise jurisdiction over crimes referred to the ICC Prosecutor by the United Nations Security Council under Chapter VII of the Charter of the United Nations. Under

Chapter VII, the Security Council is authorized to take measures to "maintain or restore international peace and security" after identifying "any threat to the peace, breach of the peace, or act of aggression." U.N. Charter art. 39. The United States is a permanent member of the United Nations Security Council and has the power to veto proposed actions.

### C. The Stages of ICC Proceedings

30.    Matters before the ICC proceed in several stages: (1) preliminary examination, involving an initial assessment of various preconditions to a formal investigation, including jurisdictional criteria, evidentiary sufficiency, the gravity of the alleged crimes, and the interests of justice and victims; (2) formal investigation, involving evidence-gathering, identification of possible suspects, and the issuance of arrest warrants or summonses to appear; (3) pre-trial, involving a determination by the ICC judges of whether there is sufficient cause to take the case to trial; (4) trial, requiring proof of guilt beyond a reasonable doubt before the ICC judges may convict and impose a sentence and/or order reparations for victims; (5) appeals; and (6) enforcement of any sentence in a country that has agreed to enforce ICC sentences.

31.    Article 42(2) of the Rome Statute gives the Prosecutor full authority over OTP operations, and Article 54(1)(b) gives the Prosecutor the power and duty to "[t]ake appropriate measures to ensure the effective investigation and prosecution of crimes" within the ICC's jurisdiction. The OTP may not delegate its investigative and prosecutorial functions to external parties or other departments. *See* Rome Stat. art. 42.

32.    The Office of the Prosecutor consists of three main Divisions: (1) the Jurisdiction, Complementarity and Cooperation Division, which conducts preliminary examinations of "situations" (that is, matters involving alleged crimes within the ICC's jurisdiction); (2) the Investigation Division, which conducts formal investigations of the alleged crimes associated with

9

those situations; and (3) the Prosecution Division, which prepares litigation strategies and prosecutes the allegedly responsible individuals before the ICC's judges.

33.    Each Division of OTP reports to the Prosecutor and the Deputy Prosecutor(s). The OTP is currently staffed with one Prosecutor and two Deputy Prosecutors, supported by advisors and staff.[3] Karim Khan is the Prosecutor; the Assembly of States Parties elected him to that role in 2021.

34.    The Prosecutor may authorize OTP staff "to represent him or her in the exercise of his or her functions," but may not delegate to OTP staff certain "inherent powers," ICC Rule of Proc. and Evid. 11,[4] such as the power to "initiate an investigation," Rome Stat. art. 53.

35.    The Prosecutor may initiate an investigation of a situation referred by a State Party or the United Nations Security Council following preliminary examination. The Prosecutor may also request authorization from the ICC's Pre-Trial Chamber to initiate an investigation following the preliminary examination stage under Article 15 of the Rome Statute, based on information of crimes within the ICC's jurisdiction and without a referral from a State Party or the United Nations Security Council.

36.    During the preliminary examination stage, the OTP assesses the preconditions specified in the Rome Statute for initiating or requesting a formal investigation. The OTP must assess, *inter alia*, whether there is a reasonable basis to believe that a crime within the ICC's jurisdiction has been committed; the alleged crimes were committed on or after July 1, 2002; the alleged crimes were committed in the territory of a State Party or by nationals of a State Party; the gravity of the

---

[3] *Who's Who*, ICC, https://www.icc-cpi.int/about/otp/who-s-who (last visited Apr. 8, 2025).

[4] See Official Records of the Assembly of States Parties to the Rome Statute of the International Criminal Court, First session, New York, ICC-ASP/1/3 and Corr.1, part II.A (Sept. 3–10, 2002), https://www.icc-cpi.int/sites/default/files/2024-09/RulesProcedureEvidenceEng-2024.pdf.

alleged crimes is sufficient to warrant ICC involvement; and opening an investigation would serve the interests of justice and the victims. The OTP must also make a complementarity determination: because national authorities bear primary responsibility for investigating and prosecuting the crimes within the ICC's jurisdiction, the OTP may initiate or request a formal investigation only when "national authorities have failed to uphold this primary responsibility" and "there are no genuine investigations or prosecutions for the same crimes at the national level."[5]

37.    When the Prosecutor seeks to initiate a formal investigation without a referral from a State Party or the United Nations Security Council under Article 15 of the Rome Statute, he must request authorization from the judges of the ICC's Pre-Trial Chamber. The Pre-Trial Chamber must verify that the Rome Statute's preconditions to an investigation are satisfied and that there is a reasonable basis to proceed to a formal investigation. The Pre-Trial Chamber has the power to reject the Prosecutor's request to initiate an investigation.

38.    Likewise, certain decisions by the Prosecutor not to initiate an investigation of a situation referred by a State Party or the United Nations Security Council are reviewable by the Pre-Trial Chamber under Article 53(3) of the Rome Statute. The referrer may request the Pre-Trial Chamber to conduct such a review, and after review, the Pre-Trial Chamber may request that the Prosecutor reconsider his decision not to open a formal investigation. If the Prosecutor's decision rests solely on a conclusion that an investigation would not be in the interests of justice, the Pre-Trial Chamber may initiate its own review, and it must confirm the Prosecutor's decision for that decision to be effective.

39.    In the investigation stage, the OTP often sends investigators, cooperation advisers, and prosecutors to relevant countries with their consent to collect evidence of alleged crimes.

---

[5] *Office of the Prosecutor*, ICC, https://www.icc-cpi.int/about/otp (last visited Apr. 8, 2025).

### D. The Work of the ICC and the OTP

40.   In conducting preliminary examinations, investigations, and prosecutions, the OTP seeks and obtains information and assistance from a range of state and non-state actors and individuals: States Parties and non-States Parties, Special Advisers appointed by the Prosecutor to provide advice because of their legal expertise on specific issues, informal advisers to the OTP, international and regional organizations, victims and their representatives, and members of civil society. Under Article 42(1) of the Rome Statute, the OTP (and ultimately the Prosecutor) is responsible for conducting all preliminary examinations, investigations, and prosecutions.

41.   Victims of crimes within the ICC's jurisdiction, as well as their representatives, play an active role at all stages of ICC proceedings. Victims and their representatives frequently provide the OTP with information and evidence during the preliminary examination and formal investigation phases. In the course of preliminary examinations, the OTP, in performing its evidence-gathering function, may also contact potential victims through their legal representatives. Civil society groups also submit evidence to the OTP regarding situations that are under, or are being considered for, preliminary examination.

42.   Additionally, under Article 15(3) of the Rome Statute and Rule 50(3) of the ICC's Rules of Procedure and Evidence, victims may, of their own accord or in response to a request by the Prosecutor, make written representations to the ICC's Pre-Trial Chamber regarding an Article 15 request by the Prosecutor for the Chamber's authorization to open a formal investigation.

43.   The ICC's judges may issue arrest warrants at the request of the OTP, but the ICC lacks independent enforcement power and relies on States Parties to enforce its warrants. Non-States Parties, including the United States, have provided critical assistance in facilitating the transfer of suspects to ICC custody. To date, the ICC has issued arrest warrants or summonses for 69 defendants and has convicted 11 of them.

44.  Although the United States has not ratified the Rome Statute, both Democratic and Republican administrations have supported several prominent ICC investigations and prosecutions. For example:

a.  *Democratic Republic of the Congo*: In April 2004, the Democratic Republic of the Congo referred to the ICC war crimes and crimes against humanity—including rape, murder, and the use of child soldiers—allegedly committed during an armed conflict in its territory since July 2002. The OTP opened an investigation into these crimes in June 2004. The investigation led to charges against Bosco Ntaganda, a militia commander, among other individuals. In March 2013, Ntaganda surrendered to the U.S. Embassy in Rwanda, and the United States facilitated his transfer to ICC custody. At the time, the "United States welcome[d] the removal of one of the most notorious and brutal rebels in the Democratic Republic of the Congo, Bosco Ntaganda, . . . to the International Criminal Court."[6] In November 2013, the U.S. Ambassador-at-Large for War Crimes Issues commended the United States's "key role in the surrender of Bosco Ntaganda to the ICC."[7] In July 2019, the Trial Chamber of the ICC found Ntaganda guilty of five counts of crimes against humanity and thirteen counts of war crimes, including offenses such as intentionally directing attacks against civilians, ordering the displacement of the civilian population,

---

[6] Press Statement, John Kerry, Sec. of State, U.S. Dep't of State, Bosco Ntaganda's Expected Surrender to the International Criminal Court (Mar. 22, 2013), https://2009-2017.state.gov/secretary/remarks/2013/03/206556.htm.

[7] Remarks, Stephen J. Rapp, Amb.-at-Large for War Crimes Issues, Office of Glob. Crim. Just., Statement of the U.S. at the Twelfth Session of the Assembly of States Parties of the International Criminal Court (Nov. 21, 2013), https://2009-2017.state.gov/j/gcj/us_releases/remarks/2013/218069.htm.

and conscripting and enlisting children under the age of fifteen years into an armed group and using them to participate actively in hostilities. In November 2019, the Trial Chamber sentenced him to thirty years in prison.

b.  *Uganda*: In January 2004, Uganda referred to the ICC war crimes and crimes against humanity—including rape and murder—allegedly committed during an armed conflict in its territory since July 2002. The OTP opened an investigation into these crimes in July 2004. The investigation has led to five ICC arrest warrants. U.S. forces captured one defendant, Dominic Ongwen, in the Central African Republic in 2015 and facilitated his transfer to Ugandan and Central African Republic forces for transfer to ICC custody. The U.S. Department of State "welcome[d] the transfer of Dominic Ongwen by Central African authorities to the International Criminal Court," calling it "a welcome step toward justice for the victims of the Lord's Resistance Army."[8]

c.  *Central African Republic*: In December 2004, the Central African Republic referred to the ICC war crimes and crimes against humanity—including mass rapes and killings—allegedly committed during an armed conflict in its territory in 2002 and 2003. The OTP opened an investigation into these crimes in May 2007. In May 2014, the Central African Republic referred to the ICC additional war crimes and crimes against humanity—including rape, murder, and the use of child soldiers—allegedly committed during an armed conflict in its territory since August 2012. The OTP opened an investigation into these crimes in

---

[8] Press Statement, Jen Psaki, Dep't Spokesperson, U.S. Dep't of State, Transfer of Dominic Ongwen to the International Criminal Court (Jan. 20, 2015), https://2009-2017.state.gov/r/pa/prs/ps/2015/01/236142.htm.

September 2014. In March 2016, the U.S. Department of State indicated that "[t]he United States supports the ICC's investigations in the Central African Republic, and we commend [the Central African Republic]'s commitment to ensuring accountability for serious crimes, including through its cooperation with the ICC in this matter."[9]

d. *Darfur, Sudan*: In March 2005, the United Nations Security Council referred to the ICC the situation in the Darfur region of Sudan. In June 2005, the OTP opened an investigation into crimes allegedly committed in Darfur since July 2002, including genocide, war crimes, and crimes against humanity. Although the United States holds a unilateral veto as a permanent Security Council member, President George W. Bush's administration abstained from the vote referring the Darfur situation to the ICC, thereby allowing the referral to proceed. A March 2005 Security Council press release reported that the Acting U.S. Permanent Representative to the United Nations said the United States "strongly supported bringing to justice those responsible for the crimes and atrocities that had occurred in Darfur and ending the climate of impunity there."[10] Likewise, in a February 2007 press conference, the U.S. Department of State stated that the United States "fully support[s] bringing to justice those responsible for crimes and atrocities that occurred . . . in Darfur. . . . [W]e

---

[9] Press Statement, John Kirby, Asst. Sec. and Dep't Spokesperson, Bureau of Pub. Affairs., U.S. Dep't of State, ICC Convicts Jean-Pierre Bemba Gombo of War Crimes and Crimes Against Humanity (Mar. 22, 2016), https://2009-2017.state.gov/r/pa/prs/ps/2016/03/254958.htm.

[10] Press Release, U.N. Sec. Council, Security Council Refers Situation in Darfur, Sudan, to Prosecutor of International Criminal Court, U.N. Press Release SC/8351 (Mar. 31, 2005), https://www.un.org/press/en/2005/sc8351.doc.htm.

would call upon the Sudanese Government to cooperate fully with the ICC under the aegis of UN Security Council Resolution 1593. . . . [I]t is now incumbent upon the Government of Sudan, we believe, to cooperate with the ICC."[11]

e.  *Libya*: In February 2011, the United Nations Security Council referred to the ICC the situation in Libya, which included widespread and systematic attacks on civilians. In March 2011, the OTP opened an investigation into crimes allegedly committed in Libya since February 2011, including murder, torture, and persecution. The United States voted for the referral. The U.S. Permanent Representative to the United Nations explained at the time of the vote that "the Security Council has responded to the Libyan people's cry for help. This Council's purpose is clear: to protect innocent civilians. On February 26, . . . the Security Council demanded a halt to the violence in Libya and enabled genuine accountability for war crimes and crimes against humanity by referring the situation to the International Criminal Court."[12] According to a May 2011 Security Council press release, the Ambassador said the Security Council's referral "reflect[ed] the importance the international community attached to

---

[11] Daily Press Briefing, Sean McCormack, Spokesman, U.S. Dep't of State (Feb. 27, 2007), https://2001-2009.state.gov/r/pa/prs/dpb/2007/feb/81127.htm.

[12] Remarks, Susan E. Rice, U.S. Permanent Rep. to the U.N., Explanation of Vote on UN Security Council Resolution 1973, Libya (Mar. 17, 2011), https://2009-2017.state.gov /p/io/rm/2011/158576.htm.

ensuring that those responsible for widespread attacks against innocent civilians in Libya were held responsible."[13]

f.  *Mali*: In July 2012, Mali referred to the ICC war crimes—including deliberate destruction of Muslim shrines in the city of Timbuktu—allegedly committed during an armed conflict in its territory since January 2012. The OTP opened an investigation into these crimes in January 2013. The U.S. Department of State "welcome[d] the announcement by the Prosecutor of the International Criminal Court . . . that Ahmad Al Faqi Al Mahdi, an alleged member of the Islamic extremist group Ansar al-Dine . . . , has been surrendered to the Court by Nigerien authorities," called the surrender "an important step toward holding accountable those responsible for serious crimes in Mali," and commended "Mali's commitment to ensuring accountability for serious crimes and its cooperation with the ICC in this matter."[14]

g.  *Venezuela*: In September 2018, a group of States Parties referred to the ICC crimes against humanity—including arbitrary detention, torture, rape and sexual violence, and persecution—committed by the government of Venezuelan dictator Nicolás Maduro against its political opponents. In November 2021, the OTP requested authorization to open an investigation, which the Pre-Trial Chamber granted. The following year, the U.S. Ambassador-at-Large for Global

---

[13] Press Release, U.N. Sec. Council, Chief Prosecutor of International Criminal Court Tells Security Council He Will Seek Arrest Warrants Soon Against Three Individuals in First Libya Case, U.N. Press Release SC/10241 (May 4, 2011), https://www.un.org/press/en/2011/sc10241.doc.htm.

[14] Press Statement, John Kirby, Dep't Spokesperson, U.S. Dep't of State, ICC Announces Case on Destruction of Cultural Sites in Mali (Oct. 1, 2015), https://2009-2017.state.gov/r/pa/prs/ps/2015/10/247741.htm.

Criminal Justice announced the United States's support for the investigation.[15] The investigation was paused following a deferral request from Venezuela under Article 18 of the Rome Statute, but the Pre-Trial Chamber authorized the OTP to resume it in June 2023. The U.S. Ambassador "welcomed" that development, along with progress in a host of other OTP investigations and prosecutions.[16]

h. *Myanmar*: In August 2022, the U.S. Secretary of State expressed the United States's "commit[ment] to advancing justice and accountability for Rohingya and all the people of Burma in solidarity with the victims and survivors," and indicated the government's support for "credible courts around the world that have jurisdiction in cases involving Burmese military's atrocity crimes." In particular, the Secretary indicated that the United States "would support a UN Security Council referral of the situation in Burma to the International Criminal Court."[17]

i. *Ukraine*: In March 2022, a coordinated group of States Parties referred to the ICC war crimes and crimes against humanity—including attacks against

---

[15] *See* Speech, Beth Van Schaack, Amb.-at-Large for Glob. Crim. Just., Building Justice: Criminal Accountability and the Road to Peace, Questions on Justice in Libya and Beyond (Dec. 1, 2022), https://2021-2025.state.gov/building-justice-criminal-accountability-and-the-road-to-peace-questions-on-justice-in-libya-and-beyond.

[16] Remarks, Beth Van Schaack, Amb.-at-Large for Glob. Crim. Just., Off. of Glo. Crim. Just., Statement of the United States at the 22nd Session of the Assembly of States Parties of the International Criminal Court (Dec. 8, 2023), https://2021-2025.state.gov/statement-of-the-united-states-at-the-22nd-session-of-the-assembly-of-states-parties-of-the-international-criminal-court.

[17] Press Statement, Antony J. Blinken, Sec. of State, U.S. Dep't of State, Marking Five Years Since the Genocide in Burma (Nov. 20, 2023), https://bd.usembassy.gov/28385.

civilians and the unlawful deportation of children—allegedly committed in Russia's recent invasion of and subsequent war in Ukraine. The OTP opened an investigation a day later. The United States has supported this investigation in a number of ways. In December 2022, Congress, acting on a bipartisan basis, lifted with respect to the situation in Ukraine certain restrictions on U.S. government cooperation with the ICC.[18] The following year, after the ICC issued a warrant for the arrest of Russian President Vladimir Putin, then-President Joseph R. Biden, Jr. told the press that the step was "justified" and that the ICC "makes a very strong point."[19] And a few months later, he reportedly ordered the U.S. government to share evidence of Russian war crimes with the ICC to aid its investigation—a move supported by Senators of both parties.[20]

### E. Background on OTP Investigations to Which Plaintiffs Have Contributed

### Bangladesh/Myanmar

45.    On September 18, 2018, then-Prosecutor Fatou Bensouda announced that the OTP was conducting a preliminary examination into crimes against humanity committed against the ethnic minority Rohingya people in the People's Republic of Bangladesh and the Republic of the Union of Myanmar, known as the situation in Bangladesh/Myanmar.

---

[18] Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. K, tit. VII, 136 Stat. 4459, 5092 (2022) (codified in relevant part at 22 U.S.C. § 7433(a)).

[19] Remarks, President Joseph R. Biden, Jr., Remarks by President Biden Before Marine One Departure (Mar. 17, 2023), https://bidenwhitehouse.archives.gov/briefing-room/speeches-remarks/2023/03/17/remarks-by-president-biden-before-marine-one-departure-32.

[20] *See* Charlie Savage, *Biden Orders U.S. to Share Evidence of Russian War Crimes With Hague Court*, N.Y. Times (July 26, 2023), https://www.nytimes.com/2023/07/26/us/politics/biden-russia-war-crimes-hague.html.

46.    On July 4, 2019, Ms. Bensouda requested authorization from the Pre-Trial Chamber under Article 15(3) of the Rome Statute to initiate a formal investigation into alleged crimes against humanity, such as deportation and persecution, committed against the Rohingya population in 2016 and 2017 at least in part in Bangladesh, a State Party to the Rome Statute, and in Myanmar. In this request, Ms. Bensouda explained that hundreds of thousands of the Rohingya people had been deported from Myanmar to Bangladesh.[21] Ms. Bensouda elaborated that the Rohingya people have suffered decades of "particularly severe discrimination by the Myanmar Government" through a "lack of legal status," "restrictions on movement, subsistence and development," and other human rights violations.[22]

47.    On November 14, 2019, the Pre-Trial Chamber granted the Prosecutor's Article 15 request.

48.    On November 27, 2024, Mr. Khan—now Prosecutor—filed an application for an arrest warrant in connection with the investigation of Senior General and Acting President Min Aung Hlaing, Commander-in-Chief of the Myanmar Defence Services, for the crimes against humanity of deportation and persecution of the Rohingya people committed in Myanmar and partly in Bangladesh.[23] The OTP alleged that these crimes were committed between August 25, 2017 and December 31, 2017 by the armed forces of Myanmar and supported by the national police, border

---

[21] OTP, Situation in the People's Republic of Bangladesh / Republic of the Union of MyanmarICC-01/19, Request for authorization of an investigation pursuant to article 15, (July 4, 2019), http://icc-cpi.int/sites/default/files/CourtRecords/CR2019_03510.PDF.

[22] *Id*. at 22.

[23] Statement, Prosecutor of the ICC, Application for an Arrest Warrant in the Situation in Bangladesh/Myanmar (Nov. 27, 2024), https://www.icc-cpi.int/news/statement-icc-prosecutor-karim-aa-khan-kc-application-arrest-warrant-situation-bangladesh.

guard police, and non-Rohingya citizens. That application for an arrest warrant remains pending before the Pre-Trial Chamber.

49.    One of the four ICC judges sanctioned by the Secretary of State sits in ICC Pre-Trial Chamber I, and her current situations and cases include the Situation in the People's Republic of Bangladesh/Republic of the Union of Myanmar.

### Afghanistan

50.    In 2007, the OTP announced that it was conducting a preliminary examination of the situation in Afghanistan based on information available to the office without a referral from a State Party or the United Nations Security Council. On November 20, 2017, Ms. Bensouda, then Prosecutor, requested authorization from the Pre-Trial Chamber under Article 15(3) of the Rome Statute to initiate a formal investigation into alleged war crimes and crimes against humanity (1) related to the armed conflict in Afghanistan and allegedly committed in Afghanistan since May 1, 2003, and (2) related to the armed conflict in Afghanistan and allegedly committed in the territory of other States Parties to the Rome Statute since July 1, 2002.

51.    On April 12, 2019, the Pre-Trial Chamber rejected Ms. Bensouda's Article 15 request for authorization of an investigation, finding that an investigation would not serve the interests of justice. But on March 5, 2020, the Appeals Chamber of the ICC reversed that ruling and unanimously authorized Ms. Bensouda to investigate alleged crimes relating to the situation in Afghanistan, including both crimes allegedly committed in Afghanistan and crimes that have a sufficient nexus to the armed conflict in Afghanistan and were allegedly committed in the territory of other States Parties. The investigation covered crimes allegedly committed by the Taliban and affiliated groups, the Afghan National Security Forces, and the U.S. military and Central Intelligence Agency (the "CIA").

52.   On April 15, 2020, Ms. Bensouda notified the Pre-Trial Chamber that the government of Afghanistan had requested, under Article 18(2) of the Rome Statute, that the OTP defer its Afghanistan investigation pending Afghanistan's own investigations of "its nationals or others within its jurisdiction with respect to criminal acts allegedly committed within the authorised parameters of the Situation in Afghanistan, which may constitute crimes referred to in Article 5 of the Statute, and which relate to the information provided in your notification to States dated 12 March 2020."

53.   The following year, on September 27, 2021, Mr. Khan—now Prosecutor—requested authorization from the Pre-Trial Chamber to resume the investigation. In making that request, Mr. Khan explained that he had "decided to focus [the OTP]'s investigations in Afghanistan on crimes allegedly committed by the Taliban and the Islamic State – Khorasan Province ('IS-K') and to deprioritise other aspects of this investigation." The deprioritized aspects of the investigation concerned actions allegedly committed by U.S. personnel in Afghanistan, largely ending the threat of investigative action or prosecution targeting U.S. persons. According to Mr. Khan, this decision was warranted in light of "[t]he gravity, scale and continuing nature of alleged crimes by the Taliban and the Islamic State, which include allegations of indiscriminate attacks on civilians, targeted extrajudicial executions, persecution of women and girls, crimes against children and other crimes affecting the civilian population at large."[24] On October 31, 2022, the Pre-Trial Chamber granted that authorization, on the grounds that the Afghan government was not carrying

---

[24] *See* Statement, Prosecutor of the ICC, Statement of the Prosecutor of the International Criminal Court, Karim A. A. Khan QC, following the application for an expedited order under article 18(2) seeking authorisation to resume investigations in the situation in Afghanistan, ICC. (Sept. 27, 2021), https://www.icc-cpi.int/news/statement-prosecutor-international-criminal-court-karim-khan-qc-following-application.

out genuine investigations in a manner that would justify deferral or showing an interest in pursuing its prior deferral request.

54. On January 23, 2025, Mr. Khan announced that the OTP had applied for two warrants for arrest for the crime against humanity of persecution on gender grounds. The subjects of both warrant requests are leaders of the Taliban: Haibatullah Akhundzada, the Supreme Leader of the Taliban, and Abdul Hakim Haqqani, the Chief Justice of the "Islamic Emirate of Afghanistan."[25] On July 8, 2025, the Pre-Trial Chamber issued arrest warrants for Akhundzada and Haqqani.

55. No arrest warrants have been issued for any U.S. persons in connection with the OTP's investigation into the situation in Afghanistan.

### F. Plaintiffs' Work with the OTP

### Plaintiff Smith

56. Plaintiff Smith is the co-founder and Chief Executive Officer of Fortify Rights, an award-winning nonprofit, nongovernmental organization dedicated to ensuring human rights for all by investigating human rights violations, engaging with officials and institutions regarding potential solutions to address human rights concerns, and strengthening defenders of human rights. His work has exposed genocide, war crimes, crimes against humanity, multibillion-dollar corruption, and other human rights violations.

57. Plaintiff Smith has worked regularly with the ICC since 2019, with a particular focus on the OTP's investigation into the situation in Bangladesh/Myanmar.

---

[25] *See* Statement, Prosecutor of the ICC, Statement of ICC Prosecutor Karim A. A. Khan KC: Applications for arrest warrants in the situation in Afghanistan, ICC (Jan. 23, 2025), https://www.icc-cpi.int/news/statement-icc-prosecutor-karim-aa-khan-kc-applications-arrest-warrants-situation-afghanistan.

58. In support of the investigation, Plaintiff Smith has led Fortify Rights's work on, and routinely provided to OTP personnel, investigative reports detailing atrocity crimes against the Rohingya population in Myanmar. Then-Prosecutor Bensouda cited one of these reports dozens of times in her successful request to the ICC Pre-Trial Chamber to authorize the Bangladesh/Myanmar investigation.[26]

59. Plaintiff Smith has regularly shared and discussed with OTP and ICC personnel the direct evidence he and his colleagues have obtained of atrocity crimes against the Rohingya. For example:

a. On October 17, 2019, Fortify Rights submitted to the OTP two firsthand testimonies from Rohingya survivors of horrific crimes in Myanmar, in addition to information about a massacre of Rohingya civilians in Myanmar and a report detailing how Myanmar authorities systematically denied Rohingya the right to a nationality and revoked their citizenship ahead of widespread violent attacks. And more recently, in August 2024, Plaintiff Smith provided to the OTP evidence collected by Fortify Rights of the involvement of the non-state Arakan Army in atrocity crimes against Rohingya women, men, and children.[27]

b. In June 2020, Plaintiff Smith met virtually with an OTP Investigator and others from the OTP to discuss Fortify Rights's novel research into the chain of

---

[26] *See* Situation in the People's Republic of Bangladesh/Republic of the Union of Myanmar, ICC-01/19, Request for Authorisation of an Investigation Pursuant to Article 15 (July 4, 2019), http://icc-cpi.int/sites/default/files/CourtRecords/CR2019_03510.PDF (citing "They Gave Them Long Swords:" Preparations for Genocide and Crimes Against Humanity Against Rohingya Muslims in Rakhine State, Myanmar, Fortify Rights (July 19, 2018)).

[27] *See, e.g.*, News Release, Fortify Rights, International Criminal Court: Investigate Arakan Army Massacre of Rohingya Civilians, Hold Perpetrators Accountable (Aug. 27, 2024), https://perma.cc/2D8E-UCUU.

command of the Myanmar military—research critical to understanding which specific individuals may be criminally liable for atrocity crimes against the Rohingya.[28] At this meeting, Plaintiff Smith also discussed video evidence obtained by Fortify Rights of Myanmar soldiers speaking to other residents of Rakhine State, Myanmar about their plans to "clear out" the Rohingya. And he explained to the OTP how, in May 2020, he and Fortify Rights had tracked down in Western Myanmar two perpetrators who had confessed to multiple atrocity crimes, including murdering up to 180 civilians in Rakhine State, rape of civilians, burying bodies in mass graves, and other crimes against Rohingya in five villages in Maungdaw Township, Rakhine State during the Myanmar military's 2017 attacks against Rohingya civilians. Plaintiff Smith provided the OTP with the specific location of the two perpetrators, together with reliable confirmation he had obtained that both would cooperate with international justice mechanisms.[29] Due in part to Plaintiff Smith's assistance, those perpetrators are now in the hands of the ICC.

c.  In December 2020, at the request of a cooperation advisor at the OTP, Plaintiff Smith visited the ICC in The Hague to meet with the OTP's Bangladesh/Myanmar investigation team, including a Senior Investigator.

---

[28] *See* "They Gave Them Long Swords": Preparations for Genocide and Crimes Against Humanity Against Rohingya Muslims in Rakhine State, Myanmar, Fortify Rights (July 19, 2018), https://perma.cc/GY9Q-DUQJ; "Nowhere is Safe": The Myanmar Junta's Crimes Against Humanity Following the Coup d'État, Fortify Rights (Mar. 2022), https://perma.cc/6VR3-BGSE.

[29] *Cf.* News Release, Fortify Rights, International Criminal Court: Prosecute and Offer Witness Protection to Myanmar Army Deserters (Sept. 8, 2020), https://www.fortifyrights.org/mya-inv-2020-09-08/.

During the meeting, he shared with the investigative team further evidence of atrocity crimes and specific investigative leads uncovered by Fortify Rights, including specific people and events to target for further investigation, among other information.

60.   In the course of his work with the OTP, Plaintiff Smith has regularly met with OTP employees, including at senior leadership levels, to provide guidance and information in support of their work. These employees include the staff leading the Bangladesh/Myanmar investigation, international cooperation advisers, a special advisor to the Prosecutor, and a Country Expert. Plaintiff Smith has also spoken in public fora with OTP personnel. For example:

   a.   On December 7, 2021, Fortify Rights co-hosted a side event at the ICC's annual Assembly of States Parties in The Hague, which involved a public panel discussion, entitled "Myanmar: What Next for International Justice Efforts Following the *Coup*?" Plaintiff Smith spoke on the panel alongside a special advisor to the OTP Prosecutor.

   b.   In March 2023, Plaintiff Smith met twice virtually with the Genocide Advisor to the ICC Prosecutor to share sensitive information about a large trove of official Myanmar documents, including internal memos and notes from Myanmar Cabinet-level meetings that occurred during the Rohingya genocide. A senior staff member of Myanmar State Counsellor Aung San Suu Kyi during the Rohingya genocide had personally provided the evidence to Plaintiff Smith and expressed a willingness to cooperate with international justice mechanisms. At the time, the witness was in a precarious situation, living in hiding from the Myanmar junta on the Thailand-Myanmar border, and Plaintiff Smith and the

Prosecutor's Advisor discussed the importance of getting him to safety for cooperation with future prosecutions and evidence sharing. The witness was subsequently resettled from Thailand to a third country. During these meetings, Plaintiff Smith also shared general information about his and his team's investigative work relating to Myanmar generals and others responsible for committing atrocity crimes in Myanmar.

c.  In March 2024, Plaintiff Smith met virtually with senior OTP staff to share information about a high-ranking Myanmar military officer who fled to Bangladesh and was facing forced return to Myanmar by the Bangladeshi authorities. Fortify Rights had information that the individual was responsible for atrocities against Rohingya civilians in Myanmar in 2017 and requested that the OTP intervene because of the possibility that the defector could contribute to the ICC's body of evidence of atrocities committed by the Myanmar military. In less than 24 hours, Plaintiff Smith was told by ICC personnel that the OTP was actively addressing the matter.

61.  The Executive Order, Regulations, and Designations have forced Plaintiff Smith to stop ongoing and planned communications with the OTP because of the substantial risk that they will cause Plaintiff Smith to be subjected to penalties under IEEPA. For example, due to the Executive Order, Regulations, and Designations, Plaintiff Smith has refrained from communicating with OTP as follows:

a.  In response to a request from the head of the OTP's Myanmar investigation, Plaintiff Smith had planned to share with the OTP information that could help

expand OTP jurisdiction to investigate ongoing atrocities occurring nationwide in Myanmar following a deadly *coup d'etat* in 2021.

b.  Plaintiff Smith wishes to provide the OTP further evidence of crimes, including newly uncovered details of ongoing mass atrocity crimes committed by non-state actors in Myanmar, as well as information known only to Fortify Rights that identifies members of the Myanmar military junta who may be criminally liable for their role in deadly airstrikes against civilian targets.

c.  In 2024, an OTP representative informed Plaintiff Smith that a delegation from Myanmar would be helpful in explaining to the OTP why its jurisdiction should be expanded to encompass more crimes occurring in that country. Plaintiff Smith has abandoned plans to organize such a delegation to the OTP this year.

d.  On March 18, 2025, Plaintiff Smith and Fortify Rights published a report on widespread, heinous violence committed against Rohingya refugees in Bangladesh by Rohingya-led militant groups. That same day, Bangladeshi authorities arrested the leader of an armed group featured in the report. If not for the substantial risk of IEEPA penalties, Plaintiff Smith would immediately have communicated with OTP staff about liaising with local authorities in Dhaka, Bangladesh to help ensure that OTP could take custody of the arrested militant leader.

**Plaintiff Radhakrishnan**

62.  Plaintiff Radhakrishnan is a leading proponent of gender justice and women's rights, and an expert in international human rights and criminal law. She has worked with the OTP and ICC as an external advocate and expert since around 2014, when she served as Legal Director for

the Global Justice Center. She currently serves as a Legal Advisor for the End Gender Apartheid Campaign, which focuses on sexual and gender-based rights violations and crimes in Iran and Afghanistan.

63.    Plaintiff Radhakrishnan's work with the OTP and ICC focuses on matters involving sexual and gender-based violence; it includes preparing and filing Article 15 submissions with the OTP, advising victim communities on possible legal recourse before the ICC, arguing as an amicus in connection with ICC prosecutions, facilitating discussions between OTP personnel and victim communities, advising the OTP on the investigation and prosecution of sexual and gender-based crimes, and consulting with the OTP on its internal policies. To illustrate:

    a.    In December 2024, Plaintiff Radhakrishnan accompanied a group of eight Afghan women to The Hague. There, they met with the OTP's Afghanistan situation team, as well as other relevant OTP staff, with whom they discussed the status and scope of the OTP's investigation into systematic violations of women's rights and gender-based crimes committed by the Taliban. Their meeting also covered ways in which civil society could support the OTP through providing documentation, evidence, and legal expertise.

    b.    Plaintiff Radhakrishnan has provided expert advice to the OTP on its ongoing development of policies relating to gender justice, as well as its development of policies relating to gender persecution (2022), gender-based crimes (2023), and slavery crimes (2024). In doing so, Plaintiff Radhakrishnan has regularly engaged with OTP staff at all levels, including the Deputy Prosecutor, staff focused on sexual and gender-based violence, and multiple Special Advisors to the Prosecutor.

c.   Since November 2019, Plaintiff Radhakrishnan has facilitated the OTP's engagement with Rohingya partner organizations and experts who seek to contribute to the OTP's investigation of the situation in Bangladesh/Myanmar. For instance, in December 2022, Plaintiff Radhakrishnan organized and spoke on a panel during the ICC's Assembly of States Parties with Prosecutor Khan on justice options for Myanmar. In January 2025, following the Prosecutor's statement that he was seeking an arrest warrant for Senior General Min Aung Hlaing, Plaintiff Radhakrishnan moderated a discussion on justice for the Rohingya that included the OTP's International Cooperation Officer on the Bangladesh/Myanmar matter.

d.   Plaintiff Radhakrishnan argued as amicus in *The Prosecutor v. Dominic Ongwen* concerning a Ugandan war criminal, presenting to the Appeals Chamber on the crime of forced pregnancy, in the Court's first prosecution of that crime.

e.   In 2023, Plaintiff Radhakrishnan moderated an official roundtable at the United Nations with prospective judicial candidates for the ICC on issues of importance to civil society, including approaches to sexual and gender-based crimes.

f.   Plaintiff Radhakrishnan has regularly visited the ICC—most recently in December 2024—as part of her advocacy and consulting work, including for meetings and consultations with the OTP. Visiting the ICC in person enhances her work with ICC staff, including at the OTP, as well as her work supporting victims and other organizations that engage with the ICC.

g. Plaintiff Radhakrishnan has regularly attended the annual meeting of the ICC Assembly of State Parties, where, among other things, she has met in person with OTP staff and has organized or participated in discussions of situations within OTP's remit—including events at which Mr. Khan has spoken.

h. In 2017, Plaintiff Radhakrishnan prepared a filing to the OTP urging it to investigate the Islamic State of Iraq and Syria's ("ISIS") genocide against the Yazidi people, in support of a submission to the court from two Yazidi partner organizations, the Free Yezidi Foundation and Yazda. Plaintiff Radhakrishnan engaged in direct advocacy with the OTP on the filing and supported the Yazidi partners in their own advocacy.

i. Plaintiff Radhakrishnan sits on the Board of the Women's Initiatives for Gender Justice ("WIGJ"). Among other things, WIGJ monitors all ICC situations and cases and engages with all arms of the ICC, including the OTP, to ensure the effective prosecution of sexual and gender-based crimes. WIGJ also hosts the secretariat of the Coalition for the International Criminal Court (CICC), a global civil society network of member organizations that led the campaign to set up the International Criminal Court and monitor its current work, ranging from community and grassroots groups in 150 countries to prominent international human rights non-governmental organizations.

64. The Executive Order, Regulations, and Designations have forced Plaintiff Radhakrishnan to stop ongoing and planned work with the OTP because of the substantial risk that her communications will cause Plaintiff Radhakrishnan to be subjected to penalties under IEEPA. For example, when President Trump issued the Executive Order, Plaintiff Radhakrishnan was in

the midst of working with Afghan partners to provide the OTP with evidence of, and other information relating to, sexual and gender-based crimes perpetrated by the Taliban in Afghanistan—including in the form of an Article 15 submission. Because of the Executive Order, Regulations, and Designations, Plaintiff Radhakrishnan has had to cease her work on that Article 15 submission, can no longer assist the Afghan women with whom she had been partnering in submitting evidence to the OTP, and has also been forced to abandon plans to consult with the OTP on using the concept of gender apartheid to frame its potential cases on Afghanistan.

## II. Legal Framework of Economic Sanctions

### A. The International Emergency Economic Powers Act

65. IEEPA authorizes the President to take specific actions in response to a national emergency constituting an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). In particular, once the President has declared such an emergency, IEEPA permits the President to:

> block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States. *Id.* § 1702(a)(1)(B).

66. The President may impose IEEPA sanctions only to respond to the threat that gave rise to the national emergency—not for any other purpose. *Id.* § 1701(b).

67. Presidents have often exercised their IEEPA authority by issuing an executive order that declares a national emergency and "blocks" (that is, freezes) the property of persons designated either by the order or later by specific federal officials or agencies, such as the

Department of the Treasury and the Department of State, to which the order delegates IEEPA authority. These orders block all of a designated person's property and property interests that are in the United States or in the possession or control of a U.S. person, which means that U.S. persons may not transfer or otherwise deal in such property.

68.    A typical executive order under IEEPA also prohibits U.S. persons from providing any "funds, goods, or services by, to, or for the benefit" of the designated persons. OFAC has interpreted this language broadly to prohibit nearly all interaction by U.S. persons with designated persons. For example, OFAC regulations implementing sanctions against Russia for its invasion of Ukraine clarify that U.S. persons may not provide "services of any nature whatsoever" that benefit sanctioned Russian persons or entities. 31 C.F.R. § 589.331.

69.    When the president or OFAC designates a person or entity for sanctions, OFAC adds them to the SDN List.

70.    IEEPA makes it unlawful for anyone "to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under" the statute. 50 U.S.C. § 1705(a). The consequences of violating IEEPA sanctions can be extremely severe. Anyone who violates IEEPA sanctions, intentionally or not, may be subject to a civil penalty equaling the greater of $377,700 or twice the value of the transaction giving rise to the violation. 50 U.S.C. § 1705(b); 90 Fed. Reg. 3687, 3688 (Jan. 15, 2025). Anyone who willfully violates IEEPA sanctions, attempts or conspires to do so, or aids and abets a violation faces criminal fines of up to $1,000,000 and up to twenty years in prison. 50 U.S.C. § 1705(c). The government has also prosecuted people for conspiracy to commit an offense against the United States under 18 U.S.C. § 371 in connection with the planned violation of an IEEPA order.

71.  OFAC is responsible for the civil enforcement of IEEPA sanctions regimes, and it regularly imposes civil penalties on individuals and entities for IEEPA violations.

72.  The Department of Justice is responsible for the criminal enforcement of IEEPA sanctions regimes, and it has frequently prosecuted persons for IEEPA violations.[30]

73.  Thus, IEEPA orders trigger two distinct sets of consequences: (1) designation of sanctioned persons and their addition to the SDN List, and (2) enforcement of civil and criminal penalties for dealing in blocked property or providing goods or services to or for the benefit of a designated person. The threat of such penalties deters individuals, financial institutions, and other businesses and entities from interacting with designated persons.

74.  Congress has imposed certain restrictions on the President's authority under IEEPA. Among other limitations, IEEPA expressly denies the President "the authority to regulate or prohibit, directly or indirectly . . . the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials[.]"  50 U.S.C. § 1702(b). OFAC interprets this statutory limitation as applying only to information or informational materials fully created and in existence at the time of the transaction with the sanctioned person. *See, e.g.*, 31 C.F.R. § 560.210(c)(2).

75.  Presidents have historically invoked IEEPA to address national security concerns such as the proliferation of weapons of mass destruction or rogue states like Iran or North Korea. *See*, *e.g.*, 31 C.F.R. § 539.201 (nuclear proliferation); 31 C.F.R. § 510.201 (North Korea). Only once before has a President attempted to use IEEPA to impose economic sanctions against people pursuing justice at an international court or body. That attempt came in 2020, when President

---

[30] *See Summary of Major U.S. Export Enforcement, Economic Espionage, and Sanctions-Related Criminal Cases*, U.S. Dep't of Justice (Nov. 2019), https://www.justice.gov/nsd/page/file/1044446/download.

Trump, during his first term in office, sought to impose similar sanctions aimed at specific ICC actions and imposing blocking sanctions on two individuals, including then-Prosecutor Bensouda. *See* Exec. Order No. 13928, Blocking Property of Certain Persons Associated With the International Criminal Court, 85 Fed. Reg. 36139 (June 15, 2020). That Order promptly faced legal challenges, and a court preliminarily enjoined its enforcement as an impermissible content-based regulation of speech that likely violated the First Amendment. *See Open Soc'y Just. Initiative v. Trump*, 510 F.Supp.3d 198 (S.D.N.Y. 2021).

### B. The Executive Order and Regulations

76.    Invoking IEEPA, the Executive Order asserts that "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons . . . constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States." Exec. Order at 9370. It further states that the "ICC has, without a legitimate basis, asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel, and has further abused its power by issuing baseless arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and Former Minister of Defense Yoav Gallant." *Id.* at 9369. On these asserted bases, the Executive Order declares a national emergency. *Id.* at 9370.

77.    Under the Executive Order, "protected persons" include:

    a.    "any United States person, unless the United States provides formal consent to ICC jurisdiction over that person or becomes a state party to the Rome Statute," *id.* § 8(d)(i);[31] or

---

[31] The Executive Order defines "United States person" as "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including a foreign branch, subsidiary, or employee of such entity), or any person lawfully in the United States." Exec. Order § 8(c).

b.  "any foreign person that is a citizen or lawful resident of an ally of the United States that has not consented to ICC jurisdiction over that person or is not a state party to the Rome Statute," *id.* § 8(d)(ii).

78.  The Executive Order blocks "[a]ll property and interests in property" of Mr. Khan and any other "foreign person" whom "the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General," determines:

> (A) to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality;
>
> (B) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity in subsection (a)(ii)(A) of this section or any person whose property or interests in property are blocked pursuant to this order; or
>
> (C) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property or interests in property are blocked pursuant to this order.

*Id.* § 1(a); *see id.* at 9373.

79.  Section 3 of the Executive Order prohibits anyone, including Americans, from making "any contribution or provision of funds, goods, or services by, to, or for the benefit of" Mr. Khan or any other "person whose property and interests in property are blocked." *Id.* § 3(a). Likewise, it prohibits "the receipt of any contribution or provision of funds, goods, or services from" Mr. Khan or a person whose property and interests in property are blocked. *Id.* § 3(b). The Regulations prohibit the same transactions as the Executive Order. *See* 31 C.F.R. § 528.201(a).

80.  The government has previously issued guidance indicating that engagement with an institution in which an SDN is an official may run afoul of IEEPA's prohibitions. For example, it has warned U.S. persons to be "cautious" in their dealings with such institutions "to ensure that they are not engaged in transactions or dealings, *directly or indirectly*, with an SDN (e.g., by

entering into contracts that are signed by an SDN, entering into negotiations with an SDN, or processing transactions, directly or indirectly, on behalf of the SDN), absent authorization from OFAC or an applicable exemption."[32] This guidance concerned executive orders using language identical to that of section 3(a) of the Executive Order.[33]

81.    The Executive Order and Regulations prohibit advocates, experts, and others from providing investigatory, legal, or other services to any OTP personnel—including services that take the form of information and informational materials—because such services are for the benefit of the designated Prosecutor, even if they only "indirectly" involve him.

82.    Plaintiffs wish to continue their speech with the OTP, which they have been forced to cease. There is a substantial risk that Plaintiffs' constitutionally protected speech would subject them to penalties for violating the prohibitions in Section 3 of the Executive Order and Regulations, because it would benefit Mr. Khan and other designated persons.

83.    If the speech restrictions imposed by the Executive Order and Regulations on Plaintiffs were rescinded, or their enforcement were enjoined, Plaintiffs would resume their speech with the OTP.

---

[32] *Frequently Asked Questions: Hong Kong-Related Sanctions*, U.S. Dep't of the Treasury (Sept. 25, 2020), https://home.treasury.gov/policy-issues/financial-sanctions/faqs/840 (emphasis added); *see also Frequently Asked Questions: Venezuela Sanctions*, U.S. Dep't of the Treasury (July 19, 2018), https://ofac.treasury.gov/faqs/505 (similar).

[33] *See* Exec. Order 13,936, The President's Executive Order on Hong Kong Normalization, 85 Fed. Reg. 43,413, 43,416, § 6(a) (July 17, 2020) ("The prohibitions in section 4(a) of this order include . . . the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 4(a) of this order . . . .").; *see also* Exec. Order 13,692, Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Venezuela, 80 Fed. Reg. 12,747, 12,748, § 4(a) (Mar. 8, 2015) ("The prohibitions in section 1 of this order include but are not limited to . . . the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order").

## CAUSES OF ACTION

### CLAIM I
### Violation of the Free Speech Clause of the First Amendment to the U.S. Constitution
### Against All Defendants

84.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the claims below as though fully set forth in this claim.

85.    The Executive Order and Regulations violate the First Amendment because they prohibit Plaintiffs and others like them from engaging in constitutionally protected speech under threat of civil and criminal penalties.

86.    Plaintiffs wish to continue communicating with the OTP but are chilled from doing so because of the substantial risk that they will be penalized for providing services "for the benefit of" the Prosecutor or other designated persons.

87.    The Executive Order and Regulations impose content-based restrictions on Plaintiffs' speech and are not narrowly tailored to achieve a compelling government interest.

88.    To the extent that the Executive Order's and Regulations' speech restrictions have any legitimate sweep, they are unconstitutionally overbroad, because a substantial number of their applications violate the First Amendment.

### CLAIM II
### Ultra Vires Action in Violation of IEEPA, 50 U.S.C. §§ 1701–1706
### Against All Defendants

89.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the claims below as though fully set forth in this claim.

90.    The authority granted to the President under IEEPA does not include the authority to "regulate or prohibit, directly or indirectly," the import or export of "any information or informational materials." 50 U.S.C. § 1702(b)(3).

91.    OFAC narrowly interprets 50 U.S.C. § 1702(b)(3). According to OFAC, § 1702(b)(3) permits the government, under IEEPA, to regulate "information or informational materials not fully created and in existence at the date of the transactions," "business consulting services," and "services to market, produce or co-produce, create, or assist in the creation of information or informational materials." *E.g.*, 31 C.F.R. § 560.210(c)(2). That interpretation is inconsistent with the unqualified statutory text and fails to give the limitation the "broad scope" that Congress intended. H.R. Rep. No. 103-482, at 239 (1994) (Conf. Rep.).

92.    Plaintiffs have engaged with the OTP in a manner that involves the importation or exportation of information or informational materials, including (but not limited to) legal filings and publications detailing evidence of atrocity crimes. If not for the Executive Order, Regulations, and Designations, Plaintiffs would continue to do so.

93.    The Executive Order and Regulations are *ultra vires* and otherwise unlawful because they purport to regulate or prohibit, and purport to authorize Defendants to regulate or prohibit, acts that are exempt from regulation or prohibition under IEEPA, including the transmission of information and informational materials, thereby chilling the provision of such materials.

**CLAIM III**
**Violation of the APA**
**Against Defendants Department of State, Rubio, Department of Treasury, Bessent, Department of Justice, Bondi, OFAC, and Palluconi**

94.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth in this claim.

95.    The Regulations regulate or prohibit acts that are exempt from regulation or prohibition under IEEPA, including the importation or exportation of information and informational materials. 50 U.S.C. § 1702(b)(3).

96.    The Regulations violate the APA because they are "not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," *id.* § 706(2)(B), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) declaring that the speech restrictions imposed by the Executive Order, Regulations, and Designations violate the First Amendment to the United States Constitution;

B.    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) declaring that the speech restrictions imposed by the Executive Order and Regulations are *ultra vires* under IEEPA and those imposed by the Regulations are in violation of the APA;

C.    Enjoin Defendants from implementing or enforcing the speech restrictions imposed by the Executive Order, including through the civil and criminal penalty provisions of IEEPA;

D.    Set aside under the APA the speech restrictions imposed by the Regulations;

E.    Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

F.    Grant any other and further relief that this Court may deem just and proper.

July 22, 2025

Respectfully submitted,

/s/ Carol J. Garvan

Carol J. Garvan
AMERICAN CIVIL LIBERTIES UNION
OF MAINE FOUNDATION
PO Box 7860
Portland, Maine 04112
(207) 619-8687
cgarvan@aclumaine.org

/s/ Charles Hogle

Charles Hogle*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
charlie.hogle@aclu.org

/s/ Zachary Heiden

Zachary Heiden
AMERICAN CIVIL LIBERTIES UNION
OF MAINE FOUNDATION
PO Box 7860
Portland, Maine 04112
(207) 619-6224
zheiden@aclumaine.org

/s/ Ashley Gorski

Ashley Gorski*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
agorski@aclu.org

/s/ Anahita D. Sotoohi

Anahita D. Sotoohi
AMERICAN CIVIL LIBERTIES UNION
OF MAINE FOUNDATION
PO Box 7860
Portland, Maine 04112
(207) 613-4350
asotoohi@aclumaine.org

/s/ Hina Shamsi

Hina Shamsi*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
hshamsi@aclu.org

ATTORNEYS FOR PLAINTIFFS
*Admitted *pro hac vice*