IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

MATTHEW SMITH and
AKILA RADHAKRISHNAN

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,
*Defendants*.

Case No. 1:25-cv-00158-NT

## DEFENDANTS' MOTION TO DISMISS

Defendants hereby move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and

12(b)(6). Accompanying this motion is a memorandum of points and authorities in support of the

motion. Defendants respectfully request that the Court grant the motion for the reasons described in

the memorandum.

Dated:  September 4, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ALEXANDER D. HAAS
Director, Federal Programs Branch

STEPHEN M. ELLIOTT
Assistant Director, Federal Programs Branch

*/s/ Ryan M. Underwood*
RYAN M. UNDERWOOD
Trial Attorney (D.C. Bar No. 1656505)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-1952
E-mail:  ryan.m.underwood2@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| MATTHEW SMITH and<br>AKILA RADHAKRISHNAN,<br><br>    *Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as<br>President of the United States, *et al.*,<br><br>    *Defendants*. | No.: 1:25-cv-00158-NT |

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

I.    The International Emergency Economic Powers Act ......................................... 2

II.   Executive Order No. 14,203 ............................................................................. 3

III.  The Regulations ............................................................................................... 5

IV.   Plaintiffs' Lawsuit ............................................................................................. 5

LEGAL STANDARD ....................................................................................................... 7

ARGUMENT .................................................................................................................. 8

I.    This Court lacks subject matter jurisdiction because Plaintiffs do not have standing ............. 8

      A.    Plaintiffs fail to allege an injury-in-fact. ............................................... 8

      B.    Plaintiffs' claims are not ripe. ............................................................. 13

II.   Plaintiffs fail to state a claim for relief on the merits. ................................... 14

      A.    Plaintiffs have not plausibly alleged that the Government censored its speech. ........ 14

            1.    The EO and Regulations expressly exclude constiutionally protected speech. ............. 14

            2.    The EO and Regulations are not a content-based restriction speech ........... 15

            3.    The EO satisfies both intermediate scrutiny and strict scrutiny. ................... 16

      B.    Plaintiffs fail to establish that the EO and Regulations are *ultra vires* ........... 18

      C.    Plaintiffs fail to establish that the Regulations violate the APA. ................... 19

CONCLUSION .............................................................................................................. 21

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ............................................................................... 21

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................... 9, 16, 20

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ........................................................................ 11, 14

*Baker v. Carr,*
  369 U.S. 186 (1962) ............................................................................. 10

*Bank Markazi v. Peterson,*
  578 U.S. 212 (2016) ............................................................................. 19

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ......................................................................... 9, 20

*Branzburg v. Hayes,*
  408 U.S. 665 (1972) ............................................................................. 20

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
  596 U.S. 61 (2022) ............................................................................... 17

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................................................. 11

*Dames & Moore v. Regan,*
  453 U.S. 654 (1981) ............................................................................... 2

*Equal Means Equal v. Ferriero,*
  3 F.4th 24 (1st Cir. 2021) ................................................................. 9, 10

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) ............................................................................. 10

*Fed. Exp. Corp. v. U.S. Dep't of Com.,*
  39 F.4th 756 (D.C. Cir. 2022) ............................................................ 21

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ............................................................................. 21

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ............................................................................................... 10

*G.K. Ltd. Travel v. City of Lake Oswego,*
    436 F.3d 1064 (9th Cir. 2006) ............................................................................... 19

*Garcia-Catalan v. United States,*
    734 F.3d 100 (1st Cir. 2013) ................................................................................... 9

*Haig v. Agee,*
    453 U.S. 280 (1981) ............................................................................................... 19

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010) ............................................................................................18, 19

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
    219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ............ 20

*Kiobel v. Royal Dutch Petroleum Co.,*
    621 F.3d 111 (2d Cir. 2010), *aff'd*, 569 U.S. 108 (2013) ......................................... 4

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994) ................................................................................................. 9

*Lead Indus. Ass'n v. EPA,*
    647 F.2d 1130 (D.C. Cir. 1980) ............................................................................. 23

*Lorillard Tobacco Co. v. Reilly,*
    533 U.S. 525 (2001) ............................................................................................... 19

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................... 10

*Maldonado v. Fontanes,*
    568 F.3d 263 (1st Cir. 2009) ................................................................................... 9

*Metromedia, Inc. v. City of San Diego,*
    453 U.S. 490 (1981) ............................................................................................... 19

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1866) ................................................................................. 21

*Nixon v. Fitzgerald,*
    457 U.S.  (1982) ..................................................................................................... 21

*Nyunt v. Broad. Bd. of Governors,*
    589 F.3d 445 (D.C. Cir. 2009) ...................................................................... 21-22

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11,*
    393 U.S. 233 (1968) ............................................................................................ 21

*Open Soc'y Just. Initiative v. Trump,*
    510 F. Supp. 3d 198 (S.D.N.Y. 2021) ...........................................................21, 22

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ......................................................................................17, 18

*Regan v. Wald,*
    468 U.S. 222 (1984) .............................................................................................. 2

*Rideout v. Gardner*
838 F.3d 65 (1st Cir. 2016) ...................................................................................... 19

*SEC v. Tambone,*
    597 F.3d 436 (1st Cir. 2010) ...........................................................................9, 20

*Simon v. E. Ky. Welfare Rts. Org.,*
    426 U.S. 26 (1976) .............................................................................................. 12

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.,*
    549 U.S. 422 (2007) .............................................................................................. 8

*Smith v. Trump,*
    No. 1:25-CV-00158-NT, 2025 WL 2021785 (D. Me. July 18, 2025) ................ 18

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ............................................................................................ 16

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ............................................................................................ 10

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ............................................................................................ 14

*Texas v. United States,*
    523 U.S. 296 (1998) ............................................................................................ 16

*Thomas v. Anchorage Equal Rts. Comm'n,*
    220 F.3d 1134 (9th Cir. 2000) ............................................................................ 15

*Toilet Goods Assn., Inc. v. Gardner,*
  387 U.S. 158 (1967) ............................................................................................. 16

*U.S. Postal Serv. v. Gregory,*
  534 U.S. 1 (2001) ................................................................................................. 22

*United States v. Amirnazmi,*
  645 F.3d 564 (3d Cir. 2011) ................................................................................. 3

*United States v. Chem. Found.,*
  272 U.S. 1 (1926) ................................................................................................. 22

*Valentin v. Hosp. Bella Vista,*
  254 F.3d 358 (1st Cir. 2001) ................................................................................ 9

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ............................................................................................. 19

*Younger v. Harris,*
  401 U.S. 37 (1971) ............................................................................................... 14

**Constitution**

U.S. Const. art. III, § 2, cl. 1 ................................................................................. 9-10

**Statutes**

5 U.S.C. § 706(2) ................................................................................................... 22

22 U.S.C. § 7421 *et seq.* ....................................................................................... 4

50 U.S.C. §§ 1601-1651 ........................................................................................ 3

50 U.S.C. § 1701 .................................................................................................. 2, 23

50 U.S.C. §§ 1701-1707 ........................................................................................ 2

50 U.S.C. § 1702 ................................................................................................... *passim*

50 U.S.C. § 1705 ................................................................................................... 3

50 U.S.C. § 4301 *et seq.* ....................................................................................... 2

50 U.S.C. § 4305(b)(1)(B) ..................................................................................... 2

American Service-Members' Protection Act,
  Pub. L. No. 107-206, tit. II, 116 Stat. 820 (2002) .............................................. 4

National Emergencies Act,
Pub. L. No. 94-412, 90 Stat. 1255 (1976) ................................................................................. 3

Trading With the Enemy Act,
Pub. L. No. 65-91, 40 Stat. 411 (1917) ................................................................................... 2

**Rules**

Federal R. Civ. P. 12(b) ........................................................................................................ 8, 9

**Legislative Materials**

S. Rep. No. 95-466 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540 .................................... 2

**Administrative and Executive Materials**

31 C.F.R. § 501.801 ........................................................................................................... 8, 16

31 C.F.R., Part 528 ................................................................................................................ 6

31 C.F.R. § 528.201 ........................................................................................................... 6, 11

31 C.F.R. § 528.205(a) .................................................................................................... *passim*

31 C.F.R. § 560.210 ............................................................................................................. 14

Exec. Order No. 14,203, *Imposing Sanctions on the International Criminal Court*,
90 Fed. Reg. 9369 (Feb. 6, 2025) ................................................................................. *passim*

**Other Authorities**

*Frequently Asked Questions: Hong Kong-Related Sanctions*, U.S. Dep't of the Treasury (Sept. 25, 2020),
https://home.treasury.gov/policy-issues/financial-sanctions/faqs/840 ...................................... 13-14

*Frequently Asked Questions: Venezuela Sanctions*, U.S. Dep't of the Treasury (July 19, 2018)
https://ofac.treasury.gov/faqs/505 ........................................................................................... 14

Gene R. Nichol, Jr., *Ripeness and the Constitution*,
54 U. Chi. L. Rev. 153 (1987) ................................................................................................ 15

OFAC, *Specially Designated Nationals List*,
https://sanctionslist.ofac.treas.gov/Home/SdnList (last visited April 29, 2025) ................................ 3

OFAC, U.S. Dep't of Treasury, *Basic Information on OFAC and Sanctions FAQ 1190* (Aug. 27, 2024) ("FAQ 1190"),
https://ofac.treasury.gov/faqs/1190 ................................................................................................. *passim*

OFAC, U.S. Dep't. of Treasury, *Contact OFAC*,
https://ofac.treasury.gov/contact-ofac (last visited Sep. 3, 2025) ......................................................... 15

OFAC, U.S. Dep't of Treasury, *Specific Licenses and Interpretive Guidance*
https://ofac.treasury.gov/ofac-license-application-page (last visited May 15, 2025) ........................... 8

Off. of the Spokesperson, U.S. Dep't of State, Fact Sheet, *Imposing Sanctions in Response to the ICC's Illegitimate Actions Targeting the United States and Israel* (June 5, 2025),
https://www.state.gov/releases/office-of-the-spokesperson/2025/08/imposing-further-sanctions-in-response-to-the-iccs-ongoing-threat-to-americans-and-israelis .......................................................... 5

Off. of the Spokesperson, U.S. Dep't of State, Fact Sheet, *Imposing Further Sanctions in Response to the ICC's Ongoing Threat to Americans and Israelis* (August 20, 2025),
https://www.state.gov/imposing-sanctions-in-response-to-the-iccs-illegitimate-actions-targeting-the-united-states-and-israel ................................................................................................................. 5

Off. of the Spokesperson, U.S. Dep't of State, Press Statement, *Sanctioning Foreign NGOs Directly Engaged in ICC's Illegitimate Targeting of Israel* (Sept. 4, 2025),
https://www.state.gov/releases/office-of-the-spokesperson/2025/09/sanctioning-foreign-ngos-directly-engaged-in-iccs-illegitimate-targeting-of-israel/ ................................................................. 5

Off. of the Spokesperson, U.S. Dep't of State, Press Statement, *Sanctioning Lawfare that Targets U.S. and Israeli Persons* (July 9, 2025),
https://www.state.gov/releases/office-of-the-spokesperson/2025/07/sanctioning-lawfare-that-targets-u-s-and-israeli-persons/ ................................................................................................................. 5

Rome Statute of the International Criminal Court art. 15, 2187 U.N.T.S. 90 (July 17, 1998),
https://www.icc-cpi.int/sites/default/files/2024-05/Rome-Statute-eng.pdf. ................................... 7-8

## INTRODUCTION

Executive Order 14,203, "Imposing Sanctions on the International Criminal Court" (the "EO" or the "Order"), which the President issued on February 6, 2025, declares a national emergency with respect to the efforts of the International Criminal Court ("ICC") to investigate and prosecute "protected persons," as defined by the EO, not subject to the ICC's jurisdiction and provides authority to designate persons for sanctions in connection with those efforts. At present, the restrictions in this Order apply to the nine individuals, including current Prosecutor of the ICC Karim Khan, three entities, and twelve other individuals. As a result of these sanctions, Plaintiffs, two U.S. citizens based in the United States, may not deal in the property or interests in property of the blocked persons, including by providing goods, funds, or services to them or for their benefit. Plaintiffs filed this suit alleging that the EO is a content-based prohibition infringing on their First Amendment speech rights, is *ultra vires* because it regulates or prohibits conduct that is covered by an exemption to the statutory authority under which the President issued this EO, and that the regulations enacted pursuant to the EO violate the Administrative Procedure Act.

As a threshold matter, Plaintiffs' claims should be dismissed for lack of standing. Plaintiffs cannot demonstrate that they have suffered, or will suffer, a legally cognizable injury that is fairly traceable to the EO or the regulations. Plaintiffs have failed to establish in their Amended Complaint that they plan to engage in activities that will certainly and imminently subject them to enforcement under the EO or the ICC-Related Sanctions Regulations, 31 C.F.R., part 528 ("the Regulations"), as set forth more fully below.

But the Plaintiffs' arguments fail even if they have standing.  Plaintiffs' facial First Amendment claim likewise fails because the EO and the Regulations are content-neutral restrictions that advance important governmental interests unrelated to the suppression of free speech. Further, Plaintiffs have no private right of action to bring an *ultra vires* challenge to the EO or the Regulations, but such a claim

1

would fail in any event because the EO and Regulations are fully consistent with the relevant statutory text. Finally, Plaintiffs fail to establish that the Regulations violate the APA.

For these reasons, as discussed more fully below, the Court should dismiss this case.

## BACKGROUND

I.    **The International Emergency Economic Powers Act**

For nearly its entire history, the United States has utilized economic sanctions as a tool of foreign policy and national security. Under current U.S. law, the International Emergency Economic Powers Act resides at the core of the United States' economic sanctions regime where the President's executive authority is expansive. The President not only exercises the expansive powers provided under IEEPA, but the President also determines the conditions under which those powers may be exercised. *See* 50 U.S.C. § 1701.

For much of the 20th century, U.S. sanctions programs were authorized and implemented pursuant to the Trading With the Enemy Act ("TWEA"). *See* Pub. L. No. 65-91, 40 Stat. 411 (codified as amended at 50 U.S.C. § 4301 et seq.). In 1977, Congress enacted the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, to delineate "the President's authority to regulate international economic transactions during wars or national emergencies." S. Rep. No. 95-466 at 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541. IEEPA limited TWEA's application to periods of declared wars and to certain existing TWEA programs, while the President could use the authority under IEEPA during other periods when he declared a national emergency. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). Under IEEPA, the President may declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States[.]" 50 U.S.C. § 1701(a). Similar to TWEA, IEEPA authorized the President to

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or

privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

*Id.* § 1702(a)(1)(B). In addition, the National Emergencies Act ("NEA"), Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601-1651), established procedures for regular congressional review over a President's national emergency declarations.

IEEPA includes several exemptions to the President's authority, including that the President may not "regulate or prohibit, directly or indirectly . . . the importation from any country, or the exportation to any country, . . . of any information or informational materials[.]" 50 U.S.C. § 1702(b), (b)(3). This exclusion, which Congress added to IEEPA in 1988 and expanded to include new forms of media in 1994, is part of what is commonly known as the "Berman Amendment." *See United States v. Amirnazmi*, 645 F.3d 564, 584–86 (3d Cir. 2011). Presidents have designated persons under IEEPA-based sanctions programs in response to a variety of declared national emergencies. In general, persons who are designated under an IEEPA-based sanctions program are added to the List of "Specially Designated Nationals and Blocked Persons" (the "SDN List"), which is administered by the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC).[1] Persons on the SDN List have their assets subject to U.S. jurisdiction "blocked" (i.e., frozen) and U.S. individuals and entities are generally prohibited from dealing in them. *See* 50 U.S.C. § 1705(b) (civil penalties), *id.* § 1705(c) (criminal penalties).

## II.    Executive Order No. 14,203

On February 6, 2025, President Trump issued the EO, in which he determined that "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons… constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States" and declared a national emergency to address that threat." Exec. Order No. 14,203, pmbl., 90 Fed. Reg. 9369, 9369 (Feb. 6, 2025) The EO states that the ICC has "engaged in illegitimate and baseless actions targeting

---

[1] *See* OFAC, *Specially Designated Nationals List*, https://sanctionslist.ofac.treas.gov/Home/SdnList (last visited April 29, 2025).

America and our close ally Israel," and "without a legitimate basis[] asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel," and "issu[ed] baseless arrest warrants targeting" Israeli government officials." *Id.*

The EO reflects the President's determination the ICC infringes upon the sovereignty of the United States and undermines the critical national security and foreign policy work of the United States and its allies, thereby threatening the United States' national security and foreign policy interests. *See id.* The EO also reflects longstanding U.S. policy to object to the ICC's assertions of jurisdiction over U.S. personnel. The United States has never ratified the Rome Statute, the treaty establishing the ICC, and has thus never undertaken any obligations related to the ICC, nor has it agreed to subject its citizens to the ICC's jurisdiction. *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 119 n.16 (2d Cir. 2010) (describing U.S. decision to "un-sign" the Rome Statute (citation omitted)), *aff'd*, 569 U.S. 108 (2013). In 2002, the same year the ICC was established, Congress passed the American Service-Members' Protection Act ("ASPA"), Pub. L. No. 107-206, tit. II, 116 Stat. 820, 899 (2002) (codified at 22 U.S.C. § 7421 *et seq.*), which prohibits several forms of cooperation between the United States and the ICC.

The President identified Karim Khan, the current ICC Prosecutor listed in the Annex to EO 14,203, as subject to specified sanctions pursuant to the EO, and authorized the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to designate additional foreign persons who meet certain criteria for designation. Exec. Order No. 14,203 § 1. Specifically, under Section 1 of the EO, the Secretary of State may designate foreign persons determined to have "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute" any protected person, as defined by the EO, without the consent of that person's country of nationality. Exec Order No. 14,203 § 1(a)(ii)(A). That section of the EO also authorizes the designation of foreign persons determined to have "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity in [§ 1(a)(ii)(A)]" or any person designated under the EO. *Id.* § 1(a)(ii)(B). Section 3 of the EO specifies that this prohibition includes the making "of any

contribution or provision of funds, goods, or services by, to, or for the benefit of any" person blocked pursuant to the EO, or the receipt of such funds, goods, or services from such person. *Id.* § 3(a), (b). Accordingly, absent an applicable exception or authorization, U.S. persons are prohibited from providing funds, goods, or services to, or for the benefit of, a designated or otherwise blocked person. The EO authorizes the Secretary of the Treasury, in consultation with the Secretary of State, to "employ all powers granted to [the President] by IEEPA," to promulgate rules and regulations to carry out the purposes of the EO, and to re-delegate such functions within the Department of the Treasury. Exec. Order No. 14,203 § 10.

### III.    The Regulations

Effective July 1, 2025, OFAC the Regulations implementing the EO *See* 31 C.F.R., Part 528. The operative provision of the Regulations states that "all transactions prohibited pursuant to E.O. 14203 of February 6, 2025 are prohibited pursuant to this part." 31 C.F.R. § 528.201. The Regulations also implement the exclusions contained in the Berman Amendment, providing in 31 C.F.R. § 528.205(a) that "[t]he prohibitions contained in this part do not apply to any transactions that are exempt pursuant to section 203(b) of the International Emergency Economic Powers Act (50 U.S.C. 1702(b))."

### IV.    Plaintiffs' Lawsuit

In this case, Plaintiffs are two U.S. citizens and human rights advocates who allege that they have previously interacted with the ICC—predominantly the Office of the Prosecutor (OTP). They contend that their work with the OTP is protected by the First Amendment, and they have been forced to abstain from this work under threat of penalty imposed by the U.S. government agencies named in their suit. They request a declaration that the EO, Regulations, and designations pursuant to the E.O. are an unconstitutional violation of the First Amendment and that the EO and Regulations are *ultra vires* under IEEPA, and they seek an order enjoining the Government from enforcing the EO and imposing

any civil and criminal penalties authorized under IEEPA. Amended Complaint ("Am. Compl."), ECF No. 31, ¶ 1.

According to Plaintiffs' Amended Complaint, Plaintiff Matthew Smith "has worked regularly with the ICC since 2019, with a particular focus on the OTP's investigation into the situation in Bangladesh/Myanmar." Am. Compl., ¶ 57. This work consisted of "provid[ing] to OTP[] personnel investigative reports detailing atrocity crimes," "shar[ing] and discuss[ing] with OTP and ICC personnel the direct evidence he and his colleagues have obtained," "[meeting] with OTP employees . . . to provide guidance and information in support of their work," and "sp[eaking] in public fora with OTP personnel." *Id.*, ¶¶ 57-60. Plaintiff Smith claims that, since the EO was issued, he has voluntarily refrained from communicating with OTP personnel.

Plaintiff Akila Radhakrishnan has purportedly "worked with the OTP and ICC as an external advocate and expert" and is currently "focus[ed] on sexual and gender-based rights violations and crimes in Iran and Afghanistan." *Id.*, ¶ 62. Plaintiff Radhakrishnan's work with the OTP and ICC has allegedly consisted of preparing Article 15 submissions with the OTP, arguing as an amicus in connection with ICC prosecutions, facilitating discussions between OTP personnel and victim communities, and advising the OTP on the investigation and prosecution of sexual and gender-based crimes. *Id.*, ¶ 63.[2] Plaintiff Radhakrishnan has voluntarily abstained from ongoing and planned work with the OTP.

To date, Plaintiffs have not submitted a request for interpretive guidance to OFAC with respect to the portion of the EO and Regulations they allege would subject them to penalties. Nor have Plaintiffs submitted a request for a specific license to OFAC. *See* OFAC, U.S. Dep't. of Treasury, *Specific Licenses and Interpretive Guidance*, https://ofac.treasury.gov/ofac-license-application-page (last visited May 15, 2025); *see also* 31 C.F.R. § 501.801.

---

[2] An Article 15 submission is a formal communication to the OTP presenting information on alleged crimes within the ICC's jurisdiction, requesting the Prosecutor to initiate a preliminary examination *proprio motu*. Rome Statute of the International Criminal Court art. 15, 2187 U.N.T.S. 90, 100 (July 17, 1998), https://www.icc-cpi.int/sites/default/files/2024-05/Rome-Statute-eng.pdf.

In their Amended Complaint, Plaintiffs bring three claims. In Count One, Plaintiffs allege that the EO and Regulations violate the First Amendment. Am. Compl., ¶ 84-88. In Count Two, Plaintiffs allege that the EO and Regulations are *ultra vires*. *Id.*, ¶ 89-93. In Count Three, Plaintiffs allege that the Regulations promulgated pursuant to the EO prohibit acts that are exempt from regulation or prohibition under IEEPA. *Id.*, ¶ 94-96.

## LEGAL STANDARD

Plaintiffs' complaint should be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). When a defendant raises the issue of subject matter jurisdiction, the court must resolve the jurisdictional issue before proceeding to the merits of the plaintiff's claims. *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007). In reviewing a motion to dismiss for lack of subject matter jurisdiction, a court is guided by the principle that "[f]ederal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Thus, a court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears, and the plaintiff bears the burden of establishing that such jurisdiction exists. *Id.* The court's review under Rule 12(b)(1) is not restricted to the pleadings; rather, the court may review extrinsic evidence to address any factual issues that affect jurisdiction. *See Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001).

Defendants also move to dismiss for failure to state a claim. To survive a motion brought pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up); *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *Tambone*, 597 F.3d at 442 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A court must separate the well-pleaded facts from conclusory legal allegations and accept as true only the factual allegations. *Garcia-Catalan v. United States*, 734 F.3d

7

100, 103 (1st Cir. 2013). And "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) (second alternation in original) (cleaned up).

## ARGUMENT

### I.    This Court lacks subject matter jurisdiction because Plaintiffs do not have standing.

Article III of the Constitution limits federal-court jurisdiction to "actual cases and controversies." *Equal Means Equal v. Ferriero,* 3 F.4th 24, 27 (1st Cir. 2021) (citing U.S. Const. art. III, § 2, cl. 1). "An actual case or controversy only exists if the plaintiff has demonstrated 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends.'" *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

> "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Friends of the Earth, Inc. v. Laidlaw Env't* Servs. *(TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). "The burden on the plaintiff at the pleading stage is plausibly to allege that each of the requirements to establish standing has been met." *Equal Means Equal*, 3 F.4th at 28.

### A.    Plaintiffs fail to allege an injury-in-fact.

Plaintiffs—both seeking to engage in speech with or the transmission of information to the OTP—cannot meet the "injury in fact" requirement to establish standing. The first prong of the standing inquiry, "injury in fact," requires (1) an "invasion of a legally protected interest" that is (2)

"concrete and particularized" and (3) "actual or imminent." *Lujan*, 504 U.S. at 560 (citations omitted). Demonstration of an injury in fact "is a hard floor of Article III jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). Plaintiffs' Amended Complaint fails to allege an "invasion" of their legally protected interest in communicating with the OTP, fails to allege a "concrete" or "particularized" injury, and fails to demonstrate that that injury is "actual" or "imminent." Plaintiffs have not been threatened by, let alone subjected to, any enforcement action by the government, nor have they been warned or otherwise put on notice that the activities from which they have abstained would subject them to civil or criminal penalties. Furthermore, Plaintiffs have not taken any steps available to them to concretize or actualize their injuries by either seeking interpretive guidance or a license from OFAC.

Plaintiffs fail to carry their burden to show that they have suffered a concrete and particularized injury caused by Defendants' actions. In order to satisfy the "injury-in-fact" requirement, Plaintiffs must show their "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). However, it has also held that the injury-in-fact inquiry should not "improperly water[] down the fundamental requirements of Article III . . . [i]n other words, [a plaintiff] cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). This is essentially what Plaintiffs do here. The Amended Complaint advances the bare assertion that the EO and Regulations restrict Plaintiffs' speech without offering specific, concrete facts indicating that enforcement of either has occurred or will occur. Plaintiffs only demonstrate that they have prematurely "chilled" their speech in anticipation of penalties for which they have alleged no basis to conclude they will ever face.

The prevailing Supreme Court standard for Article III standing requires "that 'the threatened injury must be *certainly impending* to constitute injury in fact." *Clapper*, 568 U.S. at 410 (emphasis added) (citation omitted). Based upon the facts alleged in Plaintiffs' Amended Complaint, it is entirely

speculative that the Government would bring an enforcement action against them for their communications with employees of the OTP; whether OFAC would interpret those communications as "services for the benefit" of the Prosecutor; and whether enforcement is certainly imminent. Indeed, as described further below, the Regulations and OFAC's public guidance make clear that conduct within the scope of the Berman Amendment, as well as conduct entitled to First Amendment protection, is not and would not be the object of OFAC enforcement. *See* 31 C.F.R. § 528.205(a); OFAC, U.S. Dep't of Treasury, *Basic Information on OFAC and Sanctions FAQ 1190* (Aug. 27, 2024) ("FAQ 1190"), https://ofac.treasury.gov/faqs/1190. So to the extent Plaintiffs' activities are described by the Berman Amendment or entitled to First Amendment protection, there can be no *certainly impending* threatened injury. Instead, Plaintiffs offer only unsupported assertions that they face the substantial risk of IEEPA penalties. Am. Compl., ¶ 61, 64. In addition, Plaintiffs cannot base their standing to sue on their general policy objection to the EO or Regulations on grounds that some other party's First Amendment rights may be infringed. *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 (1976) (holding that a party's "abstract concern with a subject that could be affected by an adjudication" is not sufficient to maintain Article III standing; they must allege an injury to themselves.). Those parties, if they exist, are not before this Court.

Further, Plaintiffs describe the activities from which they have purportedly refrained as communications with and the relaying of information to OTP officials, while entirely neglecting to mention that the Berman Amendment provides an express exclusion for "information and informational materials." 50 U.S.C. § 1702(b)(3). The same exclusion has been expressly incorporated into the Regulations. 31 C.F.R. § 528.205(a). Plaintiffs similarly make no mention of OFAC guidance, particularly Frequently Aked Question (FAQ 1190), which states that:

> OFAC does not sanction persons for their engagement in activities subject to U.S. constitutional protection, such as protected speech . . . nor do U.S. persons violate OFAC sanctions for engaging in such constitutionally protected activity. Furthermore, additional limitations and authorizations are in place to ensure that U.S. sanctions do

not restrict the exchange of information or informational materials, or personal
communication.

FAQ 1190. Without alleging facts to explain why Plaintiffs' activities fall outside these exclusions, it
cannot be said that Plaintiffs' injuries are "certainly imminent" and thus are not "actual or imminent"
or "concrete and particularized."

Moreover, Plaintiffs' complaints that any future harm is certainly impending are entirely
hypothetical and not adequately supported by the law. Plaintiffs allege in their Amended Complaint that
the "Executive Order and Regulations prohibit advocates, experts, and others from providing
investigatory, legal, or other services to any OTP personnel—including services that take the form of
information and informational materials—because such services are for the benefit of the designated
Prosecutor, even if they only 'indirectly' involve him." Am. Compl. ¶ 81. In support of their
interpretation, Plaintiffs cite the language of the EO and Regulations themselves, Am. Compl. ¶ 78-79,
and previously issued government guidance that indicated "that engagement with an institution in which
[a Specially Designated National] is an official may run afoul of IEEPA's prohibitions." Am. Compl. ¶
80. This is true, however, only to the extent that such engagement is outside the Berman Amendment's
scope. Plaintiffs also cite examples from OFAC "Frequently Asked Questions" pertaining to other EOs
where the Government has warned U.S. persons to "ensure that they are not engaged in transactions
or dealings, *directly or indirectly*, with [a designated person]." Am. Compl. ¶ 37 (citation omitted). Once
again, Plaintiffs' interpretation relies only on the restrictive provisions of the EO and the Regulations
and fails to consider the permissive language of the Berman Amendment, the EO, the Regulations, and
FAQ 1190. *See* 50 U.S.C. § 1702(b)(3); Exec. Order No. 14,203 § 12(b); 31 C.F.R. § 528.205(a); OFAC
FAQ 1190.

Plaintiffs also rely on guidance pertaining to two inapposite Executive Orders that concern
"transactions or dealings," "contracts," and "negotiations" with designated persons blocked under
separate sanctions programs than the one at issue here. *See* Am. Compl. ¶ 80. While relevant to those
sanctions regimes, Plaintiffs allege that they wish to continue "speech with the OTP," not contracts or

11

other business transactions, Am. Compl. ¶¶ 82, 83; OFAC does not dispute that First Amendment-protected "speech" by U.S. persons will not be considered prohibited conduct. *See* FAQ 1190. And in pre-enforcement review cases, such as this one, the Supreme Court has required that plaintiffs "allege[] an actual and well-founded fear that the law will be enforced against them." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014) (citation omitted). Here, however, Plaintiffs' fear is not well-founded, and their interpretation of the law fails to establish that they face a "credible threat" of enforcement. *Babbitt*, 442 U.S. at 298-99 (1979) ("[P]ersons having no fears of state prosecution except those that are imaginary or speculative, are not accepted as appropriate plaintiffs." (quoting *Younger v. Harris*, 401 U.S. 37 (1971)). Indeed, the Government has made no indication that Plaintiffs' past or intended activities would trigger civil or criminal penalties, not to mention that the Regulations specify that transactions within the scope of the Berman Amendment are exempt. 31 C.F.R. § 560.210.

A reasonable interpretation of the EO and the Regulations, read alongside other extrinsic information, leads to the conclusion that Plaintiffs would not be subject to enforcement for the activities from which they have voluntarily refrained. First, the Berman Amendment, 50 U.S.C. § 1702(b)(3), exempts from the President's authority under IEEPA the power to regulate or prohibit the importation from any country or exportation to any country of information or informational materials. Second, Section 12 of the EO provides that the EO "shall be implemented consistent with applicable law[,]" including the Berman Amendment. Exec. Order 14203, § 12(b). Third, the Regulations state that the "prohibitions contained in this part do not apply to any transactions that are exempt pursuant to [the Berman Amendment]." 31 C.F.R. § 528.205(a). Finally, OFAC's FAQ guidance states that "OFAC does not sanction persons for their engagement in activities subject to U.S. constitutional protection, such as protected speech or religious practice or for their religious beliefs; nor do U.S. persons violate OFAC sanctions for engaging in such constitutionally protected activity." FAQ 1190. In sum, the Amended Complaint does not establish that the EO and Regulations will be enforced against Plaintiffs for activities within the scope of the Berman Amendment or protected by the First Amendment, especially

given that IEEPA and the Regulations make clear that such activities will not be considered prohibited conduct.

### B.  Plaintiffs' claims are not ripe.

Finally, Plaintiffs claims are not ripe because their Amended Complaint fails to demonstrate that the Government would enforce the EO and Regulations against them for their specific activities. "The constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong. Sorting out where standing ends and ripeness begins is not an easy task." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138-9 (9th Cir. 2000) (en banc) ("And, in 'measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing.'" (quoting Gene R. Nichol, Jr., *Ripeness and the Constitution*, 54 U. Chi. L. Rev. 153 (1987)).

Plaintiffs have neglected to engage with OFAC to determine whether the EO and Regulations will be enforced against them or not. For starters, Plaintiffs can request further guidance from OFAC as to whether their proposed activities would be considered prohibited under the Regulations. FAQ 1190. Further, OFAC maintains a "Compliance Hotline" that could answer Plaintiffs' questions about whether any of their activities would be subject to enforcement, or are otherwise licensed or exempt. *See* OFAC, U.S. Dep't of Treasury, *Contact OFAC*, https://ofac.treasury.gov/contact-ofac (last visited Sep. 3, 2025). Plaintiffs may also apply for a specific license, which would either expressly authorize their activities to the extent authorization is required, or provide them with an indication, one way or another, whether OFAC considers their proposed conduct to be prohibited. *See* 31 C.F.R. § 501.801. Plaintiffs have taken no such actions, and without doing so they cannot establish that their claims are ripe for review. *Texas v. United States*, 523 U.S. 296, 300 (1998) ("Under these circumstances, where 'we have no idea whether or when such [a sanction] will be ordered, the issue is not fit for adjudication.'" (alteration in original) (citing *Toilet Goods Assn., Inc. v. Gardner*, 387 U.S. 158 (1967)). While Defendants

acknowledge existing Supreme Court precedent in cases where threatened enforcement of a law creates an Article III injury, *see, e.g., Steffel v. Thompson*, 415 U.S. 452, 459 (1974), Plaintiffs need not expose themselves to a possible enforcement action, as evidenced by the variety of means they can seek guidance from OFAC. Without taking any of these steps, Plaintiffs—and this Court—cannot assess whether Plaintiffs' activities would subject them to civil or criminal repercussions, thus making the case unripe for review.

## II.    Plaintiffs fail to state a claim for relief on the merits.

### A.    Plaintiffs have not plausibly alleged that the Government censored its speech.

Even if this Court were to find that Plaintiffs have established standing under Article III, the EO and Regulations do not violate the First Amendment. Plaintiffs contend that the Government violated its First Amendment right to freedom of speech by prohibiting it from engaging in constitutionally protected speech and preventing them from "communicating with the OTP." Am. Compl. ¶ 85-6. As explained below, Plaintiffs fail to allege sufficient facts to survive a Rule 12(b)(6) motion and offer little more than a "formulaic recitation of the elements of a cause of action" which does not allow this Court to reasonably assess whether Defendants have unlawfully harmed them. *See Ashcroft,* 556 U.S. at 678 (citation omitted).

### 1.    The EO and Regulations expressly exclude constitutionally protected speech.

Plaintiffs' claims fail as a matter of law because the EO and Regulations expressly exclude constitutionally-protected speech. Section 12(b) of the EO states that the "order shall be implemented consistent with applicable law." Exec. Order No. 14,203. This includes the First Amendment and the speech protections it affords Plaintiffs. Further, the Regulations, at 31 C.F.R. § 528.205(a), provide that "the prohibitions . . . do not apply to any transactions that are exempt pursuant to section 203(b) of [IEEPA] (50 U.S.C. 1702(b)),"—i.e., the Berman Amendment. Finally, OFAC has issued guidance that expressly states that:

> OFAC does not sanction persons for their engagement in activities subject to U.S. constitutional protection, . . . nor do U.S. persons violate OFAC sanctions for engaging in such constitutionally protected activity. Furthermore, additional limitations and authorizations are in place to ensure that U.S. sanctions do not restrict the exchange of information or informational materials, or personal communication.

FAQ 1190. OFAC's guidance references the Berman Amendment and also provides that no advance authorization is needed where persons "engage in activities that are not prohibited by or are otherwise exempt from sanctions." *Id.* Thus, as a matter of law, Plaintiffs are not subject to civil or criminal penalties for activities exempt under the Berman Amendment. Given this statutory exemption and OFAC's express guidance in FAQ 1190 that activities subject to constitutional protection will not result in enforcement, Plaintiffs have failed to plausibly establish that their speech has been or will be unconstitutionally restricted or that the EO and the Regulations impinge on constitutionally protected territory.

### 2. The EO and Regulations are not a content-based restriction on speech

Plaintiffs fail to state a claim that their First Amendment rights have been violated because, to the extent the EO and Regulations abridge their right to free speech, they are content-neutral. "A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC,* 596 U.S. 61, 69 (2022) (alteration in original) (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Plaintiffs allege that the EO and Regulations prohibit them from "providing investigatory, legal, or other services to any OTP personnel—including services that take the form of information or informational materials—because such services are for the benefit of the designated Prosecutor, even if they only 'indirectly' involve him." Am. Compl. ¶ 81. But Plaintiffs fail to demonstrate that they would be subject to penalties under the EO and Regulations because of the *content* of communications they intend to make to the OTP and how those communications would benefit Mr. Khan.[3]

---

[3] At the preliminary injunction stage, this Court did not decide whether the EO restricts speech based on its content. *Smith v. Trump*, No. 1:25-CV-00158-NT, 2025 WL 2021785, *5 (D. Me. July 18, 2025)

Further, Plaintiffs have identified no intelligible principle upon which this Court could determine whether their speech vis-à-vis the OTP constitutes a "service" that would benefit the Prosecutor, Mr. Khan, personally. Plaintiffs argue that any speech "'for the benefit of' the Prosecutor or other designated persons" would subject them to penalties, which essentially concedes that there is no content-based restriction of speech imposed by the EO or the Regulations. Am. Compl. ¶ 86. Even assuming for the sake of argument that constitutionally-protected speech was restricted at all, it is restricted in a manner devoid of any content-based rule or requirement.

### 3. The EO Satisfies Both Intermediate Scrutiny and Strict Scrutiny

The EO and Regulations are content-neutral as they "do not apply to speech based on or because of the content of what has been said, but instead 'serve[ ] purposes unrelated to the content of expression[,]'" *Rideout v. Gardner*, 838 F.3d 65 (1st Cir. 2016) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781 (1989)), and arguably burden no speech at all. At most, intermediate scrutiny applies. A regulation survives intermediate scrutiny so long as it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 26-27 (2010) (citation omitted). However, even if the Court were to conclude that the more demanding strict scrutiny standard applies instead, the EO and Regulations also satisfy that standard. Under strict scrutiny, a regulation survives if it "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (citation omitted).

The EO serves a governmental interest that is both "important" and "compelling"—protecting the personnel of the United States and its allies from investigation, arrest, detention, and prosecution by the ICC without the consent of the United States or its allies. These are "sensitive and weighty interests of national security and foreign affairs" that constitute critically important governmental interests for purposes of a First Amendment analysis. *Humanitarian L. Project*, 561 U.S. at 33-34; *see Bank Markazi v. Peterson*, 578 U.S. 212, 217 (2016) (IEEPA blocking regime allows President to "best further[]

16

the United States' foreign-relations and national-security interests" (citation omitted)); *Haig v. Agee*, 453 U.S. 280, 307 (1981) ("no governmental interest is more compelling than the security of the Nation").[4] The Government has been clear and consistent in its determination that the ICC's politicization and abuses of power warrant the sanctions it has imposed under the EO, and the prohibition of the transfer of things of value to sanctioned entities is a legitimate exercise of the Government's asserted need to counter the ICC's overreach. The defense of American allies from this overreach is an important and compelling government interest that satisfies strict scrutiny.

The EO also satisfies the applicable tailoring standards under both intermediate and strict scrutiny. Plaintiffs argue the EO and the Regulations are "unconstitutionally overbroad, because a substantial number of their applications violate the First Amendment." Am. Compl. ¶ 88. Plaintiffs, however, fail to plead with particularity any applications that violate the First Amendment by which this Court could assess that the EO and Regulations burden substantially more speech than is necessary to advance the Government's important and compelling interest. As such, Plaintiffs allegations are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *Tambone*, 597 F.3d at 442 (citing *Bell Atl. Corp.*, 550 at 555 (2007)).

Barring Plaintiffs from providing any services to or for the benefit of Khan, but not barring activity described within the Berman Amendment or subject to the protections of the First Amendment (as the Regulations and OFAC guidance affirm), agency guidance confirming non-enforcement (i.e., FAQ 1190),achieves the government interest served by the EO in a manner that is narrowly tailored to that interest. *See, e.g., Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 82 (D.D.C. 2002), (concluding that restrictions created by an Executive Order promulgated under IEEPA prohibiting the

---

[4] Even outside of the national security context, courts "generally defer" to the Government in "determining whether the government's ends are advanced by a regulation." *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1073 (9th Cir. 2006). Applying such deference, the Supreme Court has upheld speech restrictions when they are justified in numerous ways, such as with "studies and anecdotes[,]" and through "history, consensus, and 'simple common sense.'" *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (citation omitted); *see also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508-09 (1981).

provision of funds to a blocked entity were "narrowly enough tailored" to serve the governments' national security and foreign policy interest), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003). Even a narrowly tailored restriction may restrict some speech. But even if Plaintiffs' speech is incidentally burdened, this fact alone does not violate the First Amendment. *See Branzburg v. Hayes*, 408 U.S. 665, 683 (1972) ("It is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability."). Here, Plaintiffs naked assertion that their specific speech would subject them to penalties is a legal conclusion. Without further factual development, this Court cannot determine whether or not the EO and Regulations would be enforced against Plaintiffs. *Ashcroft,* 556 U.S. at 678 (2009) (explaining that a claim must be "plausible on its face" which "asks for more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)). Plaintiffs have not plausibly established that OFAC would enforce the EO or Regulations in such a way as to restrict their free speech rights. Therefore, Plaintiffs' First Amendment claim must be dismissed.

**B.    Plaintiffs fail to establish that the EO and Regulations are *ultra vires*.**

Plaintiffs' argument that the EO is *ultra vires* and violates IEEPA also fails because Plaintiffs have no entitlement to assert such a claim, and because the EO is consistent with the statute. IEEPA contains no private right of action. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). IEEPA does not contain the sort of "rights-creating language" that courts find "critical" to imputing to Congress an intent to create a private right of action. *Id.* at 288-91. Because IEEPA does not confer rights directly on individuals affected by an Executive Order issued pursuant to IEEPA and instead contains provisions that are at most "phrased as a directive" to the Executive Branch, *see Sandoval*, 532 U.S. at 289 (citation omitted), no private right of action exists to enforce the statute's provisions.

Similarly, Plaintiffs cannot obtain relief against the President for his actions in connection with the EO. Federal courts have "no jurisdiction . . . to enjoin the President in the performance of his

18

official duties[.]" *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866); *see Franklin v. Massachusetts*, 505 U.S. 788, 802-03, 806 (1992) (plurality opinion). And separation of powers concerns mandate that an "express statement by Congress" is required before even a generally available cause of action may be extended specifically to challenge an action of the President. *Franklin*, 505 U.S. at 801; *see also Nixon v. Fitzgerald*, 457 U.S. 73 1, 748 n.27 (1982). Further, even if Plaintiffs could bring an *ultra vires* claim, it would fail. *Ultra vires* review is not APA review outside the context of the APA—rather, it is a "demanding standard" where "[t]he agency overstep must be 'plain on the record and on the face of the [statute]." *Fed. Exp. Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (alteration in original) (quoting *Oesterich v. Selective Serv. Sys. Loc. Bd. No. 11*, 393 U.S. 233, 238 n.7 (1968)). "An *ultra vires* challenge, in other words, is 'essentially a Hail Mary pass.'" *Id.* (quoting *Nyunt v. Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). Here, the agency overstep is not plain on the face of the EO or the Regulations. The Berman Amendment, 50 U.S.C. § 1702(b)(3), exempts from the President's authority under IEEPA the power to regulate or prohibit the importation from any country or exportation to any country of information or informational materials. IEEPA's language is clear, and the EO and Regulations clearly state that they will be implemented in accordance with the law. It is therefore "no more than speculation that OFAC intends to violate [§ 1702(b)(3)] in its enforcement of the Executive Order." *Open Soc'y Just. Initiative v. Trump*, 510 F. Supp. 3d 198, 215-16 (S.D.N.Y. 2021). Thus, Plaintiffs facial *ultra vires* challenge to the EO and Regulations fails because, by statute, neither authority can prohibit the transmission of "information and informational materials."

### C.    Plaintiffs fail to establish that the Regulations violate the APA.

Plaintiffs allege that the Regulations violate the APA because they are "'not in accordance with law,' 5 U.S.C. § 706(2)(A), 'contrary to a constitutional right,' *id.* § 706(2)(B), and 'in excess of statutory jurisdiction, authority or limitations, or short of a statutory right,' *id.* § 706(2)(C). Am. Compl. ¶ 96. With respect to each of these alleged APA violations, Plaintiffs ask that this Court presume that the Regulations "'regulate or prohibit, directly or indirectly,' the import or export of 'any information or

informational materials" in violation of 50 U.S.C. § 1702(b)(3), i.e. in contravention of the Berman Amendment. Am. Compl. ¶ 90. However, and as mentioned herein throughout, the Regulations explicitly state that they "do not apply to any transactions that are exempt pursuant to section 203(b) of [IEEPA] (50 U.S.C. § 1702(b))." 31 C.F.R. § 528.205. Further, Defendants are entitled to a presumption of regularity in the exercise or their rulemaking authority. *See, e.g., United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and . . . that they have properly discharged their official duties."); *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("[W]e note that a presumption of regularity attaches to the actions of Government agencies[.]"). Therefore, Plaintiffs' § 706(2)(A) claim that the Regulations violate this statute fails as a matter of law.

Plaintiffs' § 706(2)(B) claim turns on this Court's assessment as to whether the Regulations violate Plaintiffs' First Amendment rights. To evaluate whether a regulation is contrary to a constitutional right, the reviewing court must "make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making" and "owes no deference to the agency's pronouncement on a constitutional question." *Lead Indus. Ass'n v. EPA,* 647 F.2d 1130, 1173-74 (D.C. Cir. 1980) (citation omitted). Nonetheless, Defendants maintain that the Regulations do not violate Plaintiff's First Amendment rights because they survive both intermediate and strict scrutiny as detailed herein.

With respect to Plaintiffs' § 706(2)(C) claim, OFAC has acted within its jurisdiction and authority in issuing the Regulations. The issuance of regulations pursuant to IEEPA is clearly within the broad scope of that statute, which provides that the President may take certain actions through "such regulations as he may prescribe[.]" 50 U.S.C. § 1702(a)(1). Moreover, the presumption of regularity applies to OFAC's issuance of regulations, and Plaintiffs have offered no allegations that OFAC has acted outside of its authority or jurisdiction to overcome this presumption. *See* Exec. Order No. 14,203 § 10. For these reasons, Plaintiffs' § 706(2)(C) claim fails.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' claims in their Amended Complaint should be dismissed and their requests for declaratory and injunctive relief should be denied.

Dated: September 4, 2025                 Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ALEXANDER HAAS
Director, Federal Programs Branch

STEPHEN M. ELLIOTT
Assistant Director, Federal Programs Branch

/s/ *Ryan M. Underwood*
RYAN M. UNDERWOOD
Trial Attorney (D.C. Bar No. 1656505)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-1952
E-mail: ryan.m.underwood2@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2025, I caused the foregoing to be electronically filed with Clerk of Court using the CM/ECF system, which sent such notice to any individuals and entities who have entered appearances in this case to date, pursuant to the Court's ECF system.

BRETT A. SHUMATE
Assistant Attorney General

 /s/ RYAN M. UNDERWOOD
Ryan Underwood
Trial Attorney (D.C. Bar No. 1656505)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-1952
E-mail: ryan.m.underwood2@usdoj.gov

22