UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

MATTHEW SMITH and AKILA
RADHAKRISHNAN,

       *Plaintiffs*,

       v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

       *Defendants*.

Civil Case No. 1:25 Civ. 158 (JAW)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

BACKGROUND ...................................................................................................................2

    I.   The International Criminal Court ....................................................................2

    II.  The Order and Regulations..............................................................................5

    III. Procedural History.........................................................................................6

LEGAL STANDARD ...........................................................................................................7

ARGUMENT ........................................................................................................................7

    I.   Plaintiffs have alleged an injury in fact. ........................................................7

    II.  Plaintiffs' claims are ripe. ..............................................................................12

    III. Plaintiffs have stated claims for relief. .........................................................13

        A. Plaintiffs sufficiently allege that the Order and Regulations violate the
           First Amendment...............................................................................13

            1.  The Order and Regulations ban speech based on content. ....................13

            2.  The speech restrictions imposed by the Order and Regulations
               fail strict scrutiny. ...........................................................................15

            3.  The speech restrictions imposed by the Order and Regulations
               fail even intermediate scrutiny..........................................................17

        B. Plaintiffs sufficiently allege that the speech restrictions imposed by the
           Regulations violate the APA. .............................................................18

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury,*
    686 F.3d 965 (9th Cir. 2012) ..............................................14

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..........................................................7

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011)..........................................................15

*Chevron, U.S.A., Inc. v. NRDC,*
    467 U.S. 837 (1984)..........................................................20

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)..........................................................9

*Gustavsen v. Alcon Lab'ys, Inc.,*
    903 F.3d 1 (1st Cir. 2018)....................................................7

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010)..........................................................8, 14

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024)..........................................................20

*Mahmoud v. Taylor,*
    145 S. Ct. 2332 (2025)......................................................9

*Monson v. Drug Enf't Admin.,*
    589 F.3d 952 (8th Cir. 2009) ..............................................13

*N.H. Hemp Council, Inc. v. Marshall,*
    203 F.3d 1 (1st Cir. 2000)..................................................13

*N.H. Lottery Comm'n v. Rosen,*
    986 F.3d 38 (1st Cir. 2021)................................................13

*Open Soc'y Just. Initiative v. Trump,*
    510 F. Supp. 3d 198 (S.D.N.Y. 2021)................................14, 18

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015)......................................................13, 15

*Reno v. ACLU,*
    521 U.S. 844 (1997)..........................................................16

*Rideout v. Gardner,*
    838 F.3d 65 (1st Cir. 2016) ........................................................................15, 17, 18

*Rona v. Trump,*
    No. 25-CV-3114 (JMF), 2025 WL 2162543 (S.D.N.Y. July 30, 2025) ........................ *passim*

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
    699 F.3d 1 (1st Cir. 2012) ........................................................................12

*Smith v. Trump,*
    ___ F. Supp. 3d___, No. 25-cv-158, 2025 WL 2021785 (D. Me. July 18,
    2025) ........................................................................................ *passim*

*Sullivan v. City of Augusta,*
    511 F.3d 16 (1st Cir. 2007) ........................................................................12

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ........................................................................7, 8, 9

*United States v. Amirnazmi,*
    645 F.3d 564 (3d Cir. 2011) ........................................................................20

*United States v. Griffith,*
    515 F. Supp. 3d 106 (S.D.N.Y. 2021) ........................................................................20

*United States v. Playboy,*
    529 U.S. 803 (1999) ........................................................................16

*United States v. Stevens,*
    559 U.S. 460 (2010) ........................................................................11

**Statutes**

5 U.S.C. § 706(2)(A)–(C) ........................................................................18

50 U.S.C. § 1702(b)(3) ........................................................................9, 19, 20

50 U.S.C. § 1705(c), (b) ........................................................................6

**Other Authorities**

Carnegie Mellon University, *Informational Material*, Ontology of Personal
    Information ........................................................................19

Executive Order 14203, "Imposing Sanctions on the International Criminal
    Court," 90 Fed. Reg. 9369 (Feb. 6, 2025) ........................................ *passim*

H.R. Rep. No. 103-482 (1994) ........................................................................19, 20

Marco Rubio, *Sanctioning Foreign NGOs Directly Engaged in ICC's Illegitimate Targeting of Israel*, U.S. Department of State (Sept. 4, 2025) ................................................6

OFAC, *Note on Frequently Asked Questions*, U.S. Dep't of Treasury ................................................................................................11

OFAC, *Basic Information on OFAC and Sanctions FAQ 1190*, U.S. Dep't of Treasury (Aug. 27, 2024) ................................................................................11

Office of the Spokesperson, *Imposing Further Sanctions in Response to the ICC's Ongoing Threat to Americans and Israelis*, U.S. Department of State (Aug. 20, 2025) ................................................................................................6

Official Records of the Assembly of States Parties to the Rome Statute of the International Criminal Court, First session, New York ICC-ASP/1/3 and Corr.1, part II.A (Sept. 3–10, 2002) ................................................................4

Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90 ................................................................................................3

*Statement of ICC Prosecutor Karim A.A. Khan KC: Applications for Arrest Warrants in the Situation in the State of Palestine*, ICC (May 20, 2024) ................................5

*The States Parties to the Rome Statute*, ICC ................................................................................................3

**Rules**

Federal Rule of Civil Procedure 12(b)(1), (b)(6) ................................................7

ICC R. P. & Evid. 11 ................................................................................................4

**Regulations**

31 C.F.R. § 510.213(c)(2) ................................................................................10

31 C.F.R. § 515.206(a)(2) ................................................................................10

31 C.F.R. § 528.101 ................................................................................................6, 8

31 C.F.R. § 528.205 ................................................................................................20

31 C.F.R. § 536.205(b)(2) ................................................................................10

31 C.F.R. § 539.204(b)(2) ................................................................................10

31 C.F.R. § 542.211(c)(2) ................................................................................10

31 C.F.R. § 544.206(b)(2) ................................................................................10

31 C.F.R. § 547.206(c)(2) .................................................................................................10

31 C.F.R. § 548.206(b)(2) .................................................................................................10

31 C.F.R. § 549.206(b)(2) .................................................................................................10

31 C.F.R. § 560.210(c)(2) .................................................................................................10

31 C.F.R. § 569.205(b)(2) .................................................................................................10

31 C.F.R. § 576.209(b)(2) .................................................................................................10

31 C.F.R. § 579.205(b)(2) .................................................................................................10

31 C.F.R. § 582.205(b)(2) .................................................................................................10

90 Fed. Reg. 3687 (Jan. 15, 2025) ......................................................................................6

## INTRODUCTION

Plaintiffs Matthew Smith and Akila Radhakrishnan are U.S. citizens and human rights experts. They have long assisted the International Criminal Court ("ICC") in investigating and prosecuting some of the most horrific crimes known to humankind. They do so, in large part, by providing the ICC's Office of the Prosecutor ("OTP") with evidence, information, and expert analysis. In this way, they help the OTP investigate and prosecute atrocity crimes within the ICC's jurisdiction that are committed by militant leaders and others in Myanmar, Bangladesh, and Afghanistan.

Plaintiffs' work with the ICC consists of constitutionally protected speech, but Executive Order 14203 (the "Order") and its implementing regulations (the "Regulations") forbid it. Under the Order and Regulations, Plaintiffs and other Americans may not provide services to or for the benefit of sanctioned persons—including the ICC's chief prosecutor (the "Prosecutor"), who leads the OTP. Doing so is punishable by ruinous fines and decades in prison. The serious risk of such punishment forced Plaintiffs to halt their speech to the OTP as soon as the Order issued. They brought this lawsuit because they wished to resume their human rights advocacy, and two months ago, this Court granted their motion for a preliminary injunction, holding that (1) the Order "broadly prohibits any speech-based services that benefit the Prosecutor" and (2) Plaintiffs had demonstrated a substantial likelihood of success on the merits of their First Amendment claim. *Smith v. Trump*, ___ F. Supp. 3d___, No. 25-cv-158, 2025 WL 2021785, at *5 (D. Me. July 18, 2025).

In their motion to dismiss Plaintiffs' Amended Complaint, Defendants press largely the same arguments on which they relied in opposing Plaintiffs' motion for a preliminary injunction. *Compare* Defendants' Motion to Dismiss 8–16 (ECF 34) ("Gov't Mot.") *with* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction 10–16 (ECF

23). They were wrong then, and they are wrong now.

First, Defendants contend that the Order and Regulations "expressly exclude constitutionally-protected speech." Gov't Mot. 14. That contention is a dodge. The question is not whether Defendants can enforce the Order and Regulations as to constitutionally-protected speech; of course they cannot. It is whether the speech at issue *here*—the speech-based services Plaintiffs provide to the OTP—is protected. And Defendants have never acknowledged, in this litigation or elsewhere, that it is. If Defendants truly viewed speech like Plaintiffs' as exempt from the Order's prohibition on providing "services" to sanctioned persons, they could have made that representation to the Court and issued corresponding, binding agency guidance long ago. Their failure to do so speaks volumes.

Second, Defendants observe that sanctions programs may not, by law, restrict the exchange of "information or informational materials." Gov't Mot. 15. Yet under Defendants' longstanding interpretation of sanctions law, speech like Plaintiffs' does not qualify as "information or informational materials." Their interpretation is incorrect, but Defendants doggedly maintain it. *See infra* 9–11, 19–20.

Defendants have raised a Sword of Damocles over the heads of Plaintiffs and others who wish to communicate with the ICC but are chilled from doing so. They seek to avoid a constitutional reckoning by asserting that they *might* not allow the sword to fall. But freedom of speech is among this country's most sacred liberties, and Defendants cannot thwart it with strategically ambiguous assurances. The Court should deny the motion to dismiss.

## BACKGROUND

### I. The International Criminal Court

For decades, the United States has played a central role in the movement for international criminal justice. It was a driving force behind the effort to hold Nazi-era war criminals to account

through the Nuremberg Trials, and during the latter half of the 20th century, it supported the creation of international criminal tribunals to address unspeakable horrors committed in Cambodia, the former Yugoslavia, Rwanda, Sierra Leone, and other conflict zones.

The ICC is the culmination of that global movement. A permanent court based in The Hague, the ICC was created in 1998 by a treaty known as the "Rome Statute." *See* Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90. Today, 125 countries—"States Parties"—have ratified or acceded to the Rome Statue, including 30 of the 32 members of NATO.[1] The United States has not ratified the Rome Statute, and at times, it has sharply criticized the ICC. Nevertheless, both Republican and Democratic administrations have also supported critical aspects of the ICC's work, as has Congress. *See* Am. Compl. ¶ 44.

The Rome Statute gives the ICC jurisdiction over genocide, war crimes, and crimes against humanity—collectively, "atrocity crimes." Rome Stat. art. 5. This authority is limited by foundational respect for national sovereignty: under the Rome Statute, the ICC's jurisdiction is "complementary to national criminal jurisdictions," *id.* art. 1, and exists only where national legal systems prove unable or unwilling to provide meaningful redress for atrocity crimes, *id.* art 17(1).

Matters before the ICC follow robust procedures spelled out in the Rome Statute. The Prosecutor—leading the OTP—plays a critical role in these procedures. *See* Am. Compl. ¶¶ 30–43. Among other things, the Prosecutor is responsible for conducting preliminary examinations and formal investigations of atrocity crimes, and for prosecuting those allegedly responsible. The Prosecutor has full authority over OTP investigations and prosecutions, as well as certain "inherent powers"—including determining whether to seek authorization to conduct a formal investigation and "analys[ing] the seriousness" of "information on crimes within the jurisdiction of the" ICC.

---

[1] *See The States Parties to the Rome Statute*, ICC, https://perma.cc/ADW6-CB8K.

Rome Stat. art. 15; *see id.* art. 42(2), 53, 54(1)(a)–(b); ICC R. P. & Evid. 11.[2]

Over time, and often with the United States' support, the OTP has successfully prosecuted atrocity crimes in a variety of conflict zones. *See* Am. Compl. ¶ 44. These include, for instance, the conviction of a Congolese warlord for enlisting and conscripting children, an Al-Qaeda–aligned militant for intentionally directing attacks against religious shrines and historic buildings, and a former Lord's Resistance Army commander for forced marriage, torture, rape, and sexual slavery perpetrated against civilians in Uganda. *Id.* The OTP's critical work continues today. Its current probes and prosecutions—all supported in one form or another by the United States—include investigations to which Plaintiffs have contributed, as well as investigations into the genocide in Darfur; arbitrary detentions, torture, rape and sexual violence, and persecution perpetrated by the Maduro regime in Venezuela; and war crimes and forced deportations committed in Ukraine and Georgia during Russia's invasions of those countries. *Id.*

The OTP has also opened investigations into alleged crimes related to the situations in Afghanistan and Palestine. The Afghanistan proceedings—first announced 18 years ago—initially encompassed crimes allegedly committed by Taliban forces, Afghan security forces, and U.S. military and Central Intelligence Agency personnel. *Id.* ¶ 50. But more than three years ago, the Prosecutor announced that he had "deprioritse[d]" all aspects of the investigation involving U.S. personnel, nullifying any realistic prospect of the investigation leading to U.S. personnel's prosecution. *Id.* ¶ 53. The current Afghanistan investigation, which targets the Taliban, aligns with longstanding foreign policy positions adopted across U.S. administrations. *Id.* ¶¶ 53–54. That investigation is ongoing. As for the Palestine investigation, the OTP has sought five arrest

---

[2] Official Records of the Assembly of States Parties to the Rome Statute of the International Criminal Court, First session, New York ICC-ASP/1/3 and Corr.1, part II.A (Sept. 3–10, 2002), https://perma.cc/T3JT-C8J2.

4

warrants: three against Hamas leaders and two against Israeli officials.[3]

## II. The Order and Regulations

On February 6, 2025, President Trump issued Executive Order 14203, "Imposing Sanctions on the International Criminal Court" (the "Order"). 90 Fed. Reg. 9369. The Order asserts that "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons . . . constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States."[4] 90 Fed. Reg. 9369 at 9370. Such an emergency now exists, says the Order, because the ICC has "asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel," and issued "arrest warrants targeting" the Israeli Prime Minister and a Former Minister of Defense. *Id.* at 9369.

In response to this purported emergency, the Order imposes sanctions under the International Economic Emergency Powers Act ("IEEPA"). Order §§ 1–4, 10. Relevant here, the Order blocks—or freezes—"[a]ll property and interests in property" under U.S. jurisdiction belonging to the Prosecutor or others whom the Secretary of State, in consultation with other officials, designates. Order § 1(a)(i); *id.* § 1(a)(ii)(A), (B). It also prohibits "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked" under the Order. *Id.* § 3(a). Combined, these provisions forbid Americans from providing services "to, or for the benefit of," the Prosecutor or anyone else sanctioned under

---

[3] *See Statement of ICC Prosecutor Karim A.A. Khan KC: Applications for Arrest Warrants in the Situation in the State of Palestine*, ICC (May 20, 2024), https://www.icc-cpi.int/news/statement-icc-prosecutor-karim-aa-khan-kc-applications-arrest-warrants-situation-state.

[4] The Order's definition of "protected person" includes "any United States Person, unless the United States provides formal consent to ICC jurisdiction over that person or becomes a state party to the Rome Statute," or "any foreign person that is a citizen or lawful resident of an ally of the United States that has not consented to ICC jurisdiction over that person or is not a state party to the Rome Statute." Order § 8(d)(i), (iii).

the Order.[5]

On July 1, 2025, the Treasury Department's Office of Foreign Assets Control ("OFAC") promulgated regulations (the "Regulations") implementing the Order. 31 C.F.R. § 528.101 *et seq.* (2025). The Regulations prohibit everything the Order prohibits, neither clarifying nor limiting its scope. *Id.* § 528.201(a) (2025).

Because the Order and Regulations establish a sanctions regime under IEEPA, violating their prohibitions is extraordinarily dangerous. Anyone who violates an IEEPA sanctions regime may be subject to a civil penalty equaling the greater of $377,700 or twice the value of the transaction giving rise to the violation. 50 U.S.C. § 1705(b); 90 Fed. Reg. 3687, 3688 (Jan. 15, 2025). Anyone who willfully violates an IEEPA sanction regime, attempts or conspires to do so, or aids and abets a violation faces criminal fines of up to $1,000,000 and up to twenty years in prison. 50 U.S.C. § 1705(c).

## III. Procedural History

Plaintiffs initiated this suit for injunctive and declaratory relief on April 11, 2025. ECF 1.[6] Their Complaint alleged that the speech restrictions imposed by the Order (1) violated the First Amendment and (2) were *ultra vires*. *Id.* ¶ 81–90. On April 25, Plaintiffs moved for a preliminary injunction. ECF 19. The Court granted that motion on July 18, holding that (1) the Order prohibited

---

[5] Defendants have continued to expand the list of sanctioned persons. On June 5, 2025, the Secretary of State sanctioned four judges of the ICC. Am. Compl. ¶ 6(a). On July 9, the Secretary of State sanctioned the U.N. Human Rights Council Special Rapporteur on the Situation of Human Rights in the Palestinian Territories. Am. Compl. ¶ 6(b). On August 20, the Secretary of State sanctioned the ICC's two deputy prosecutors and two additional ICC judges. Office of the Spokesperson, *Imposing Further Sanctions in Response to the ICC's Ongoing Threat to Americans and Israelis*, U.S. Department of State (Aug. 20, 2025), https://perma.cc/N6ZE-DYED. On September 4, the Secretary of State sanctioned three foreign non-governmental human rights organizations. Marco Rubio, *Sanctioning Foreign NGOs Directly Engaged in ICC's Illegitimate Targeting of Israel*, U.S. Department of State (Sept. 4, 2025), https://perma.cc/ANH4-8T29.

[6] Unless otherwise noted, "ECF" citations refer to the docket in *Smith v. Trump*, 25-cv-158-JAW (D. Maine).

Plaintiffs' speech to the OTP and (2) Plaintiffs had demonstrated a substantial likelihood of success on the merits of their First Amendment claim because the Order could not survive even intermediate scrutiny. *Smith*, 2025 WL 2021785, at \*5. Plaintiffs filed an Amended Complaint on July 22. ECF 31. The Amended Complaint notes Defendants' promulgation of the Regulations and alleges that the speech restrictions imposed by the Order and Regulations (1) violate the First Amendment, (2) are *ultra vires*, and (3) violate the APA.[7] *Id.* ¶¶ 84–96. On September 4, Defendants moved to dismiss Plaintiffs' Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF 34.

## LEGAL STANDARD

When a defendant moves to dismiss for lack of standing under Rule 12(b)(1), the court asks whether the plaintiff's allegations "plausibly demonstrate" standing to sue. *Gustavsen v. Alcon Lab'ys, Inc.*, 903 F.3d 1, 7 (1st Cir. 2018). Likewise, when a defendant moves to dismiss for failure to state a claim under Rule 12(b)(6), the court asks whether the plaintiff has alleged "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In both scenarios, the court accepts the plaintiff's well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Gustavsen*, 903 F.3d at 7.

## ARGUMENT

### I. Plaintiffs have alleged an injury in fact.

Defendants argue that Plaintiffs lack standing because they have failed to allege an injury in fact. Gov't Mot. 8–13. Not so. Plaintiffs have alleged that they "inten[d] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and that "there

---

[7] Plaintiffs no longer seek to press their equitable *ultra vires* claim—*i.e.*, Claim II of the Amended Complaint—and do not oppose its dismissal without prejudice.

exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014). These allegations satisfy Article III's injury-in-fact requirement.[8] *Id.*

First, Plaintiffs plausibly allege an intent to engage in constitutionally protected speech. Specifically, Plaintiffs wish to continue providing the Prosecutor's office with evidence, information, advocacy, and expert analysis that will help the Prosecutor investigate and seek accountability for atrocity crimes committed by militant leaders and others in Myanmar, Bangladesh, and Afghanistan. Am. Compl. ¶¶ 60(b)–(c), 61, 64. This speech is indisputably, and at the very least, "affected with a constitutional interest." *Driehaus*, 573 U.S. at 160.

Second, Plaintiffs plausibly allege that the Order and Regulations "proscribe[]" Plaintiffs' speech. *Id.* Indeed, as this Court has explained, the Order's language "broadly prohibits any speech-based services that benefit the Prosecutor." *Smith v. Trump*, 2025 WL 2021785, at *5 (D. Me. July 18, 2025); *accord Rona v. Trump*, No. 25-CV-3114 (JMF), 2025 WL 2162543, at *6 (S.D.N.Y. July 30, 2025) ("[T]he Order plainly regulates Plaintiffs' speech."). Consequently, to comply with the Order and Regulations—and IEEPA, the statute upon which Defendants relied in issuing them—Plaintiffs must forego speech they would otherwise make. *See, e.g.*, Am. Compl. ¶¶ 60(b)–(c), 61(a)–(d), 64.

Finally, Plaintiffs plausibly allege that violating the Order and Regulations would expose them to a "credible threat"—that is, a "substantial risk"—of severe civil and criminal penalties. *Driehaus*, 573 U.S. at 158, 160. The Order and Regulations establish a sanctions program under IEEPA. Order §§ 1–4, 10; 31 C.F.R. § 528.101 *et seq.* (2025). Defendants regularly seek penalties for violations of IEEPA sanctions programs, Am. Compl. ¶¶ 70–71, and they have not disavowed any intent to do so here. *See, e.g., Holder v. Humanitarian L. Project*, 561 U.S. 1, 9, 16 (2010)

---

[8] Plaintiffs' injuries are plainly traceable to the Order and Regulations and redressable by the Court; Defendants do not suggest otherwise.

(holding plaintiffs had standing to bring pre-enforcement challenge to statute criminalizing provision of material support to designated "foreign terrorist organizations" when government had enforced the statute in other contexts and did not deny that it would enforce the same statute against plaintiffs based on their provision of speech-based services). Thus, engaging in speech proscribed by the Order and Regulations would place Plaintiffs and others like them at "substantial risk" of punishment under IEEPA. *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2358 (2025).

Defendants' primary argument to the contrary gets the legal standard wrong. Relying on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013), Defendants contend that Plaintiffs lack standing because they have not alleged "certainly impending" enforcement of the speech restrictions imposed by the Order and Regulations. Gov't Mot. 9. But that is not the rule here. To the extent that Plaintiffs' standing depends on future enforcement actions by the government, Plaintiffs need only allege that there is a "substantial risk" of such actions—not that they are certainly impending. *Mahmoud*, 145 S. Ct. at 2358 ("[T]o pursue a pre-enforcement challenge, a plaintiff must show that "the threatened injury is certainly impending, *or* there is a substantial risk that the harm will occur." (quoting *Driehaus*, 573 U.S. at 158) (emphasis added)).

Defendants also make two attempts to diminish Plaintiffs' substantial risk of punishment for providing speech-based services to the OTP. Both fail.

First, Defendants argue that Plaintiffs face no risk of punishment for providing speech-based services to the OTP because IEEPA does not authorize the executive to regulate "information or informational materials." 50 U.S.C. § 1702(b)(3) (2001). According to Defendants, IEEPA's carve-out for information or informational materials—known as the "Berman Amendment"—is incorporated into the Order and Regulations.[9] Gov't Mot. 11. Thus, as Defendants put it, Plaintiffs

---

[9] Defendants inexplicably accuse Plaintiffs of "entirely neglecting to mention that the Berman Amendment provides an express exclusion for 'information and informational materials.'" Gov't Mot. 10 (quoting 50

may be penalized for their speech to the OTP "only to the extent that" their speech "is outside the Berman Amendment's scope." *Id.*

This argument is both incorrect and misleading. Defendants have long adhered to an unduly narrow interpretation of the Berman Amendment, applying it "only to 'informational materials that are widely circulated in a standardized format' and not to 'those that are bespoke.'" *Rona v. Trump*, No. 25-CV-3114 (JMF), 2025 WL 2162543, at *7 (S.D.N.Y. July 30, 2025); *see also* Am. Compl. ¶ 74 (noting Defendants' narrow interpretation); *id.* ¶ 91 (same).[10] Indeed, when the first Trump Administration imposed sanctions targeting the OTP, the government maintained that training, technical assistance, and presentations to the OTP, as well as *amicus curiae* briefs supporting the OTP's efforts, were not subject to the Berman Amendment's protections. *See* Defs.' Mem. of Law in Opp. to Pls.' Mot. for a Preliminary Injunction, *Open Soc'y Just. Initiative v. Trump*, 20-cv-8121 (S.D.N.Y. Nov. 9, 2020), ECF 51, at 23–25 ("*OSJI*"). And Defendants adopted the same position when defending the current Order and Regulations in a parallel lawsuit. *Rona v. Trump*, No. 25-CV-3114 (JMF), 2025 WL 2162543, at *7 (S.D.N.Y. July 30, 2025) (noting that the government had "expressly adopt[ed] the position that it took" in *OSJI*).

Thus, under Defendants' own view—which they have not disclaimed here—Plaintiffs' intended speech to the OTP is "outside the Berman Amendment's scope."[11] Gov't Mot. 11; Am. Compl. ¶¶ 74, 91. Given OFAC's interpretation, the fact that the Order and Regulations are—or

---

U.S.C. § 1702(b)(3)). But the Amended Complaint repeatedly quotes, and cites to, the Berman Amendment's protection of "information [and] informational materials"—indeed, the language of the Berman Amendment is one of the cornerstones of Plaintiffs' claims. *See, e.g.*, Am. Compl. ¶¶ 7, 74.

[10] Defendants' erroneously narrow interpretation of the Berman Amendment appears in at least 12 Treasury regulations implementing IEEPA sanctions programs. 31 C.F.R. §§ 560.210(c)(2) (2012), 582.205(b)(2) (2019), 569.205(b)(2) (2020), 547.206(c)(2) (2018), 549.206(b)(2) (2010), 579.205(b)(2) (2019), 544.206(b)(2) (2009), 576.209(b)(2) (2010), 536.205(b)(2), 510.213(c)(2) (2022), 539.204(b)(2), 515.206(a)(2) (2016).

[11] As Plaintiffs have explained, Defendants' interpretation of the Berman Amendment is wrong. Am. Compl. ¶ 91; ECF 19 at 17; ECF 26 at 7–8. To date, however, Defendants have neither withdrawn nor revised it.

*should* be—limited by the Berman Amendment does not mitigate the substantial risk that Defendants will seek to penalize Plaintiffs for their speech to the OTP. If anything, Defendants' steadfast insistence on their narrow interpretation of the Berman Amendment—including in the context of the Order and Regulations—enhances the already substantial risk that Plaintiffs face. *See* Am. Compl. ¶¶ 60(b)–(c), 61(a)–(d), 64 (describing speech that is plainly bespoke and not widely circulated in a standardized format).

Second, Defendants point the Court to OFAC FAQ 1190. There, OFAC states that it "does not sanction persons for their engagement in activities subject to U.S. constitutional protection," and that U.S. persons do not "violate OFAC sanctions for engaging in such constitutionally protected activity." OFAC, *Basic Information on OFAC and Sanctions FAQ 1190*, U.S. Dep't of Treasury (Aug. 27, 2024), https://ofac.treasury.gov/faqs/1190 ("FAQ 1190").

While this disclaimer strikes a superficially pleasing chord, it provides no assurance to Plaintiffs or others like them. For one thing, OFAC itself cautions the public against relying on its FAQs, stating that "a particular answer will not always be applicable to all programs or at all times," and emphasizing that anyone "subject to OFAC jurisdiction must comply with the full legal requirements of OFAC's programs which are set forth in the applicable statutes, Executive Orders, and implementing regulations." OFAC, *Note on Frequently Asked Questions*, U.S. Dep't of Treasury, https://perma.cc/83JB-AKSE. More fundamentally, Defendants have doggedly refused to acknowledge, in this or other litigation involving the Order and Regulations, that speech like Plaintiffs' is, in fact, "subject to U.S. constitutional protection." FAQ 1190.

Most important, a government regulation that restricts protected speech offends the Constitution even if the government has "promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010). In the words of the Supreme Court, "the First Amendment protects

against the Government; it does not leave us at the mercy of *noblesse oblige*." *Id.* Applying this rule, the U.S. District Court for the Southern District of New York has already rejected the very argument Defendants advance in their Motion, holding that "Plaintiffs' First Amendment rights cannot be defeated by the Government's professions of good will." *Rona*, 2025 WL 2162543, at *7. The same is true here.

## II. Plaintiffs' claims are ripe.

A claim challenging a government prohibition of protected speech is ripe so long as the plaintiff bringing the claim establishes a "reasonable fear of enforcement." *Sullivan v. City of Augusta*, 511 F.3d 16, 31 (1st Cir. 2007). That is because "when free speech is at issue, concerns over chilling effect call for a relaxation of ripeness requirements." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 9 (1st Cir. 2012).

Plaintiffs easily clear this bar. Their provision of speech-based services to the OTP would violate the IEEPA sanctions regime established by the Order and Regulations, exposing them to exceedingly harsh penalties. Am. Compl. ¶¶ 61, 63–64, 70–72, 79–82. Defendants regularly seek to enforce IEEPA violations. Am. Compl. ¶¶ 70–72. And they have not disclaimed any intent to do so here; on the contrary, despite months of litigation challenging the lawfulness of the speech restrictions imposed by the Order and Regulations, Defendants have never acknowledged—in a brief, a declaration, a guideline, an FAQ, or any other medium—that Plaintiffs' speech, or speech like it, is either entitled to the protections of the First Amendment or within the scope of the Berman Amendment. Against this backdrop, Plaintiffs' fears of enforcement are eminently "reasonable." *Sullivan*, 511 F.3d at 31.

According to Defendants, Plaintiffs' claims are not ripe because Plaintiffs have not sought guidance or a license from OFAC. Gov't Mot. 13–14. But no guidance is necessary: multiple federal courts, including this one, have determined that the Order "broadly prohibits any speech-

based services that benefit the Prosecutor." *Smith*, 2025 WL 2021785, at *5; *accord Rona*, 2025 WL 2162543, at *6. And Defendants have made it perfectly clear that they do not consider speech like Plaintiffs' to fall within the scope of the Berman Amendment. *Supra* 9–11. The fact that Defendants' approach to these questions in its briefs has been a study in strategic ambiguity does not render Plaintiffs' claims unfit for adjudication. *See N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 53 (1st Cir. 2021) (finding ripeness where the Department of Justice had not yet taken a final position on whether a statute applied to plaintiffs, whose only recourse was to "entirely shut[] down" their activities).

Regardless, Plaintiffs need not seek guidance or a license from OFAC because IEEPA and the First Amendment clearly prohibit Defendants from restricting Plaintiffs' speech to the OTP. In other words, "[e]ven if there were some realistic prospect of a license" or favorable guidance, Plaintiffs could not be "forced" to seek additional information from OFAC because their activity should "not [be] subject to the [Order and Regulations] at all." *N.H. Hemp Council, Inc. v. Marshall*¸ 203 F.3d 1, 5–6 (1st Cir. 2000); *see also Monson v. Drug Enf't Admin.*, 589 F.3d 952, 959 (8th Cir. 2009) ("[Plaintiffs] should not be required to apply for registration pursuant to a regulatory scheme that they contend does not apply to their activities in the first place" on the grounds it is "outside the reach of the [agency's] statutory authority.").

## III. Plaintiffs have stated claims for relief.

### A. Plaintiffs sufficiently allege that the Order and Regulations violate the First Amendment.

#### 1. The Order and Regulations ban speech based on content.

On their face, the Order and Regulations restrict speech based on its content. A speech restriction is facially content-based when it targets speech because of its "function or purpose." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). That is precisely what the Order and

Regulations do: they prohibit speech that has the "function or purpose," *id.*, of rendering a service to or for the benefit of anyone sanctioned under the Order—including the Prosecutor. Am. Compl. at ¶¶ 79–81; *see also Rona v. Trump*, No. 25-CV-3114 (JMF), 2025 WL 2162543, at *6 (S.D.N.Y. July 30, 2025) (explaining that, under the Order, U.S. human rights advocates "are free to speak if their speech does not have the function or purpose of benefitting [the Prosecutor]; but they are subject to civil and criminal penalties if it does have that function or purpose.").

Put differently, whether Plaintiffs or others like them may speak to the ICC without falling afoul of the Order and Regulations "depends on what they say": if their speech would provide a service to or for the benefit of a sanctioned person, the Order and Regulations prohibit it. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 27 (2010). This is the quintessence of a content-based regulation. Every federal court to reach the question—or one like it—has so held. *Rona*, 2025 WL 2162543, at *6; *OSJI*, 510 F. Supp. 3d 198, 212 (S.D.N.Y. 2021); *see also, e.g.*, *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 997 (9th Cir. 2012) (holding that an executive order banning the provision of "services" to designated "terrorist" organizations was subject to strict scrutiny because it placed a content-based ban on speech).

Defendants offer no clear argument to the contrary. They do not engage with the multiple judicial decisions holding that the Order and Regulations (or prohibitions like them) restrict speech based on content. *See* Gov't Mot. 15–16. Instead, they make two unconvincing assertions, both unmoored from legal authority. First, Defendants assert that the Order and Regulations are content-neutral *because* they prohibit any speech that provides a service to, or for the benefit of, a sanctioned person. Gov't Mot. 16. For the reasons stated above, *supra* 13–14, this assertion defies logic and is irreconcilable with Supreme Court precedent.

Second, Defendants assert that Plaintiffs "have identified no intelligible principle upon which

14

this Court could determine whether their speech vis-à-vis the OTP constitutes a 'service' that would benefit the Prosecutor, Mr. Khan, personally." Gov't Mot. 15-16. This assertion is irrelevant to whether the Order and Regulations restrict speech based on content. In any event, as Plaintiffs have explained, their intended speech to the OTP consists of information, evidence, advocacy, and expert analysis that would assist ICC officials—including the sanctioned Prosecutor—in investigating, evaluating, and seeking accountability for atrocity crimes. Am. Compl. ¶¶ 1, 61, 63–64. Nothing about this is unintelligible; Plaintiffs' speech "fall[s] comfortably within the broad scope of the [Order's] prohibition on 'the making of *any* . . . services by, to, or for the benefit of' designated persons." *Rona*, 2025 WL 2162543 at *6 (ellipses in original).

## 2. The speech restrictions imposed by the Order and Regulations fail strict scrutiny.

Content-based prohibitions on speech, like those imposed by the Order and Regulations, are "presumptively unconstitutional." *Reed*, 576 U.S. at 163. They cannot stand unless they survive strict scrutiny. *Id.* For that to happen, the government must prove that they are "narrowly tailored." *Id.* Speech prohibitions satisfy the narrow tailoring prong of strict scrutiny only if they are "the least restrictive means" of achieving a compelling government interest. *Rideout v. Gardner*, 838 F.3d 65, 71 (1st Cir. 2016). By design, it is exceedingly difficult for the government to satisfy this standard. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) ("It is rare that a regulation restricting speech because of its content will ever be permissible." (internal quotation marks omitted)). Defendants cannot do so here—not even close.[12]

As the Amended Complaint makes clear, the speech restrictions imposed by the Order and Regulations are "vastly overinclusive." *Id.* at 804. The Order and Regulations purport to address

---

[12] Indeed, this Court has already held that Defendants likely cannot satisfy even *intermediate* scrutiny. *Smith*, 2025 WL 2021785, at *5.

ICC actions "targeting America and [its] close ally Israel." Am. Compl. ¶ 4 (quoting Order at 9369). Yet they bar U.S. persons, including Plaintiffs, from providing speech-based services that assist sanctioned ICC officials in any way at all—including with investigations and prosecutions the United States has *supported*. Am. Compl. ¶ 44. For example, the Order and Regulations ban Americans from assisting the OTP with its investigation of atrocity crimes allegedly committed in Ukraine—even though Congress has passed a law expressly permitting the United States government to do just that. Am. Compl. ¶ 44(i). And they ban Plaintiffs from providing the OTP with evidence, information, advice, and advocacy that would assist the OTP in investigating and prosecuting atrocity crimes wholly unrelated to the "national emergency" declared in the Order, including atrocity crimes committed (a) against the Rohingya by militants in Myanmar and Bangladesh and (b) against women and girls by the Taliban in Afghanistan. Am. Compl. ¶¶ 61, 63–65.

Tellingly, Defendants make no effort to explain why the interest purportedly served by the Order and Regulations—"protecting the personnel of the United States and its allies from investigation, arrest, detention, and prosecution by the ICC"—requires them to prohibit Plaintiffs and others like them from providing the Prosecutor with speech-based services related to *any* investigation or prosecution, including those the United States continues to support.[13] Gov't Mot. 16. Nor do Defendants even attempt to explain why the panoply of non-speech restrictions imposed by the Order, standing alone, are an "ineffective" means of pursuing the government's asserted interest. *United States v. Playboy*, 529 U.S. 803, 816 (1999); *Reno v. ACLU*, 521 U.S. 844, 874 (1997) (when strict scrutiny applies, regulation of speech "is unacceptable if less restrictive alternatives would be at least as effective in achieving the" government's asserted purpose); *see*

---

[13] Plaintiffs do not concede Defendants' ability to prove that the interest purportedly served by the Order and Regulations is compelling.

Order §§ 1, 4 (imposing non-speech measures).

Instead, Defendants maintain that the speech restrictions imposed by the Order and Regulations are narrowly tailored because they do not "bar[] activity described within the Berman Amendment or subject to the protections of the First Amendment[.]" Gov't Mot. 17. This flat assertion merely recycles Defendants' meritless arguments against Plaintiffs' standing.

### 3. The speech restrictions imposed by the Order and Regulations fail even intermediate scrutiny.

Even if the speech restrictions imposed by the Order and Regulations were not subject to strict scrutiny (they are), Plaintiffs' First Amendment claims would still succeed. That is because, in light of Plaintiffs' allegations, the speech restrictions imposed by the Order and Regulations cannot survive intermediate scrutiny—as this Court has already concluded. *Smith*, 2025 WL 2021785, at *5.

Unlike content-based restrictions, content-neutral restrictions on speech "are subject to intermediate scrutiny." *Rideout*, 838 F.3d at 71. For a content-neutral speech restriction to survive intermediate scrutiny, the government must establish that it is "narrowly tailored to serve a significant governmental interest." *Id.* at 72 (quotation marks omitted). Intermediate scrutiny is more forgiving than strict scrutiny: it does not require the government to prove that a speech restriction is the "least restrictive means" of achieving a significant government interest. *Id.* at 71. Even so, intermediate scrutiny does not permit the government to "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 71–72. Thus, "broad prophylactic prohibitions that fail to respond precisely to the substantive problem which legitimately concerns the State cannot withstand intermediate scrutiny." *Id.* at 72 (cleaned up). Likewise, when "there is a substantial mismatch" between a speech prohibition and the government's asserted interest, the prohibition will fail intermediate scrutiny. *Id.* at 72.

The Court applied these standards on July 18, when, ruling on Plaintiffs' motion for a preliminary injunction, it determined that the speech restrictions imposed by the Order "fail[] even intermediate scrutiny." *Smith*, 2025 WL 2021785, at *5. The Court reached its conclusion based on allegations materially identical to those in the Amended Complaint. *Id.* at *5–*6.

Defendants now ask the Court to do an about-face. Gov't Mot. 17–18. Their motion, however, does not identify any relevant change in circumstances—much less a flaw in the Court's reasoning. *Id.* Nor could it. As explained above, the Amended Complaint alleges that the speech restrictions imposed by the Order and Regulations burden an extraordinary range of constitutionally protected speech; *i.e.*, instead of "respond[ing] precisely to the substantive problem" identified by the government, the Order and Regulations lay down "broad prophylactic prohibitions" with no plausible connection to the national emergency the Order declares. *Rideout*, 838 F.3d at 72. Accordingly, for the reasons the Court has already identified, the speech restrictions fail intermediate scrutiny. *Smith*, 2025 WL 2021785, at *5; *see also OSJI*, 510 F. Supp. 3d at 212 n.7 (concluding that virtually identical speech restrictions failed both strict and intermediate scrutiny because they "burden[ed] substantially more speech than necessary").

### B. Plaintiffs sufficiently allege that the speech restrictions imposed by the Regulations violate the APA.

The Amended Complaint also states a claim for relief under the APA. Agency action violates the APA when it is "not in accordance with law," "contrary to [a] constitutional right," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C). Any of those conditions would entitle Plaintiffs to relief, and Plaintiffs have alleged all three. Defendants' arguments to the contrary are the same as their arguments against Plaintiffs' standing and First Amendment claim—and they suffer from the same infirmities.

To start, the speech restrictions imposed by the Regulations violate the Constitution. The

Amended Complaint alleges, and this Court has confirmed, that the Regulations "broadly prohibit[] any speech-based services that benefit the Prosecutor." *Smith*, 2025 WL 2021785, at *5; *id.* at *2 n.1 ("The regulations do not define any terms within or clarify the scope of Section 3(a) of the Executive Order[.]"); Am. Compl. ¶¶ 7, 79–81. For all the reasons set forth above, this prohibition infringes the First Amendment rights of Plaintiffs and other U.S. persons who seek to provide speech-based services to the OTP.

What's more, because the Regulations "broadly prohibit[] any speech-based services that benefit the Prosecutor," *Smith*, 2025 WL 2021785, at *5, they also exceed the authority Congress granted to the executive in IEEPA. Am. Compl. ¶¶ 74, 91–92. IEEPA's Berman Amendment plainly states that the executive's authority to impose sanctions "does not include the authority to regulate or prohibit, directly or indirectly," the import or export of "information or informational materials," "regardless of format or medium of transmission." 50 U.S.C. § 1702(b)(3) (2011). The phrase "informational materials" ordinarily means "any type of content that is designed to provide information or educate the audience on a specific topic."[14] Consistent with this reading, when Congress added the Berman Amendment to IEEPA, it explicitly intended to ensure that any sanctions imposed under the statute would not restrict "information that is protected under the First Amendment." H.R. Rep. No. 103-482, at 239 (1994) (Conf. Rep.). Congress recognized that the transfer of information and informational materials provided a way for Americans to "encourag[e] democracy and human rights abroad," and for that reason, among others, Congress made clear that IEEPA's speech protections have a "broad scope." *Id.* at 238–39. Thus, the "best reading" of the Berman Amendment is that it prohibits the executive from regulating Americans' speech to the OTP. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 373 (2024).

---

[14] Carnegie Mellon University, *Informational Material*, Ontology of Personal Information, https://perma.cc/TB62-VUSF.

Defendants contend that the speech restrictions imposed by the Regulations do not exceed the executive's statutory authority because the Regulations "do not apply to any transactions that are exempt" under the Berman Amendment. Gov't Mot. 20 (quoting 31 C.F.R. § 528.205). Once again, Defendants omit that OFAC, the Treasury component responsible for promulgating and enforcing the Regulations, takes a crabbed view of the Berman Amendment—one that does not encompass speech like Plaintiffs'. *See supra* 9–11. OFAC's incorrect interpretation of the Berman Amendment is contrary to IEEPA's plain text and Congress's express intent.[15] 50 U.S.C. § 1702(b)(3); H.R. Rep. No. 103-482, at 239 (1994) (Conf. Rep.).

Although Defendants neither acknowledge nor defend OFAC's interpretation of the Berman Amendment in *this* litigation, they have explicitly endorsed it in other litigation challenging the same speech restrictions. *See supra* 10. Thus, there is no need to speculate as to whether, in Defendants' view, Plaintiffs' speech falls within the scope of the Berman Amendment. *Cf.* Gov't Mot. 19. Defendants have already made clear that it does not.[16]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

---

[15] Courts have sometimes deferred to OFAC's narrow interpretation of the Berman Amendment under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). *See, e.g.*, *United States v. Amirnazmi*, 645 F.3d 564, 586–88 (3d Cir. 2011); *United States v. Griffith*, 515 F. Supp. 3d 106, 117 (S.D.N.Y. 2021). Because the Supreme Court has overruled *Chevron*, such deference is no longer warranted. *Loper Bright*, 603 U.S. at 412–13.

[16] Defendants state that they are "are entitled to a presumption of regularity in the exercise o[f] their rulemaking authority." Gov't Mot. 20. Even assuming that Defendants are entitled to such a presumption, it is inapplicable here, because there is nothing to presume. OFAC's official interpretation of the scope of the Berman Amendment is well-established, and Defendants have neither abandoned nor modified it in the context of the Order and Regulations. *See supra* 10–11.

September 25, 2025

Respectfully submitted,

/s/ Carol J. Garvan

Carol J. Garvan
AMERICAN CIVIL LIBERTIES UNION OF
MAINE FOUNDATION
PO Box 7860
Portland, Maine 04112
(207) 619-8687
cgarvan@aclumaine.org

/s/ Zachary Heiden

Zachary Heiden
AMERICAN CIVIL LIBERTIES UNION OF
MAINE FOUNDATION
PO Box 7860
Portland, Maine 04112
(207) 619-6224
zheiden@aclumaine.org

/s/ Anahita D. Sotoohi

Anahita D. Sotoohi
AMERICAN CIVIL LIBERTIES UNION OF
MAINE FOUNDATION
PO Box 7860
Portland, Maine 04112
(207) 613-4350
asotoohi@aclumaine.org

/s/ Charles Hogle

Charles Hogle*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2660
charlie.hogle@aclu.org

/s/ Ashley Gorski

Ashley Gorski*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2660
agorski@aclu.org

/s/ Hina Shamsi

Hina Shamsi*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2660
hshamsi@aclu.org

ATTORNEYS FOR PLAINTIFFS
*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, I electronically filed the foregoing document via the Court's CM/ECF system.

Dated: September 25, 2025

/s/ Charles Hogle
Charles Hogle
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2660
charlie.hogle@aclu.org
Admitted *pro hac vice*