UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| MATTHEW SMITH and, AKILA RADHAKRISHNAN, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:25-cv-00158-JAW |
| DONALD J. TRUMP, et al., | ) | |
| Defendants. | ) | |

**ORDER ON MOTION TO DISMISS**

Plaintiffs filed this lawsuit against President Trump and several other agencies and officials, arguing that an executive order restricts protected speech in violation of the First Amendment and exceeds the executive branch's powers under the International Emergency Economic Powers Act. The government filed a motion to dismiss. Concluding that the plaintiffs have standing and have adequately pleaded a claim for relief under the applicable standard, the court denies the motion to dismiss as to all but count two.

## I. BACKGROUND

### A. Procedural History

On April 11, 2025, Plaintiffs Matthew Smith and Akila Radhakrishnan filed a complaint against Donald J. Trump, in his official capacity as U.S. President; the U.S. Secretary of State, Marco Rubio; the U.S. Department of Treasury and the U.S. Secretary of the Treasury, Scott Bessent; the U.S. Department of Justice (DOJ) and

the U.S. Attorney General, Todd Blanche[1]; and the Office of Foreign Assets Control (OFAC) and OFAC's Acting Director, Lisa M. Palluconi (collectively, the Government) asserting that Section 3(a) of Executive Order 14,203 violates the First Amendment and Executive Order 14,203 exceeds the President's authority under International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701-1707. *Compl. for Declaratory and Inj. Relief* (ECF No. 1). On July 22, 2025, Plaintiffs filed a first amended complaint, which is the operative pleading. *Am. Compl. for Decl. and Inj. Relief* (ECF No. 31) (*Compl.*).

On April 25, 2025, the Plaintiffs moved for preliminary injunction. *Pl.'s Mot. for Prelim. Inj.* (ECF No. 19). The Government responded on May 16, 2025, *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.* (ECF No. 23) (*Govt's Opp'n*), and the Plaintiffs filed a reply on May 30, 2025. *Pls.' Reply in Supp. of their Mot. for Prelim. Inj.* (ECF No. 26). On July 18, 2025, the Court[2] granted Plaintiffs' motion. *Order on Mot. for Prelim. Inj.* (ECF No. 30).

On September 4, 2025, the Government filed a motion to dismiss. *Defs.' Mot. to Dismiss* (ECF No. 34) (*Gov't's Mot.*). On September 25, 2025, the Plaintiffs replied. *Pls.' Opp'n to Defs.' Mot. to Dismiss* (ECF No. 36) (*Pls.' Opp'n*). On December 31,

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d)(1), Todd Blanche was automatically substituted for Pamela Bondi, the original defendant, when she left the office of U.S. Attorney General on April 2, 2026, and he became Acting Attorney General in her place. Attorney General Blanche was confirmed in that position on August 8, 2026 and sworn into office on August 10, 2026.

[2] United States District Judge Nancy Torresen issued the preliminary injunction order on July 18, 2025. *Order on Mot. for Prelim. Inj.* (ECF No. 30). On September 12, 2025, this case was randomly assigned to this Judge upon Judge Torresen's assuming inactive status.

2025, the Government filed their reply. *Defs.' Reply in Support of Defs.' Mot. to Dismiss* (ECF No. 43) (*Gov't's Reply*).

On May 20, 2026, Plaintiffs filed supplemental authority. *Pls.' Not. of Suppl. Authority* (ECF No. 44) (*Pls.' Not.*).

**B. Factual Record**[3]

**1. The Parties**

Plaintiff Matthew Smith, a Maine resident, is a co-founder and the chief executive officer of a nonprofit and non-governmental human rights organization. *Compl.* ¶¶ 13, 56. He has worked regularly with the International Criminal Court (ICC) since 2019, with a focus on the Office of the Prosecutor's (OTP) investigation and prosecution of atrocity crimes against the ethnic minority Rohingya people in the People's Republic of Bangladesh and the Republic of the Union of Myanmar. *Id.* ¶¶ 1, 45, 56–59. Plaintiff Akila Radhakrishnan, a New York resident, is an international human rights lawyer and an expert on issues of gender justice, women's rights, and criminal law. *Id.* ¶¶ 14, 62. She has worked with the OTP since 2014 with a focus on matters of sexual and gender-based violence, particularly in Afghanistan. *Id.* ¶¶ 62-63.

Plaintiffs name several agencies and officials of the United States government as defendants. *Id.* ¶¶ 15-23. Particularly of note, Plaintiffs name the OFAC, an office

[3] Consistent with the motion to dismiss standard, the Court relied on the complaint's well-pleaded facts. "[T]he court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)).

within the Department of the Treasury responsible for civil enforcement of IEEPA violations, as well as the DOJ, which is responsible for criminal enforcement of IEEPA violations. *Id.* ¶¶ 20-23.

### 2. The International Criminal Court

The ICC is a permanent international court based in the Hague authorized to investigate and prosecute atrocity crimes, including genocide, war crimes, and crimes against humanity, that are inadequately addressed by national criminal justice systems. *Id.* ¶¶ 27-28, 44. The ICC was established through a treaty known as the "Rome Statute," which has been ratified or acceded to by 125 countries. *Id.* ¶¶ 2, 26. The U.S. has signed, but not ratified the Rome Statute. *Id.* ¶ 26. Historically, the ICC has enjoyed bipartisan support in the United States. *Id.* ¶¶ 3, 44. In recent history, the United States has supported ICC investigatory work in the Democratic Republic of the Congo, Mali, and Venezuela, among other nations. *Id.* ¶ 44. The U.S. government has also, however, retained a longstanding policy of objection to ICC assertions of jurisdiction over U.S. personnel. *Gov't's Mot.* at 4.

The ICC operates through its internal OTP which is led by a head prosecutor (Prosecutor). *Compl.* ¶¶ 31-33. Article 42(2) of the Rome Statute gives the Prosecutor authority over OTP operations, while Article 54(1) gives the Prosecutor the power and duty to ensure effective investigation and prosecution of referred crimes. *Id.* ¶ 31. The Prosecutor may only initiate a formal investigation after determining that the relevant national authorities have failed to do so. *Id.* ¶ 36. Karim Khan has served in this role since 2021. *Id.* Mr. Khan oversees the preliminary examination,

formal investigation, prosecution, and enforcement of alleged crimes within the ICC's jurisdiction. *Id.* ¶ 33. At every stage of the investigative and adjudicative process, the OTP may obtain information and assistance from a range of state and non-state actors. *Id.* ¶¶ 40-42. These include state parties and nonparties, special advisors with relevant legal expertise appointed by the Prosecutor, international and regional organizations, and victims and their representatives. *Id.* Plaintiffs in the instant case are two of these actors.

### 3. The International Emergency Economic Powers Act

The International Emergency Economic Powers Act (IEEPA) is a federal statute that empowers the Executive to deal with any "unusual and extraordinary threat" to U.S. national security, foreign policy, or the economy by sanctioning designated foreign countries or nationals. *Id.* ¶ 65 (citing 50 U.S.C. § 1701(a)). These sanctions may only be imposed in response to the identified threat. *Id.* ¶ 66 (citing 50 U.S.C. § 1701(b)). When the Executive sanctions an individual under the IEEPA, they are added by OFAC to its list of Specially Designated Nationals and Locked Persons (SDN). *Id.* ¶¶ 5, 69.

IEEPA also imposes severe penalties for violating any restrictions the Executive imposes pursuant to its grant of power, including civil penalties equaling the greater of $377,700 or twice the value of the transaction giving rise to the violation, criminal fines up to $1,000,000, and imprisonment of up to twenty years. *Id.* ¶ 70 (citing 50 U.S.C. § 1705(b), (c)). OFAC is responsible for civil enforcement of sanctions, while the DOJ is responsible for criminal enforcement. *Id.* ¶¶ 71-72.

The President's authority under the IEEPA is broad but not unlimited. As relevant to this lawsuit, the IEEPA bars the President from regulating or prohibiting "the exportation . . . of any information or informational materials[.]" 50 U.S.C. § 1702(b)(3); *Id.* ¶ 74. This restriction, commonly known as the Berman Amendment, was added by Congress in 1988 and expanded in 1994. *Gov't's Mot.* at 3.

### 4. The President Issues EO 14,203 and Regulations

On February 6, 2025, invoking his authority under IEEPA, President Trump issued Executive Order 14,203, "Imposing Sanctions on the International Criminal Court" (Executive Order or EO). *Compl.* ¶¶ 1, 4; (citing 90 Fed. Reg. 9369 (Feb. 6, 2025)). The EO declares a national emergency with respect to "any effort by the ICC to investigate, arrest, detain, or prosecute" U.S. persons or persons of U.S. allies not party to the Rome Statute. *Id.* ¶ 4 (citing 90 Fed. Reg. 9370 (Feb 6, 2025)). The EO imposes sanctions on the ICC in response to the ICC's "illegitimate and baseless actions targeting America and [its] close ally Israel." *Gov't's Mot.* at 3-4 (citing 90 Fed. Reg. 9369 (Feb 6, 2025)). Emphasizing that neither the U.S. nor Israel is a party to the ICC's founding treaty, the EO claims that the ICC's conduct threatens to impede upon U.S. sovereignty and hinders "critical national security and foreign policy work" of the U.S., Israel, and other allies. *Id.* at 4-5 (citing 90 Fed. Reg. 9369 (Feb 6, 2025)).

The EO imposes sanctions on designated ICC officials, explicitly naming Karim Khan, the current head prosecutor of the OTP. *Compl.* ¶¶ 5-6, 78. These sanctions include freezing Mr. Khan's assets and barring entry into the United States. *Id.* ¶ 75.

The EO further authorizes the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to sanction other foreign persons. *Id.* ¶ 6. On June 5, 2025, the Secretary of State sanctioned four ICC judges, all of whom OFAC subsequently added to the SDN list. *Id.* One of the four judges sanctioned has, among her caseload, the ICC's work in Myanmar and Bangladesh. *Id.* ¶ 49.

Section 3(a) of the Executive Order also prohibits U.S. citizens and residents from "contribut[ing] or provi[ding]… funds, goods, or service by, to, or for the benefit of any person" sanctioned under the EO. *Id.* ¶ 79 (citing EO at 9370). The Government has previously issued guidance indicating that engagement with an institution in which an SDN is an official may run afoul of its prohibitions. *Id.* ¶ 80. On July 1, 2025, OFAC promulgated regulations implementing the EO and clarifying that "[a]ll transactions prohibited pursuant to [the EO] are prohibited pursuant to" the Regulations. 31 C.F.R. § 528.201(a). *Id.* ¶ 8. The regulations also note that the "prohibitions contained in this part do not apply to any transactions that are exempt pursuant to [the Berman Amendment]". *Gov't's Mot.* at 5.

Since the issuance of the EO, Mr. Smith and Ms. Radhakrishnan have halted their work with the ICC. *Compl.* ¶¶ 1, 9, 61, 64. Specifically, Mr. Smith has refrained from responding to the head of the OTP's Myanmar investigation's request to provide evidence of atrocities in Myanmar and from communicating with the OTP regarding their prosecution of a militia leader recently arrested in Bangladesh. Id. ¶ 61. Meanwhile, Ms. Radhakrishnan has abandoned existing plans to provide the OTP

with evidence of and information about sexual and gender-based crimes perpetrated by the Taliban in Afghanistan. *Id.* ¶ 64.

## II. THE PARTIES' POSITIONS

### A. The Government's Motion to Dismiss

The Government argues the Plaintiffs lack standing to sue because they fail to allege injury-in-fact and because their claims are not ripe, as the Plaintiffs have not demonstrated the Government would enforce the EO and Regulations against them for their specific activities. *Gov't's Mot.* at 8-14. The Government further argues the Plaintiffs have failed to state a claim for relief on the merits for three reasons. First, the Government contends the Plaintiffs have not plausibly alleged the Government censored their speech as the EO and Regulations exclude constitutionally protected speech, are not content-based restrictions on speech, and regardless satisfy both intermediate and strict scrutiny. *Id.* at 14-18. Second, the Government claims the Plaintiffs failed to establish the EO is ultra vires and violates IEEPA because the Plaintiffs have no entitlement to assert such a claim and because the EO is consistent with IEEPA. *Id.* at 18-19. Third, the Government argues that the Plaintiffs have failed to establish that the Regulations violate the APA. *Id.* 19-20.

### B. Matthew Smith and Akila Radhakrishnan's Opposition

In response, Plaintiffs argue that their abandonment of concrete plans to engage in courses of conduct proscribed by the EO is sufficient to establish standing. *Pls.' Opp'n* at 7-8. They further allege that the threat of enforcement is credible and argue that absolute certainty of enforcement is not required to establish standing. *Id.* at 12-13. Mr. Smith and Ms. Radhakrishnan similarly argue that their claims are

ripe because they have established a reasonable fear of enforcement based on the Government's past course of conduct. *Id.* at 11-12. The Plaintiffs maintain that the EO regulates speech based on its content and thus warrants strict scrutiny review but also argue that the EO fails even intermediate scrutiny, as it burdens an "extraordinary range of constitutionally protected speech" outside of the conduct it purportedly seeks to address. *Id.* at 13-18. Plaintiffs also, in response to the Government's argument, voluntarily withdraw their claim that the EO was *ultra vires*. Finally, Plaintiffs maintain that the Amended Complaint states a claim for relief under the APA, and that the EO exceeds the authority granted to the executive under the IEEPA given its clear conflict with the Berman Amendment. *Id.* at 18-20.

### C. The Government's Reply

In reply, the Government characterizes the Plaintiffs' fear of enforcement of the Executive Order as resting on "lengthy hypotheticals" and as too speculative to establish standing. *Gov't's Reply* at 1. The Government further reiterates that the claims are not ripe and question the Plaintiffs' certainty that their activities are in fact proscribed by the Executive Order and its accompanying regulations. *Id.* at 5-6. Finally, the Government contests Plaintiffs' read of the EO as in conflict with the Berman Amendments, arguing instead that the two are meant to be read co-extensively. *Id.* at 6-7.

## III. LEGAL STANDARDS

### A. Motion to Dismiss: Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows the filing of a motion to dismiss for "lack of subject-matter jurisdiction." FED. R. CIV. P. 12(b)(1); *see e.g.*, *Am. Fiber &*

*Finishing, Inc. v. Tyco Healthcare Grp., LP*, 362 F.3d 136, 138 (1st Cir. 2004). Rule 12(b)(1) is "the proper vehicle for addressing a variety of jurisdictional questions." *DeCotiis v. Whittemore*, 842 F. Supp. 2d 354, 360 (D. Me. 2012) (citing *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 362-63 (1st Cir. 2001) ("[Rule 12(b)(1)] is a large umbrella, overspreading a variety of different types of challenges"). The burden falls on the party invoking jurisdiction "clearly to allege facts demonstrating that he is a proper party to invoke federal jurisdiction." *Marcello v. Maine*, 464 F. Supp. 2d 38, 41 (D. Me. 2006) (citing *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1281 (1st Cir. 1996)). Furthermore, the Court may consider extrinsic materials when ruling on a motion to dismiss under Rule 12(b)(1). *Id.* (citing *Aversa v. United States*, 99 F.3d 1200, 1209-10 (1st Cir. 1996) ("In ruling on a motion to dismiss for lack of subject matter jurisdiction . . . the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff . . . . In addition, the court may consider whatever evidence has been submitted . . .").

**B. Motion to Dismiss: Rule 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To state a claim, a complaint must contain, at minimum, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is

facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

Plausible means "'something more than merely possible' or 'merely consistent with a defendant's liability.'" *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (first quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012); and then quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)). Evaluating the plausibility of a claim is a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

This is a "two-step analysis." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán*, 734 F.3d at 103 (quoting *Morales-Cruz*, 676 F.3d at 224); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements"). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)).

## IV. DISCUSSION

Preliminarily, the Court cautions that the issues in this motion to dismiss do not deal with the merits of the EO. The relationship between the ICC and the U.S.

Government is complex, and proper U.S. policy toward the ICC is substantially beyond this Court's expertise and authority. Instead, the Court addresses technical issues within its judicial ambit, first whether the Plaintiffs have made sufficient allegations to invoke federal jurisdiction, and then whether the Plaintiffs' claims withstand dismissal at an early stage.

### A. Subject Matter Jurisdiction: Rule 12(b)(1)

When a defendant raises a problem of subject matter jurisdiction, "the court must resolve the jurisdictional issue before proceeding to the merits of the plaintiff's claim." *Gov't's Mot.* at 7 (citing *Sinochem Int'l Co. v. Malay Int'l Shipping Corp.,* 549 U.S. 422, 430-31 (2007)). Article III of the Constitution limits federal court jurisdiction to "actual cases and controversies," *id.* at 8 (citing *Equal Means Equal* v. *Ferriero*, 3 F. 4th 24, 27 (1st Cir. 2021), which exist only when the plaintiff has alleged a sufficiently "personal stake in the outcome." *Baker v Carr,* 369 U.S. 186, 204 (1962). In practice, the party invoking a court's federal jurisdiction must establish: 1) An injury in fact that is concrete and particularized and actual or imminent; 2) A causal connection between the injury and the conduct complained of; and 3) A likelihood that the court could redress the injury with a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Here, the Government contests the first prong, arguing that Plaintiffs have not demonstrated an injury in fact because their claimed injuries are general rather than particularized, and merely conjectural rather than actual or imminent. *Gov't's Mot* at 8-12 ("[b]ased upon the facts alleged in Plaintiffs' Amended Complaint, it is entirely speculative that the Government would bring an enforcement action against them").

A party does not need to actually expose itself to an enforcement penalty to have suffered an injury for the purposes of standing under Article III. *Steffel v. Thompson*, 415 U.S. 452, 456, 459 (1974) (determining that the plaintiff, who wanted to distribute handbills but had withheld from doing so "because of his concern that he… would be arrested for violation of § 26-1503", had alleged "threats of prosecution" sufficient to establish standing without first exposing "himself to actual arrest or prosecution"). However, when the claimed injury is a threat of a future injury, the movant must show either that the injury is certainly impending or that there is a substantial risk that the harm will in fact occur. *Susan B. Anthony list v. Driehaus,* 573 U.S. 149, 158 (2014). In other words, Plaintiffs must demonstrate that they have an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder." *Babbit v. United Workers Nat'l Union,* 442 U.S. 289, 298 (1979). The Court considers each of these elements in turn.

**1. Plaintiffs' Course of Conduct is Constitutionally Protected**

The Government argues that Plaintiffs in their Amended Complaint have failed to allege with sufficient specificity any planned activities implicating constitutional rights. *Gov't's Mot.* at 9. The court disagrees. The Plaintiffs describe with a high degree of specificity the conduct they have stopped in the wake of the EO's issuance. *Compl.* ¶¶ 1, 9, 61, 64. Mr. Smith has alleged that he has stopped responding to requests from the head of the OTP's Myanmar investigation and further abandoned plans to organize a delegation from Myanmar to the OTP. *Id.*

¶ 61. Ms. Radhakrishnan has ceased work with Afghan partners to provide the OTP with evidence of sexual and gender-based crimes in Afghanistan. Id. ¶ 64. Each of these activities operationalizes speech on matters of public concern and thus is centrally affected with a constitutional interest. *See, e.g., Snyder v. Phelps,* 562 U.S. 443, 453, 458 (2011) ("Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community" and concluding that "that speech is entitled to special protection under the First Amendment") (internal quotations omitted); *Almog Meir Jan v. People Media Project,* No. 3:24-cv-05553-TMC, 2025 U.S. Dist. LEXIS 18021, at *31 (W.D. Wash. Jan. 31, 2025) ("speech on matters of public concern is at the heart of First Amendment protections because the First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open") (internal quotations omitted); *Boelter v. Hearst Commc'ns., Inc.,* 192 F. Supp. 3d 427, 444 (S.D.N.Y. 2016) (noting that "speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection, whereas speech on matters of purely private concern is of less First Amendment concern").

These injuries are a far cry from *Lujan,* where the court declined to find that the plaintiffs had standing because their stated intentions were too vague to establish an injury unique to them or one tied up with a constitutional interest. *Lujan v. Defenders of Wildlife* 504 U.S. 555, 561-62, 564 (noting that "standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone

action) at issue," and holding that here, there was no showing as to how the claimed "damage to the species will produce 'imminent' injury to [the plaintiffs]") (internal quotations omitted). The conduct Plaintiffs in the instant case allege an intention to engage in is, by contrast, unique to them, affected with a constitutional interest and a concrete continuation of substantial ongoing work with the OTP.

### 2. Plaintiffs' Course of Conduct is Reasonably Construed as Proscribed by the Executive Order

The Government also argues that the conduct that Plaintiffs seek to engage with is not clearly proscribed by the EO in question. *Gov't's Mot* at 9-10. This argument rests on sharply differing reads of the EO against the statutory backdrop in which it operates.

Plaintiffs argue that their activities are prohibited by the EO because the order speaks in broad terms, prohibiting "advocates, experts, and others from providing investigatory, legal, or other services to any OTP personnel – including services that take the form of information and informational materials – because such services are for the benefit of the designated Prosecutor, even if they only 'indirectly' involve him." *Compl.* ¶ 81. Plaintiffs further note that the authority granted to the President under IEEPA is limited by the Berman Amendment, which expressly excludes the power to "regulate or prohibit, directly or indirectly, the import or export of any information or informational materials." *Id.* ¶ 90 (citing 50 U.S.C. § 1702(b)(3)) (internal quotations omitted). They argue that the EO is squarely in conflict with this restriction, and thus its issuance exceeded the Executive's power. *Id.* ¶¶ 90, 93.

The Defendants read the regulatory structure differently. They argue that the broad language of the EO should be read co-extensively with the Berman Amendment, as evidenced by Section 12(b) of the EO which states that it "shall be implemented consistent with applicable law." *Gov't's Mot.* at 14 (quoting Executive Order No. 14,203). This read, they argue, is reinforced by the implementing Regulations at 31 C.F.R. § 528.205(a), which state that "the prohibitions… do not apply to any transactions that are exempt pursuant to [The Berman Amendment]". *Id.* Because activities "subject to constitutional protection will not result in enforcement," the Government argues that Plaintiffs have not sufficiently alleged that their speech would be restricted in violation of the Constitution. *Id.* at 15.

The Plaintiffs argue in response that that OFAC has historically interpreted the Berman Amendment narrowly, maintaining that "informational materials" encompass only those "widely circulated in a standardized format," rather than individualized communications of the sort Plaintiffs seek to protect. *Pls.' Opp'n* at 9-10. This, the Plaintiffs further allege, is at odds with congressional intent in enacting the Amendment to give it a "broad scope," recognizing that the transfer of information provides a way for Americans to "encourage democracy and human right abroad." *Id.* at 19 (citing to H.R. Rep. No. 103-482, at 238-39 (1994) (Conf. Rep.)). In support of this contention, Plaintiffs point to parallel lawsuit *Rona v. Trump*, wherein the defendants maintained that the Berman Amendments had a narrow scope as applied to this same EO. *Id.* at 10 (citing 797 F. Supp. 3d 278, 290 (S.D.N.Y. 2025) ("the Government also expressly adopts the position that it took in the litigation before

Judge Failla: that [plaintiffs'] desired speech activity is not covered by the informational materials exception. . . because, according to the Government, IEEPA's exception applies only to informational materials that are widely circulated in a standardized format and not to those that are bespoke") (internal quotations omitted)). Moreover, Plaintiffs argue that applying this narrow interpretation would place their proposed conduct outside the Berman Amendment's protection and thereby expose them to potential penalties. *Id.* at 10.

At a later stage of litigation, the Government may submit evidence to demonstrate that their claimed interpretation of the relevant regulatory framework is correct. However, at this stage, the Court's task is to treat the non-movant's well-pleaded factual allegations as true, and to "indulge all reasonable inferences in favor of the plaintiff." *Aversa,* 99 F.3d at 1209-10. If the EO is not read as coextensive with the Berman Amendment, then its broad prohibition on the provision of services likely encompasses conduct that Congress withheld from the President's regulatory authority under IEEPA. Moreover, even if the Berman Amendment is read into the EO, if the exclusion is interpreted as narrowly as the Plaintiffs claim and the Government has asserted in *Rona v. Trump* litigation involving this same EO, 797 F Supp at 290, then the EO still restricts constitutionally protected speech falling outside the Berman Amendment's purview, warranting further review by the Court.

**3. Plaintiffs' Perceived Threat of Prosecution is Credible**

The Government also argues that the Plaintiffs' claimed threat of prosecution is not credible, and that the Plaintiffs, by "voluntarily refraining" from their planned

activities, are inflicting their asserted injury upon themselves to manufacture standing. *Gov't's Mot.* at 9. This argument pinpoints the crux of the inquiry for standing claims resting on future harms: when is an injury that is foreseeable but not yet actual sufficiently "imminent" to establish standing for the purposes of Article III?

Cases parsing the standing requirements are instructive. In *Clapper v. Amnesty Int'l U.S.A,* individual and organizational actors alleged that 50 U.S.C. § 1881(a) unconstitutionally authorized the government to intercept their communications with foreign entities who were likely to be targeted under the act's purview. 568 U.S. 398, 401 (2013). A sharply divided Supreme Court ultimately concluded, 5-4, that the plaintiffs had failed to establish that they had standing because they had not demonstrated with sufficient certainty that the entities they sought to communicate with would even be subject to § 1881(a), much less whether their communication with those entities would then be subject to penalty under the act. *Clapper,* 568 U.S. at 400-02, 414 ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"). This "highly attenuated" chain of possibilities, the court ruled, did not rise to the level of "certainly impending" required to establish Article III standing. *Id.* at 410 ("respondents' argument rests on their highly speculative fear that: (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate. . . (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will

be parties to the particular communications that the Government intercepts"). Consequently, the precautionary measures the plaintiffs took were also deemed insufficient to establish present injury. *Id.* at 416 ("Allowing respondents to bring this action based on costs they incurred in response to a speculative threat would be tantamount to accepting a repackaged version of respondents' first failed theory of standing").

By contrast, the Supreme Court found standing in *Monsanto Company v. Geertson Seed Farms,* 561 U.S. 139 (2010), a case concerning the deregulation of genetically engineered alfalfa, where there was no uncertainty as to who the regulation would affect, but merely whether the plaintiffs' protective actions would ultimately be necessary in each individual case or merely precautionary. *Id.* at 153-55 (finding that "farmers had established a reasonable probability that their organic and conventional alfalfa crops will be infected. . . if RRA were completely deregulated" constituting injury in ways "sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis") (internal quotations omitted). The Supreme Court concluded that the alfalfa farmers' precautionary measures, including the additional testing they claimed was necessary to detect unwanted contamination of their crops in the wake of genetic engineering deregulation, were sufficient to establish standing because it was clear that they were the relevant affected party pursuant to the government action. *Id* at 154-155 ("such harms, which respondents will suffer even if their crops are not actually infected with the Roundup ready gene, are sufficiently concrete").

In the instant case, the Plaintiffs have plausibly alleged that their intended course of conduct falls within the EO's prohibitions. The EO names Mr. Khan in particular as a sanctioned person and prohibits all U.S. persons from providing "services… to, or for the benefit of," Mr. Khan. *Compl.* ¶¶ 5-7. The Government has previously issued guidance instructing U.S. persons to be careful in dealing with institutions where a sanctioned person is an official, warning them "to ensure they are not engaged in transactions or dealings directly or indirectly, with an SDN. . . absent authorization from OFAC." *Id.* ¶ 80. Plaintiffs' proposed work with the OTP is thus squarely within the purview of the EO's restrictions.

The Government argues that the instant case is instead akin to *Reddy v. Foster,* 845 F.3d 493 (1st Cir. 2017), which concerned a pre-enforcement challenge of a statute allowing reproductive healthcare facilities to demarcate zones surrounding their facilities that were closed to the public. *Id.* at 495. At the time plaintiffs brought their claims, no facility had established a buffer zone pursuant to the statute, and the First Circuit noted that plaintiffs had "not alleged that the act has meaningfully altered their expressive activities." *Reddy,* 845 F.3d at 496. The *Reddy* Court emphasized that a precondition to enforcement independent of plaintiffs' own actions had not been satisfied, and thus the plaintiffs could not yet claim a coordinate chilling of their expressive activities. *Id.* at 502 ("these alleged injuries are all conditioned on the demarcation of a zone, and the declarations allege no concrete or imminent threat of a clinic choosing to demarcate a zone. So the threat remains hypothetical") (internal quotations omitted). The First Circuit also noted that the Government had

"affirmatively disavowed prosecution under the Act[,]" determining this undermined any claims of imminent enforcement. *Id.*

Taken together, these cases indicate that when establishing standing turns on whether a future injury is sufficiently imminent, what matters is the number of links in the causal chain and the source of any uncertainties. Where concretizing the injury rests on independent action by non-parties, courts find the injury too conjectural to establish standing. Where, by contrast, the only uncertainty lies in the actual likelihood of government enforcement against activity that clearly subjects plaintiffs to penalties, a pre-enforcement challenge can stand.

This EO does not require further action by an independent body as a precondition to imposing severe civil and criminal penalties on Plaintiffs. While the Government argues that OFAC and the DOJ "ha[ve] made no indication that Plaintiff's past or intended activities would trigger civil or criminal penalties," they also volunteer no affirmative disavowal of their right to impose either. *Gov't's Mot.* at 12. Moreover, the possibility that an enforcing body might, in its discretion, forgo prosecution of a constitutionally protected action that is clearly violative of the relevant statute does not defeat the claim that Plaintiffs' precautionary measures withholding performance of that action establish a legal injury under Article III. Plaintiffs have "sufficiently demonstrated a genuine threat of imminent prosecution" and that the statute has "the potential to chill plaintiffs' protected expression." *Holder v. Humanitarian Law Project* 561 U.S. 1, 12 (2010) (internal quotations omitted). In deciding that plaintiffs had established standing in *Holder*, the Supreme

Court made much of the fact that the government had "not argued… that plaintiffs will not be prosecuted if they do what they say they wish to do." *Id* at 17. Plaintiffs in the instant case allege that the Government "frequently" imposes penalties for violations of IEEPA sanctions, *Compl.* ¶¶ 71-72, and the Court notes that Defendants have not disavowed any intent to do so here but merely argued that Plaintiffs have failed to inquire of OFAC whether their conduct is in fact prohibited. *Gov't's Mot.* at 13.

Taken together, Plaintiffs have demonstrated an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder." *Babbit,* 442 U.S. at 298. Consequently, the Court concludes that Plaintiffs have demonstrated a concrete injury that is actual or imminent sufficient to establish standing under Article III.

**4. Plaintiff's Claim is Ripe**

The "basic rationale [of ripeness] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbot Labs v. Gardner,* 387 U.S. 136, 148-49 (1967). The relevant inquiry is twofold: is the issue fit for judicial resolution or might future developments more sharply frame the dispute for the court, and what is the hardship

to the parties were the court to deem the case not yet ripe? *Abbot Labs,* 387 U.S. at 149.

The Government notes that, in many cases, deciding whether a case is ripe for adjudication is functionally collapsed into determining whether the plaintiff has alleged a sufficiently concrete injury in fact. *Gov't's Mot.* at 13 (citing *Thomas v. Anchorage Equal Rts. Comm'n,* 220 F.3d 1134, 1138-39 (9th Cir. 2000)). Given the Government's stance that Plaintiffs have failed to allege an injury in fact, their position that the claims are not ripe naturally follows. The Government additionally argues that Plaintiffs' claims are not ripe because they have failed to take a variety of actions to clarify the permissibility of their proposed actions under the EO. *Id.* at 13-14. Particularly of note, the Government alleges that Plaintiffs have neglected to engage with OFAC to determine whether the EO would be enforced against them or to apply for a license authorizing their activity. *Id.* These, the Government argues, would clarify the contours of the instant dispute without risking exposure to possible enforcement action. *Id.*

Plaintiffs argue that recommending they seek a license defeats the very purpose of their underlying claim: their speech is constitutionally protected and should not be subject to restriction in the first place. *Pls.' Opp'n* at 13; *Pls.' Not.* at 1-2 (noting recent persuasive authority finding the "existence of a licensing scheme in the first place" infringed upon the plaintiff's constitutionally protected interests. *L.C. v. Trump,* No. 1:26-cv-00688-RJL, 2026 U.S. Dist. LEXIS 106000, at *5-6 (D.D.C. May 13, 2026)). They also argue that ripeness requirements are relaxed when applied to

First Amendment claims due to concerns about chilling effects on speech even before punitive action is taken. *Sindicato Puertorriqueño de Trabajadores v. Fortuño,* 699 F.3d 1, 9 (1st Cir. 2012) ("'A facial challenge of this sort, implicating First Amendment values, customarily works a relaxation of the ripeness criteria'… justified by the potential for irretrievable loss often involved in cases where First Amendment rights are at stake.") (quoting *El Dia, Inc. V. Hernandez Colon,* 963 F.2d 488, 495-96 (1st Cir. 1992). This bar, Plaintiffs assert they "easily clear," as their activity is clearly affected with a constitutional interest and clearly unrelated to the primary aim of the Government regulation, yet still subject to harsh penalties. *Pls.' Opp'n* at 12-13.

The crux of the parties' disagreement regarding the ripeness of Plaintiffs' claims turns on their differing characterizations of the Plaintiffs' asserted injury, or lack thereof. The Court has already determined that Plaintiffs' claimed injury is sufficiently concrete and particularized to establish Article III standing. *See supra* Section IV(A). Plaintiffs have plausibly alleged that the EO is best read as broadly barring *all* communicative conduct with the OTP. *Pls.' Opp'n* at 12-13. This is sufficient to ground a "reasonable fear of enforcement," which renders the claim ripe for adjudication. *Sullivan v. City of Augusta*, 511 F.3d 16, 31 (1st Cir. 2007). This is not a case where further factual developments would more sharply frame the dispute. *Cf. Reddy*, 845 F.3d, at 505 (noting that "until the claim ripens, and more facts come to light, we cannot perform the requisite claim-specific…. analysis") (internal quotations omitted). Moreover, the Plaintiffs' claimed injury, their inability to continue providing ongoing speech-based services to the OTP, would persist if the

Court declined to adjudicate their claims. The Court consequently concludes that the claim is sufficiently ripe for adjudication at this time.

### B. Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

The Government also argues that the Plaintiffs have failed to allege sufficient facts to state a cause of action, warranting a dismissal under Rule 12(b)(6).

#### 1. Count 1: First Amendment Constitutional Violation

The First Amendment limits the government's ability to act in ways that infringe upon the freedom of speech. *McCoy v. Town of Pittsfield, N.H.,* 59 F.4th 497, 505 (1st Cir. 2023); U.S. Const. amend. I. When the government restricts protected speech, the constitutionality of the restriction depends on the nature of the speech restricted. Restrictions on speech that are "content neutral" - where the speech restriction makes no reference to the content of the speech to be restricted - warrant intermediate scrutiny review. *Rideout v. Gardner,* 838 F.3d 65, 71-72 (1st Cir. 2016) ("These laws do not apply to speech based on or because of the content of what has been said, but instead serve purposes unrelated to the content of expression") (internal quotation omitted). Intermediate scrutiny requires that the law be "narrowly tailored to serve a significant governmental interest." *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). Content-based restrictions, by contrast, regulate speech based on its communicative content, or in other words, what has been said. Content-based restrictions warrant strict scrutiny review, wherein a regulation survives only if it "furthers a compelling interest and is narrowly tailored to achieve that interest." *Gov't's Mot.* at 16, *Reed,* 576 U.S. at 171.

The parties diverge as to what level of scrutiny is applicable to the EO's restrictions on speech. Plaintiffs argue that the EO constitutes content-based restrictions on speech and demands strict scrutiny review. *Pls.' Opp'n* at 13-15. Defendants argue that any restriction on speech is merely incidental to the regulation of nonspeech conduct and therefore the EO instead warrants intermediate scrutiny review. *Gov't's Mot.* at 15-16. *Ward* advises that the "principal inquiry in determining content neutrality. . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward,* 491 U.S. at 791. The Government claims that the EO "reflects the President's determination the ICC infringes upon the sovereignty of the United States and undermines the critical national security and foreign policy work of the United States and its allies, thereby threatening the United States' national security and foreign policy interests." *Gov't's Mot.* at 4. On the allegations before the Court, this stated purpose plausibly supports the Plaintiffs' contention that the EO restricts speech when that speech assists the ICC in performing its principal functions, or, based on what it says.

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), provides a useful analogue. There, the government argued that a prohibition on providing "material support" to designated foreign terrorist organizations primarily regulated conduct and therefore warranted only intermediate scrutiny review. *Holder,* 561 U.S. at 26–27. The Supreme Court rejected that characterization as applied to the plaintiffs' proposed speech because "the conduct triggering coverage under the statute consists

of communicating a message," finding that this constituted a content-based regulation of speech. *Id.* at 27-28 (Plaintiffs want to speak… and whether they may do so under § 2339B depends on what they say"). Thus, the fact that a prohibition is framed in terms of providing services or assistance does not, standing alone, render its application to communicative activity merely incidental to its regulation of conduct.

Plaintiffs argue that the EO clearly fails strict scrutiny. *Pls.' Opp'n* at 15-17. Plaintiffs also argue in the alternative that the EO fails even intermediate scrutiny, noting that the services they seek to provide the OTP with are "wholly unrelated to the 'national emergency' declared in the EO. *Id.* at 16-18. At this stage, it is not necessary to decide whether the EO warrants intermediate scrutiny or strict scrutiny review. It is also unnecessary to decide at this stage whether the Government's proffered justification for the restriction is compelling or merely important. Accepting the facts alleged as true in Plaintiffs' complaint for the purpose of evaluating a motion to dismiss, the Court finds it plausible, as it did upon granting Plaintiffs' motion for a preliminary injunction, that the restriction burdens substantially more speech than is necessary to achieve its purported goal. *Order on Mot. for Prelim. Inj.* (ECF No. 30) at 10. This is enough to conclude that there is a strong likelihood the EO violated Plaintiffs' First Amendment rights sufficient to survive a motion to dismiss on this claim. Consequently, Defendants' motion to dismiss Count 1 of Plaintiffs' claims is DENIED.

**2. Count Two: Ultra Vires**

The Government requests that Plaintiffs' claim that the government action is *ultra vires* be dismissed. *Gov't's Mot.* at 18-19. In response, Plaintiffs voluntarily withdraw their *ultra vires* claim and request its dismissal without prejudice. *Pls.' Opp'n* at 7 n.7. The motion to dismiss Count II, *ultra vires* claim, is thus GRANTED.

**3. Count Three: THE APA**

A claim for relief has been stated under the APA when petitioners sufficiently allege that agency action is "not in accordance with law," "contrary to [a constitutional right," or "in excess of statutory jurisdiction, authority, or limitations." *Id.* at 18 (citing 5 U.S.C. § 706(2)(A)-(C)). Plaintiffs argue they have alleged all three. *Id.* The Government notes that evaluation of whether a regulation is contrary to constitutional right requires an independent assessment by the reviewing court without deference to the agency's pronouncement, though they maintain that the EO survives review at any tier of scrutiny. *Gov't's Mot.* at 20.

At this stage of the proceeding, for the reasons discussed above, the Plaintiffs have plausibly alleged that the challenged action violates their First Amendment rights. *See supra* Section IV.B.1. Those allegations ground the claim that the challenged agency action is "contrary to [a] constitutional right" sufficient to survive a 12(b)(6) motion to dismiss. 5 U.S.C. § 706(2)(B). Moreover, drawing all reasonable inference in Plaintiffs' favor, they have set out that a reasonable interpretation of the EO is that it is incompatible with IEEPA's governing legislation. *See supra* Section IV(A)(2). This makes it plausible that the agency action in question was in "excess of statutory authority or limitations." *Id.* § 706(2)(C). Accordingly, the Court need not separately determine at this stage whether the Plaintiffs have also stated a claim

under § 706(2)(A). For these reasons, the motion to dismiss Plaintiffs' APA claim is DENIED.

## V. CONCLUSION

The Court GRANTS in part and DENIES in part the Defendants' Motion to Dismiss (ECF No. 34). The Court DISMISSES Count Two and DENIES the motion as to Counts One and Three.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 28th day of September, 2026